UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,   :
  :
           Applicant,   :
-against-   :
  :
COMMITTEE ON WAYS AND MEANS   :   Case No. 14 Misc 00193 (PG 6)
OF THE U.S. HOUSE OF REPRESENTATIVES   :   ECF CASE
and BRIAN SUTTER,   :
  :
           Respondents.   :
-------------------------------------------------------------------x

### DECLARATION OF AMANDA L. STRAUB IN SUPPORT OF SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER TO SHOW CAUSE AND FOR AN ORDER REQUIRING COMPLIANCE WITH SUBPOENAS

I, Amanda L. Straub, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1. I am employed as an attorney in the Enforcement Division in the New York Regional Office of Applicant Securities and Exchange Commission ("Commission"). I am a member of the bar of this Court.

2. I submit this Declaration in support of the Commission's Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas directing the Committee on Ways and Means of the U.S. House of Representatives (the "Committee") and Brian Sutter ("Sutter") (collectively, "Respondents") to comply with investigative subpoenas served on them in the Commission's non-public investigation titled *In the Matter of Humana Inc.* (Internal File No. NY-8910) (the "Humana Investigation"). I also submit this Declaration pursuant to Local Civil Rule 6.1(d) to show that good and sufficient reasons exist for bringing this matter before the Court by an application and order to show cause rather than by notice of motion.

3. The Commission's Humana Investigation concerns whether any persons or entities have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule

10b-5 promulgated thereunder, by employing devices, schemes, or artifices to defraud; obtaining money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were or are made, not misleading; or engaging in transactions, acts, practices or courses of business which operated, operate, or would operate as a fraud or deceit upon any person; by, among other things, trading in the securities of Humana or other issuers on the basis of material nonpublic information, or disclosing to others material nonpublic information regarding Humana or other issuers, in breach of a fiduciary or other duty arising out of a relationship of trust and confidence.

4. I have been the primary attorney working on the Commission's Humana Investigation since April 2013, during which time I have reviewed numerous documents produced by multiple sources and interviewed a number of witnesses. I make this Declaration based on personal knowledge, including my own review of documents and other information the Commission staff obtained during its Humana Investigation.

I. **RESPONDENTS**

5. The Committee on Ways and Means is a committee of the U.S. House of Representatives. According to the Committee's website, its jurisdiction includes Medicare.

6. During the events at issue in the Humana Investigation, Sutter was on the Professional Staff to the Committee's Health Subcommittee. On April 22, 2013, Sutter was appointed the Staff Director of the Subcommittee, according to a press release by the office of Representative Dave Camp.

## II. THE COMMISSION'S INVESTIGATION

7. On April 9, 2013, the Commission issued an Order Directing Private Investigation and Designating Officers to Take Testimony (the "Formal Order") pursuant to Section 21(a) of the Exchange Act, 15 U.S.C. § 78u(a).[1]

8. Pursuant to Section 21(b) of the Exchange Act, 15 U.S.C. § 78u(b), the Formal Order designates certain individuals in the Commission's New York Regional Office, including me, as officers of the Commission empowered to issue subpoenas and take evidence, among other things, in the Humana Investigation.

9. The Humana Investigation concerns the final 2014 Medicare Advantage rate announcement by the U.S. Centers for Medicare and Medicaid Services (CMS) on April 1, 2013 at approximately 4:15 p.m. (the "Rate Announcement"), a copy of which the staff obtained from CMS's public website, attached hereto (without voluminous attachments) as Exhibit A.

10. The rates in the final Rate Announcement were more favorable to healthcare insurers than the preliminary rates that had been announced by CMS on February 15, 2013 (the "Advance Notice"). According to the Advance Notice, certain payments from Medicare Advantage to insurers would have declined by 2.3% from the prior year. According to the rates released in the final Rate Announcement on April 1, those payments, in contrast, were set to increase by 3.5% from the prior year.

11. CMS effected this change through a significant alteration to its methodology: CMS now incorporated into its Rate Announcement the assumption that Congress would eventually act to prevent the scheduled reduction in Medicare physician payment rates from occurring, thereby preventing the full reduction required under the "sustainable growth rate" ("SGR")

---

[1] Commission formal orders are not public. The Commission has not included a copy of the Formal Order with this Application and respectfully requests that, if the Court wishes to review the Formal Order, the Court conduct an *in camera* review.

3

formula, as it had done in preceding years. Previously, CMS had not assumed this override would occur.  Rate Announcement (Exhibit A hereto), at 1.

12. On 3:11 p.m. on April 1, just over an hour before the release of the Rate Announcement by CMS, a lobbyist at Greenberg Traurig, LLP (the "GT Lobbyist") sent an email to an analyst at Height Securities, LLC (the "Height Analyst") stating in relevant part the following:

> Our intel is that a deal was already hatched by [Sen.] Hatch to smooth the way for Tavenner as long as they address the MA rates in the final notice. We have heard from very credible sources that the final notice will adjust the phase in on risk adjustment and take into account the likelihood/certainty of an SGR fix.

13. At 3:40 p.m., approximately 30 minutes after the GT Lobbyist sent his email to the Height Analyst, and 20 minutes before the close of trading on that date, the Height Analyst and/or his colleagues distributed by email and insant messaging a "flash report" to nearly 200 clients, including a number of prominent investment funds, that stated the following in relevant part:

> 1. We now believe that a deal has been hatched to protect Medicare Advantage rates from the -2.3% rate update issued in the advanced notice mid-February
> 2. We believe that the SGR will be assumed in the trends going forward resulting in roughly a 4% increase in cost trends
> 3. This is a drastic change in historical policy aimed to smooth the confirmation of Marylyn Tavernier [sic]
> 4. We are supportive of MA related stocks (HUM, HNT) under this circumstance[.]

14. Within 5 minutes of the release of the flash report by the Height Analyst, trading volume and prices of stocks of certain health insurers rose precipitously.  For example, the price of Humana stock rose from $70.40 at 3:40 p.m. to $75.46 at 3:52 p.m., an increase of approximately 7%, as shown in the Bloomberg chart the staff obtained during its investigation, and which is attached hereto as Exhibit B.

4

15. Based on documents and information obtained by the Commission staff during the Humana Investigation, Sutter, and Sutter's work files at the Committee, may have documents and information highly relevant to the Humana Investigation.

16. Information obtained by the Commission staff indicates that Sutter spoke several times in March 2013 to a colleague of the GT Lobbyist.

17. Emails in the possession of Commission staff indicate that Sutter also communicated with at least two individuals at CMS in the week before the Rate Announcement.

18. On April 1, 2013 at 11:07 a.m., Sutter emailed the GT Lobbyist about the termination of one of the lobbyist's clients from the Medicare Advantage program. The GT Lobbyist asked if he could call Sutter, and the two discussed times to speak.

19. According to the GT Lobbyist, Sutter and the GT Lobbyist spoke by telephone at approximately 3 p.m. on April 1. This was approximately ten minutes before the GT Lobbyist sent his email to the Height Analyst.

20. The GT Lobbyist has acknowledged that he and Sutter discussed the Rate Announcement by CMS on their April 1 telephone call.

21. An agent of the Federal Bureau of Investigation and an investigator from the Office of the Inspector General at the U.S. Department of Health and Human Services ("HHS OIG") interviewed Sutter about his communications with the GT Lobbyist, among other topics, several weeks after the Rate Announcement. Mr. Sutter said he did not recall speaking to the GT Lobbyist about the Rate Announcement. No Commission staff were present at the interview.

22. Several days after this interview, Deputy Counsel of the U.S. House of Representatives, William Pittard ("House Counsel") sent the FBI and HHS OIG a letter (which he later provided to the Commission staff) that stated (in relevant part):

> I understand that you may have asked Mr. Sutter whether he ever had used his mobile telephone to speak with [the GT Lobbyist]. Mr. Sutter may have answered that he could not recall doing so, which would have been a correct statement of Mr. Sutter's memory at the time. With the benefit of some time for reflection, Mr. Sutter's best recollection now is that he previously may have used his mobile telephone to speak with [the GT Lobbyist], although he is not certain. It is also possible that Mr. Sutter may have made other statements in the course of his interrogation that, while an accurate reflection of his memory at the time, might merit clarification if, for example, Mr. Sutter were to review records that could refresh his memory.

23. To my knowledge, Sutter has never met with the FBI, HHS OIG, or any federal agency to clarify his earlier statements.

24. The Commission staff also has additional information indicating that Sutter may have been a source of the information in the GT Lobbyist's email to the Height Analyst. Under the terms of a confidentiality agreement, the Commission is not at liberty to specify this additional information at this time.

25. Sutter has never met with or been interviewed by the Commission staff.

### III. THE INVESTIGATIVE SUBPOENAS

26. On January 31, 2014, I contacted House Counsel, and requested a voluntary production of documents from Sutter's files and an interview with Sutter. From that date through April 25, 2014, I exchanged a number of letters and participated in several telephone calls with House Counsel to follow up on my initial request. These efforts were not successful in obtaining the production of documents, or an interview with Sutter, from House Counsel, on a voluntary basis.

27. On May 6, 2014, the Commission staff served an investigative subpoena on each Respondent (together, the "Subpoenas") pursuant to the Formal Order. House Counsel indicated that he could and would accept service on behalf of the Committee and Sutter. I emailed the Subpoenas to House Counsel and also sent them via UPS Next Day delivery to House Counsel's

office at 219 Cannon House Office Building, Washington, D.C., 20515-3902. Copies of the Subpoenas are attached hereto as Exhibits C and D.

28. The Subpoenas seek certain documents highly relevant to the Commission's investigation of possible insider trading. The documents sought by the Subpoenas concern a two-month period from February 10, 2013 through April 10, 2013, and include all documents concerning: communications between Sutter and any member or employee of Greenberg Traurig, including several named individuals (Request No. 1); communications between Sutter and CMS (Request No. 2); communications involving Sutter that concerned (i) the preliminary 2014 Medicare Advantage payment rates announced by CMS on February 15, 2013, and/or (ii) the final Medicare Advantage Rates (Request No. 3); communications involving Sutter that concerned the potential confirmation of Marilyn Tavenner as CMS Administrator by the U.S. Senate (Request No.4); all documents created by Sutter or in Sutter's files concerning (i) the relevant individuals at Greenberg Traurig (ii) the Medicare Advantage Rates; and/or (iii) the potential confirmation of Marilyn Tavenner as CMS Administrator by the U.S. Senate (Request No.5); records from Sutter's work telephones (Request No.6 in Ex. C); and documents sufficient to show all of Sutter's personal and work telephone numbers and email addresses (Request No. 6 in Ex. D). Exhibits C & D.

29. The Subpoenas required Respondents to produce documents by May 19, 2014, and for Sutter to appear for testimony on May 21, 2014. Exhibits C & D.

30. On May 7, House Counsel sent the staff a letter (attached hereto as Exhibit E) with questions about the subject matter of the Subpoenas, and stating that "at least some, and perhaps all, of the documents that your agency has demanded are protected by the Speech or Debate

7

Clause, U.S. Const. art. I, § 6, cl. 1, and it is plausible, if not likely, that matters about which you may seek to question Mr. Sutter will be protected in the same fashion."

31. The Commission staff responded to House Counsel's letter by letter dated May 8, 2014 (attached hereto as Exhibit F).

32. Respondents' counsel sent the Commission staff a letter dated May 19, 2014 (attached hereto as Exhibit G, without enclosure), in which counsel asserted a list of objections to the Subpoenas, announced that Respondents would not be complying with the Subpoenas in any way, and insisted that the Commission withdraw them.

33. Following an attorney proffer in late May by Sutter's individual counsel, the Commission staff made a compromise proposal to House Counsel by letter dated June 11, 2014, a copy of which is attached hereto as Exhibit H, to avoid the necessity of litigation. House Counsel rejected the staff's proposed compromise in a letter of June 17, 2014, attached hereto as Exhibit I.

34. To date, Respondents have not produced documents in response to the Subpoenas, and Sutter has not appeared for testimony.

## IV. STATEMENT PURSUANT TO LOCAL CIVIL RULE 6.1(d)

35. The Commission has submitted its application by Order to Show Cause, rather than by Notice of Motion, because the instant application is a summary subpoena enforcement matter, and proceeding by Order to Show Cause will afford the opportunity for an appropriate and prompt briefing schedule to be set on the Commission's application. Further, prior to filing the application, I telephoned House Counsel and individual counsel for Sutter earlier today, and informed them that the Commission would be filing this application at the United States District Court for the Southern District of New York. I also emailed them at

8

William.Pittard@mail.house.gov and mkaiser@tklf.com to the same effect, and attached the papers in support of the Commission's application.

36. No prior request for this or similar relief has been made by the Commission to this or any other Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 20, 2014.

*Amanda L. Straub*

Amanda L. Straub