# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

SECURITIES AND EXCHANGE COMMISSION, )
)
)
Applicant, )
)
v. )          Case No. 14 Misc. 00193
)
THE COMMITTEE ON WAYS AND MEANS OF )
THE U.S. HOUSE OF REPRESENTATIVES and )
BRIAN SUTTER, )
)
Respondents. )
_____)

## RESPONDENTS' CONSOLIDATED
## (I) RESPONSE TO ORDER TO SHOW CAUSE, AND
## (II) MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR,
## IN THE ALTERNATIVE, TO TRANSFER

Kerry W. Kircher, General Counsel
William Pittard, Deputy General Counsel
Todd B. Tatelman, Assistant Counsel
Mary Beth Walker, Assistant Counsel
Eleni M. Roumel, Assistant Counsel
Isaac B. Rosenberg, Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone:     (202) 225-9700

*Counsel for Respondents the Committee on Ways
and Means of the U.S. House of Representatives,
and Brian Sutter*

July 4, 2014

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

GLOSSARY ........................................................................................xii

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................2

    I.     The Committee and Its Subcommittee on Health. .............................2

    II.    The Committee's Work on Certain Health Issues during the
        Current Congress. ....................................................................4

    III.   The SEC (and DOJ) Investigations and Subpoenas..........................7

ARGUMENT ......................................................................................12

    I.     This Action is Barred by the Doctrine of Sovereign Immunity.........13

    II.    This Court Lacks Personal Jurisdiction over the Committee and
        Mr. Sutter. ............................................................................16

        A.    Due Process Requires Minimum Contacts and
             Constitutional Reasonableness...............................................17

        B.    It Is Not Constitutionally Reasonable for This Court to
             Exercise Personal Jurisdiction over the Committee and
             Mr. Sutter. ...........................................................................18

    III.   Venue Is Improper Here – And, Even if It Were Proper, It Would
        Be More Appropriate in the District of Columbia. ...........................21

    IV.   The Speech or Debate Clause Bars Enforcement of the SEC's
        Subpoenas. ...........................................................................23

        A.    Constitutional Overview. ......................................................24

             1.    The History and Purpose of the Clause.....................24

             2.    The Scope of the Clause. .........................................26

              3.    The Protections Afforded by the Clause.....................28

        B.    The Speech or Debate Clause Applies Here to Bar the
              SEC's Enforcement Action....................................................29

        C.    The SEC's Contrary Arguments Are Unavailing. .................31

V.   Federal Common Law Bars the SEC from Deposing Mr. Sutter. .....39

    A.   The Exceptional Circumstances Doctrine Applies to
       Mr. Sutter. ............................................................................40

    B.   The Information the SEC Seeks Can Be Obtained
       Elsewhere. ............................................................................42

    C.   The Information Sought Is Not Necessary or Essential to
       the SEC's Investigation.......................................................43

    D.   Compliance with the Subpoena Would Interfere with
       Mr. Sutter's Official Responsibilities. ..................................44

CONCLUSION........................................................................................45

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Alltel Commc'ns, LLC v. DeJordy*,
    675 F.3d 1100 (8th Cir. 2012) ...................................................15

*Army & Air Force Exch. Serv. v. Sheehan*,
    456 U.S. 728 (1982)..................................................................13

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002).....................................................18

*Bardoff v. U.S.*,
    628 A.2d 86 (D.C. 1993) ...........................................................42

*Barr v. Matteo*,
    360 U.S. 564 (1959)..................................................................29

*Benford v. Am. Broad. Cos.*,
    102 F.R.D. 208 (D. Md. 1984)...................................................27

*Bogan v. City of Boston*,
    489 F.3d 417 (1st Cir. 2007) ..........................................39, 40, 43

*Bonnet v. Harvest (U.S.) Holdings, Inc.*,
    741 F.3d 1155 (10th Cir. 2014) .................................................15

*Boron Oil Co. v. Downie*,
    873 F.2d 67 (4th Cir. 1989) ......................................................14

*Brown & Williamson Tobacco Corp. v. Williams*,
    62 F.3d 408 (D.C. Cir. 1995)............................27, 28, 30, 34, 36, 38

*Buono v. City of Newark*,
    249 F.R.D. 469 (D.N.J. 2008).........................................40, 43, 44

*Cano v. Davis*,
    No. 2:01-cv-08477 (C.D. Cal. Mar. 28, 2002)............................40

*Capitol Vending Co. v. Baker*,
    36 F.R.D. 45 (D.D.C. 1964)......................................................40

*Catskill Dev., LLC v. Park Place Entm't Corp.*,
    206 F.R.D. 78 (S.D.N.Y. 2002) ................................................16

*COMSAT Corp. v. Nat'l Sci. Found.*,
    190 F.3d 269 (4th Cir. 1999) .....................................................15

*Consumers Union of the U.S., Inc. v. Periodical Correspondents' Ass'n*,
  515 F.2d 1341 (D.C. Cir. 1975), *cert. denied*,
  423 U.S. 1051 (1976) ........................................................................................4

*Dep't of Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999) .........................................................................................13

*Dennis v. Sparks*,
  449 U.S. 24 (1980) ...........................................................................................28

*Doe v. McMillan*,
  412 U.S. 306 (1973) ....................................................................26, 27, 28, 29, 32

*Dombrowski v. Burbank*,
  358 F.2d 821 (D.C. Cir. 1966), *aff'd in part and rev'd in part sub nom.*
  *Dombrowski v. Eastland*, 387 U.S. 82 (1967) ...............................................28

*Dugan v. Rank*,
  372 U.S. 609 (1963) .........................................................................................14

*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975)................................................2, 25, 26, 27, 29, 30, 31, 32, 33

*E.P.A. v. Gen. Elec. Co.*,
  197 F.3d 592 (2d Cir. 1999), *vacated in irrelevant part*,
  212 F.3d 689 (2d Cir. 2000)..........................................................................14, 15

*Exxon Shipping Co. v. U.S. Dep't of Interior*,
  34 F.3d 774 (9th Cir. 1994) ............................................................................15

*F.D.I.C. v. Meyer*,
  510 U.S. 471 (1994).........................................................................................13

*Franklin Sav. Ass'n v. Ryan*,
  922 F.2d 209 (4th Cir. 1991) ..........................................................................39

*F.T.C. v. Jim Walter Corp.*,
  651 F.2d 251 (5th Cir. Unit A July 1981), *abrogated on other grounds by*
  *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) .................20

*F.T.C. v. W. Gen. Dairies, Inc.*,
  432 F. Supp. 31 (N.D. Cal. 1977) ....................................................................20

*Gov't of the Virgin Islands v. Lee*,
  775 F.2d 514 (3d Cir. 1985)............................................................................27

*Gravel v. U.S.*,
  408 U.S. 606 (1972) ...................................................25, 26, 27, 28, 29, 35, 36

*Gulf Ins. Co. v. Glasbrenner*,
    417 F.3d 353 (2d Cir. 2005).............................................................................21

*Hankins v. City of Phila.*,
    No. 95-cv-1449, 1996 WL 524334 (E.D. Pa. Sept. 12, 1996)...........................40

*Hearst v. Black*,
    87 F.2d 68 (D.C. Cir. 1936)..............................................................................28

*Helstoski v. Meanor*,
    442 U.S. 500 (1979)..........................................................................................25

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979)...................................................................................35, 36

*In re F.D.I.C.*,
    58 F.3d 1055 (5th Cir. 1995) ..............................................................39, 40, 43

*In re S.E.C. (Glotzer)*,
    374 F.3d 184 (2d Cir. 2004)........................................................................13, 14

*In re U.S. (Bernanke)*,
    542 F. App'x 944 (Fed. Cir. 2013) ................................................................39, 40

*In re U.S. (Kessler)*,
    985 F.2d 510 (11th Cir. 1993) ...........................................................................39

*In re U.S. (Reno & Holder)*,
    197 F.3d 310 (8th Cir. 1999) ........................................................................39, 43

*Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional*,
    No. 08-cv-8106(PGG), 2009 WL 2252116 (S.D.N.Y. July 28, 2009) ..............23

*Jewish War Veterans of the U.S., Inc. v. Gates*,
    506 F. Supp. 2d 30 (D.D.C. 2007) ....................................................................36

*Kasi v. Angelone*,
    300 F.3d 487 (4th Cir. 2002) .............................................................................14

*Kawananakoa v. Polybank*,
    205 U.S. 349 (1907)..........................................................................................13

*Keener v. Congress*,
    467 F.2d 952 (5th Cir. 1972) .............................................................................13

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880)..........................................................................................26

*Kyle Eng'g Co. v. Kleppe*,
    600 F.2d 226 (9th Cir. 1979) .......................................................................39

*Lane v. Pena*,
    518 U.S. 187 (1996) ................................................................................13

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) .............................................................................13, 16

*Lederman v. N.Y. City Dep't of Parks & Recreation*,
    731 F.3d 199 (2d Cir. 2013), *cert. denied*,
    134 S. Ct. 1510 (2014) ..............................................39, 40, 41, 42, 43

*Lehman v. Nakshian*,
    453 U.S. 156 (1981) ................................................................................13

*Liberation News Serv. v. Eastland*,
    426 F.2d 1379 (2d Cir. 1970) ...........................................................18, 19

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012) .......................................................................17

*Luckett v. Bure*,
    290 F.3d 493 (2d Cir. 2002) ......................................................................14

*Lunney v. U.S.*,
    319 F.3d 550 (2d Cir. 2003) ......................................................................13

*Maarawi v. U.S. Cong.*,
    24 F. App'x 43 (2d Cir. 2001) ....................................................................13

*Malik v. Meissner*,
    82 F.3d 560 (2d Cir. 1996) ........................................................................14

*Makarova v. U.S.*,
    201 F.3d 110 (2d Cir. 2000) ......................................................................14

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ....................................................................24

*Mariash v. Morrill*,
    496 F.2d 1138 (2d Cir. 1974) ....................................................................17

*Marisol A. v. Giuliani*,
    No. 95-cv-10533, 1998 WL 132810 (S.D.N.Y. Mar. 23, 1998).................40, 43

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)............................................................................27, 31

*McNamee v. Massachusetts*,
   No. 12-cv-40050, 2012 WL 1665873 (D. Mass. May 10, 2012)..........................40, 42, 43

*McSurely v. McClellan*,
   553 F.2d 1277 (D.C. Cir. 1976) (en banc) ......................................................27, 28, 35, 36

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996)...............................................................................17, 18, 21

*Miller v. Transam. Press, Inc.*,
   709 F.2d 524 (9th Cir. 1983) .................................................................................27, 28

*MINPECO, S.A. v. Conticommodity Servs., Inc.*,
   844 F.2d 856 (D.C. Cir. 1988) ...................................................................26, 28, 30, 39, 40

*Mohsen v. Morgan Stanley & Co.*,
   No. 11-cv-6751(PGG), 2013 WL 5312525 (S.D.N.Y. Sept. 23, 2013)............................22

*Mortise v. U.S.*,
   102 F.3d 693 (2d Cir. 1996)........................................................................................13

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
   599 F.3d 102 (2d Cir. 2010).......................................................................................22

*Pentagen Techs. Int'l, Ltd. v. Comm. on Appropriations of the U.S. House of Representatives*,
   20 F. Supp. 2d 41 (D.D.C. 1998), *aff'd*,
   194 F.3d 174 (D.C. Cir. 1999) (per curiam) ..................................................................29

*Porteous v. Baron*,
   729 F. Supp. 2d 158 (D.D.C. 2010) ............................................................................28

*Rockefeller v. Bingaman*,
   234 F. App'x 852 (10th Cir. 2007)...............................................................................13

*Ruhrgas AG v. Marathon Oil Co.*,
   526 U.S. 574 (1999).................................................................................................12

*S.E.C. v. Fin. Insts. Assurance Corp.*,
   No. C85-1912A, 1985 WL 1562 (N.D. Ga. Mar. 18, 1985)............................................20

*S.E.C. v. Straub*,
   921 F. Supp. 2d 244 (S.D.N.Y. 2013)......................................................................17, 18

*Simplex Time Recorder Co. v. Sec'y of Labor*,
   766 F.2d 575 (D.C. Cir. 1985) ................................................................................39, 40

*Springfield Terminal Ry. Co. v. United Transp. Union*,
   No. 89-0073, 1989 WL 225031 (D.D.C. May 18, 1989).................................................41

*Synochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007)..................................................................................12

*Tavoulareas v. Piro*,
    527 F. Supp. 676 (D.D.C. 1981) .............................................................36

*Tenney v. Brandhove*,
    341 U.S. 367 (1951)..................................................................24, 25, 28

*Thomas v. Cate*,
    715 F. Supp. 2d 1012 (E.D. Cal. 2010).................................................44

*Troma Entm't, Inc. v. Centennial Pictures, Inc.*,
    729 F.3d 215 (2d Cir. 2013)....................................................................16

*U.S. v. Ballin*,
    144 U.S. 1 (1892).......................................................................................4

*U.S. v. Biaggi*,
    853 F.2d 89 (2d Cir. 1988)...............................................................30, 38

*U.S. v. Brewster*,
    408 U.S. 501 (1972)......................................................28, 32, 33, 37

*U.S. v. Dowdy*,
    479 F.2d 213 (4th Cir. 1973) ........................................27, 30, 31, 35

*U.S. v. Helstoski*,
    442 U.S. 477 (1979)..................................................................25, 28, 32

*U.S. v. James*,
    980 F.2d 1314 (9th Cir. 1992) ................................................................16

*U.S. v. Johnson*,
    383 U.S. 169 (1966)..............................................24, 25, 26, 28

*U.S. v. King*,
    395 U.S. 1 (1969).....................................................................................13

*U.S. v. Mitchell*,
    445 U.S. 535 (1980)................................................................................13

*U.S. v. Morgan*,
    313 U.S. 409 (1941)................................................................................39

*U.S. v. Myers*,
    635 F.2d 932 (2d Cir. 1980)............................................................25, 26

*U.S. v. Peoples Temple of the Disciples of Christ,*
    515 F. Supp. 246 (D.D.C. 1981) ...............................................................................29, 30

*U.S. v. Sherwood,*
    312 U.S. 584 (1941) .................................................................................................13

*U.S. v. Testan,*
    424 U.S. 392 (1976) .................................................................................................13

*U.S. Int'l Trade Comm'n v. ASAT, Inc.,*
    411 F.3d 245 (D.C. Cir. 2005) .................................................................................19

*United Transp. Union v. Springfield Terminal Ry. Co.,*
    Nos. 87-cv-03442P & 88-cv-0117P, 1989 WL 38131 (D. Me. Mar. 13, 1989) ..........28, 38

*Walker v. Jones,*
    733 F.2d 923 (D.C. Cir.), *cert. denied,* 469 U.S. 1036 (1984) .............................................4

*Wall v. DOJ,*
    No. 3:09-cv-1066 (DJS), 2010 WL 4923736 (D. Conn. Nov. 29, 2010) .........................15

*Warren Bank v. Camp,*
    396 F.2d 52 (6th Cir. 1968) .....................................................................................39

*Warzon v. Drew,*
    155 F.R.D. 183 (E.D. Wis. 1994), *aff'd,*
    60 F.3d 1234 (7th Cir. 1995) ...................................................................................40

*Webster v. Sun Co., Inc.,*
    561 F. Supp. 1184 (D.D.C. 1983) .........................................................................28, 35

*X-Men Sec., Inc. v. Pataki,*
    196 F.3d 56 (2d Cir. 1999).......................................................................................31

## Constitutional Provisions

U.S. Const. art. I, § 5, cl. 2...........................................................................................4

U.S. Const. art. I, § 6, cl. 1...........................................................................................2

U.S. Const. art. II, § 2, cl. 2 ........................................................................................34

## Statutes

5 U.S.C. § 701.............................................................................................................15

5 U.S.C. § 702.................................................................................................15

15 U.S.C. § 78u(c) ...............................................................................17, 19, 21

28 U.S.C. § 1404(a) ..........................................................................................22

28 U.S.C. § 1406(a) ..........................................................................................22

Federal Trade Commission Act,
    15 U.S.C. § 49......................................................................................19, 20

Securities Exchange Act of 1934,
    Pub. L. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a et seq.) ..............17

STOCK Act,
    Pub. L. No. 112-105, 126 Stat. 291 (2012)......................................................16

**Legislative Authorities**

Rules of the House of Representatives, 113th Cong. (2013)
    Rule VII ...............................................................................................10
    Rule X.1(t) ........................................................................................2, 3
    Rule X.2(a) ...........................................................................................4
    Rule X.2(b)(1)........................................................................................3
    Rule XI.1(b)(1) ......................................................................................3

Rules of the Comm. on Ways & Means, 113th Cong. (2013)
    Rule 8.3 ...............................................................................................4

160 Cong. Rec. H4048 (daily ed. May 9, 2014) ...........................................9

Final Vote Results for Roll Call 135, Office of the Clerk, Mar. 14, 2014.....................7

Hon. Dave Camp, *Amendment in Nature of a Substitute to H.R. 2810* ...........................7

*Report to the Congress:  Medicare Payment Policy:  Hr'g before the Subcomm. on
    Health of the H. Comm. on Ways & Means*, 113th Cong. (2013)
    (statement of Glenn M. Hackbarth, Chairman, MedPAC) ..................................6

**Other Authorities**

Alex Wayne & Drew Armstrong, *Grassley Shifts Focus of Probe on Source of
    Medicare Leak*, Bloomberg News (Apr. 18, 2013),
    http://www.bloomberg.com/news/2013-04-17/gray-area-of-washington-leak-
    makes-insider-hard-to-define.html.................................................................8

Brody Mullins, et al., *Probe of How U.S. Agency's Medicare Move Reached Investors Hits Wall*, Wall St. J., Nov. 21, 2013 ......................................................................11

Comm. on Ways & Means, http://waysandmeans.house.gov/
    (last visited July 4, 2014) ..................................................................3, 6, 44, 45

Fed. R. Civ. P. 12(b)(3).................................................................................22

Letter from Hon. Dave Camp, Chairman, Comm. on Ways & Means, to
    Hon. Darrell Issa, Chairman, Comm. on Oversight & Gov't Reform, &
    Hon. Candice S. Miller, Chairman, Comm. on House Admin. (Feb. 15, 2013)..................5

Letter from Hon. Dave Camp, Chairman, House Comm. on Ways & Means, et al.,
    to Marilyn Tavenner, Acting Adm'r, CMS (Feb. 28, 2013)...........................................5, 6

Louis L. Jaffe, *Suits against Gov'ts & Officers:  Sovereign Immunity*,
    77 Harv. L. Rev. 1 (1963) ..................................................................15

Mem. from Dave Camp, Chairman, Comm. on Ways & Means, et al., to Provider
    Cmty. (Apr. 3, 2013)..................................................................6

Mem. from Comm. on Ethics, U.S. House of Reps., to Members, Officers, & Employees
    (Jan. 15, 2014), http://ethics.house.gov/sites/ethics.house.gov/files/2014%20pay%
    20pink%20sh_0.pdf ..................................................................41

Mem. from Comm. on Ethics, U.S. House of Reps., to Members, Officers, & Employees
    (Jan. 24, 2013), https://ethics.house.gov/sites/ethics.house.gov/files/pay%20rates%
    202013_0.pdf ..................................................................41

Overview of SGR Repeal & Reform Proposal ....................................................5

The Federalist No. 48 (James Madison) ..........................................................24

The Federalist No. 51 (James Madison or Alexander Hamilton) ..................................24

W. Wilson, Congressional Government (1885)..................................................36

## GLOSSARY

| | |
|---|---|
| CMS | U.S. Centers for Medicare and Medicaid |
| Committee | Committee on Ways and Means, U.S. House of Representatives |
| DHHS | U.S. Department of Health and Human Services |
| DOJ | U.S. Department of Justice |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| House Rules | Rules of the House of Representatives, 113th Cong. (2013) |
| MA | Medicare Advantage |
| MedPAC | Medicare Payment Advisory Commission |
| SEC | U.S. Securities and Exchange Commission |
| SGR | Medicare's Sustainable Growth Rate Formula |

**INTRODUCTION**

The Securities and Exchange Commission ("SEC") purports to be investigating

> whether material nonpublic information concerning the April 1, 2013
> announcement by the U.S. Centers for Medicare and Medicaid ("CMS")
> of 2014 reimbursement rates for the Medicare Advantage [("MA")]
> program was leaked improperly to certain members of the public in
> advance of CMS's announcement, and whether such action resulted in
> insider trading in violation of the federal securities law.

Mem. of Law in Supp. of [SEC]'s Appl. for an Order to Show Cause . . . at 1 (June 20, 2014)

(ECF No. 2) ("SEC Memorandum").  CMS, of course, is part of the Executive Branch of the

federal government (more particularly, part of the Department of Health and Human Services

("DHHS")), and only Executive Branch employees could have had definitive knowledge of the

2014 reimbursement rate for the MA program prior to the April 1, 2013 CMS announcement.

Certainly neither the Committee on Ways and Means of the U.S. House of Representatives

("Committee") nor Brian Sutter, Staff Director of the Committee's Subcommittee on Health,

possessed material nonpublic information about the relevant reimbursement rates prior to CMS's

April 1, 2013 announcement.  And indeed, the SEC has not alleged otherwise, or alleged any

wrongdoing on the part of either the Committee or Mr. Sutter.

What the SEC has done is embark on a remarkable fishing expedition for congressional

records – core *legislative* records – in the form of two administrative subpoenas:  one to the

Committee for documents, and one to Mr. Sutter for documents and testimony.  *See* Decl. of

Amanda L. Straub (June 20, 2014) (ECF No. 3) ("Straub Declaration"), Ex. C (Subpoena [to

Committee] (May 6, 2014) ("Committee Subpoena")), Ex. D (Subpoena [to Brian Sutter] (May

6, 2014) ("Sutter Subpoena")).  In this action, the SEC invites the federal judiciary to enforce

those administrative subpoenas as against the Legislative Branch of the federal government.

This Court should decline that invitation.

1

As an initial matter, the SEC's enforcement action should be dismissed for three reasons that are independent of the information it seeks. *First*, this action is barred by the doctrine of sovereign immunity; *second*, this Court lacks personal jurisdiction over the Committee and Mr. Sutter; and, *third*, venue is improper here (and, even if proper here as an initial matter, is much more appropriate in the District of Columbia). *See infra* Argument, Parts I-III.

Separately, this action must be dismissed for two reasons that turn on the information the SEC actually seeks. *First*, the Committee and Mr. Sutter are "absolute[ly]" immune under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place."), from this suit because it seeks to compel production of information concerning Committee activity "within the sphere of legitimate legislative activity," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501, 503, 509-10 & n.16 (1975). *See infra* Argument, Part IV. *Second*, with respect to the *ad testificandum* aspect of the Sutter Subpoena, the SEC has not established the exceptional circumstances necessary to permit it to depose Mr. Sutter regarding the matters about which it says it wishes to interrogate him. *See infra* Argument, Part V.

## BACKGROUND

### I.    The Committee and Its Subcommittee on Health.

The Committee on Ways and Means is a standing committee of the House. *See* Rule X.1(t), Rules of the House of Representatives, 113th Cong. (2013) ("House Rules"), http://clerk.house.gov/legislative/house-rules.pdf. Its jurisdiction over "revenue measures generally" makes it essential to the operation of the House and the country, an importance that is magnified as to health care policy issues by its additional jurisdiction over those "health care . . .

programs" supported by "payroll deductions," one of which is Medicare.  *Id.*; *see also* Comm. on

Ways & Means, http://waysandmeans.house.gov/ (last visited July 4, 2014).

The House has vested the Committee with the following legislative responsibilities,

among others:

> In order to determine whether laws and programs addressing subjects within the jurisdiction of [the Committee] are being implemented and carried out in accordance with the intent of Congress and whether they should be continued, curtailed, or eliminated, [the Committee] . . . shall review and study on a continuing basis –
>
> (A)   the application, administration, execution, and effectiveness of laws and programs addressing subjects within its jurisdiction;
>
> (B)   the organization and operation of Federal agencies and entities having responsibilities for the administration and execution of laws and programs addressing subjects within its jurisdiction;
>
> (C)   any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation addressing subjects within its jurisdiction (whether or not a bill or resolution has been introduced with respect thereto); and
>
> (D)   future research and forecasting on subjects within its jurisdiction.

House Rule X.2(b)(1); *see also, e.g.*, House Rule XI.1(b)(1) ("Each committee may conduct at

any time such investigations and studies as it considers necessary or appropriate in the exercise

of its responsibilities under rule X.").  The Committee is charged with these "oversight

responsibilities . . . in order to assist the House" in–

> (1) its analysis, appraisal, and evaluation of–
>
> (A)   the application, administration, execution, and effectiveness of Federal laws; and
>
> (B)   conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation; and

3

(2) its formulation, consideration, and enactment of changes in Federal laws, and of such additional legislation as may be necessary or appropriate.

House Rule X.2(a).[1]

The Committee, in turn, has delegated to its Subcommittee on Health initial jurisdiction over those Committee matters "that relate to programs providing payments (from any source) for health care, health delivery systems, or health research," including particularly those "bills and matters that relate to the health care programs of the Social Security Act (including title[] . . . XVIII [Medicare] . . . ) . . . ." Rule 8.3, Manual of Rules of the Comm. on Ways & Means, 113th Cong. (2013), http://waysandmeans.house.gov/uploadedfiles/rules113th.pdf.

## II.   The Committee's Work on Certain Health Issues during the Current Congress.

At the beginning of the current Congress, the Committee adopted an Oversight Plan that articulated its intention to investigate, consistent with its above-described responsibilities:

> **Priorities of [DHHS].** [E.g.,] . . . concerns related to . . . reimbursement under Medicare.
>
> . . . .
>
> **Medicare Advantage.** Oversight of Medicare health plans, including: . . . reimbursements . . . .
>
> . . . .
>
> **CMS Administration.** Oversight of CMS, including issuance of regulations and their impact on Medicare beneficiaries and providers . . . and general agency accountability.

---

[1]  These rules were duly adopted by the 113th Congress (Jan. 2013 – Jan. 2015) pursuant to the Rulemaking Clause of the Constitution, U.S. art. I, § 5, cl. 2, which is a "broad grant of authority," *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1343 (D.C. Cir. 1975), *cert. denied*, 423 U.S. 1051 (1976), that sits "[a]t the very core of our constitutional separation of powers," *Walker v. Jones*, 733 F.2d 923, 938 (D.C. Cir.) (MacKinnon, J., concurring in part & dissenting in part), *cert. denied*, 469 U.S. 1036 (1984). Rules promulgated pursuant to the Rulemaking Clause, within constitutional limitations, are "absolute and beyond the challenge of any other body." *U.S. v. Ballin*, 144 U.S. 1, 5 (1892).

Letter from Hon. Dave Camp, Chairman, Comm. on Ways & Means, to Hon. Darrell Issa,
Chairman, Comm. on Oversight & Gov't Reform, & Hon. Candice S. Miller, Chairman, Comm.
on House Admin. 3-4 (Feb. 15, 2013), http://waysandmeans.house.gov/uploadedfiles/rwm.pdf
(transmitting Oversight Plan; also outlining planned investigations regarding "Medicare Part A
and Part B (Fee-for Service Providers)," "Medicare Part D (Prescription Drug Plans),"
"Medicare Entitlement," and "Private Health Insurance Coverage" (emphases omitted)).

      Pursuant to its authority and consistent with its Oversight Plan, the Committee, on
February 7, 2013, released its framework for reform of Medicare's Sustainable Growth Rate
Formula ("SGR"), a formula critical to CMS's calculation of MA physician reimbursement rates.
*See* Overview of SGR Repeal & Reform Proposal, http://waysandmeans.house.gov/uploaded
files/sgr_reform_short_summary_2013.pdf.  The framework called for, among other things,
"[f]ully repealing the SGR" and enacting, in its place, "statutorily-defined payment rates."  *Id.* at
1-3 (also proposing various DHHS reporting requirements to "[p]rovide [Congress] information
for further improvements"); *see also id.* at 1 (noting that Committee generated these proposed
reforms after "series of Health Subcommittee hearings . . . on reforming the Medicare physician
payment system," "[s]taff meetings with physicians, physician organizations and other
stakeholders," and "[r]esponses from over 70 physician organizations to a . . . letter asking for
guidance on incorporating quality and efficiency into the Medicare payment system").

      On February 28, 2013, the Committee wrote to Marilyn Tavenner, the then-Acting
Administrator of CMS, seeking information regarding CMS's "February 15 . . . announcements
[regarding the SGR and] affecting [MA] payments and policies."  Letter from Hon. Dave Camp,
Chairman, House Comm. on Ways & Means, et al., to Marilyn Tavenner, Acting Adm'r, CMS,
at 1 (Feb. 28, 2013) (asking various questions, and requesting "a written response to our

questions by March 15, 2013"), attached as Ex. A.  Those concerns focused on, among other

issues, CMS's assumption "that Congress will not patch [via legislation] the . . . physician

payment cut scheduled for 2014," and the effect of that assumption on the SGR and MA

generally.  *Id.* at 2.

On March 15, 2013, the Subcommittee on Health held a hearing regarding issues raised

by the annual report of the Medicare Payment Advisory Commission ("MedPAC"), a

"congressional support agency that provides . . . advice to the Congress on issues affecting the

Medicare program."  *Report to the Congress:  Medicare Payment Policy:  Hr'g before the*

*Subcomm. on Health of the H. Comm. on Ways & Means*, 113th Cong. 1 (2013) (statement of

Glenn M. Hackbarth, Chairman, MedPAC) ("Hackbarth Statement"), http://www.medpac.gov/

documents/20130315_WandM_testimony_March_Report.pdf.  That hearing considered "where

Medicare payments can be adjusted in a way that is fair to providers and taxpayers, while

protecting seniors' access to care," while again focusing particularly on the SGR and MA

generally.  *Chairman Brady Announces Hr'g on MedPAC's Annual Mar. Report to Congress*,

Comm. on Ways & Means, Mar. 8, 2013, http://waysandmeans.house.gov/news/documentsingle.

aspx?DocumentID=323109; *see* Hackbarth Statement at 1, 8-12.

And, on April 3, 2013, the Committee issued a memorandum summarizing "stakeholder

input" – and soliciting additional "feedback" – regarding the Committee's proposed legislation

regarding the "SGR physician payment system."  Mem. from Dave Camp, Chairman, Comm. on

Ways & Means, et al., to Provider Cmty. 1-2 (Apr. 3, 2013), http://waysandmeans.house.gov/

uploadedfiles/sgr_joint_release_document.pdf.

Since then, the Committee has continued to pursue its legislative agenda with regard to

these issues.  For example, (i) on May 7, 2013, the Subcommittee on Health conducted a hearing

6

devoted to SGR reform;[2] (ii) on June 20, 2013, the Subcommittee conducted a Medicare hearing

that included consideration of the SGR and the status of the MA program;[3] (iii) on October 31,

2013, the Committee released a discussion draft of the Committee's proposed SGR legislation;[4]

(iv) on December 12, 2013, the Committee conducted a markup regarding its SGR reform bill;[5]

(v) on February 6, 2014, Chairman Camp introduced replacement SGR reform legislation (H.R.

4015);[6] and (vi) on March 14, 2014, the House passed H.R. 4015.[7]

Clearly and indisputably, therefore, the Committee and its Subcommittee on Health –

with Mr. Sutter as its Staff Director – have a deep and abiding legislative interest in CMS, the

SGR, and the MA program – precisely the matters into which the SEC now seeks to probe.

**III.    The SEC (and DOJ) Investigations and Subpoenas.**

The SEC's investigation commenced in or about April 2013.  *See* Straub Decl. ¶¶ 4, 7.  It

centers on CMS's April 1, 2013 announcement regarding the SGR and MA reimbursement rates.

*See Id.* ¶¶ 9-13 & Ex. A (CMS Announcement).  More particularly, the investigation concerns

---

[2]  *See Chairman Brady Announces Hr'g on Developing a Viable Medicare Physician Payment Policy*, Comm. on Ways & Means, May 7, 2013, http://waysandmeans.house.gov/calendar/eventsingle.aspx?EventID=332173.

[3]  *See Chairman Brady Announces Hr'g on the 2013 Medicare Trustees Report*, Comm. on Ways & Means, Jan. 20, 2013, http://waysandmeans.house.gov/calendar/eventsingle.aspx?EventID=338954.

[4]  *See House, Senate Health Leaders Introduce Bipartisan, Bicameral SGR Replacement Framework*, Comm. on Ways & Means, Oct. 31, 2013, http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=359858.

[5]  *See Markup of: H.R. 2810 "Medicare Patient Access & Quality Improvement Act of 2013,"* Comm. on Ways & Means, Dec. 12, 2013, http://waysandmeans.house.gov/calendar/eventsingle.aspx?EventID=364041; Hon. Dave Camp, *Amendment in Nature of a Substitute to H.R. 2810*, http://waysandmeans.house.gov/uploadedfiles/chairmans_ans_to_hr2810_121213.pdf.

[6]  *See House, Senate Leaders Introduce SGR Replacement Bill*, Comm. on Ways & Means, Feb. 6, 2014, http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=369175.

[7]  *See* Final Vote Results for Roll Call 135, Office of the Clerk, Mar. 14, 2014, http://clerk.house.gov/evs/2014/roll135.xml.

information that allegedly flowed, prior to the announcement, from "a lobbyist at Greenberg Traurig, LLP" to "an analyst at Height Securities, LLC," and from there to investor clients of Height Securities. *Id*. ¶¶ 12-13. According to numerous press reports, the Greenberg lobbyist was Mark Hayes, and Greenberg has stated that Mr. Hayes did not possess material nonpublic information but, rather, provided his own policy analysis to Height Securities. *See, e.g*., Alex Wayne & Drew Armstrong, *Grassley Shifts Focus of Probe on Source of Medicare Leak*, Bloomberg News (Apr. 18, 2013), http://www.bloomberg.com/news/2013-04-17/gray-area-of-washington-leak-makes-insider-hard-to-define.html.

At or around the same time, the Department of Justice ("DOJ") also commenced an investigation into the same matter. We know this because, on the evening of April 29, 2013, Mr. Sutter was approached at his home in northern Virginia by FBI and DHHS agents and questioned about his dealings with Mr. Hayes, and about his work for the Committee and its Subcommittee on Health. Mr. Sutter did not have the benefit of counsel, was not informed that he could consult counsel if he wished, and did not have access to any records to which he could refer to refresh his recollections. Notwithstanding, he answered the agents' questions to the best of his abilities. Several days later, counsel for Mr. Sutter wrote to the FBI and DHHS – out of an abundance of caution, and to ensure that they possessed accurate information – to clarify certain issues about which they had inquired. *See* Decl. of William Pittard (July 4, 2014) ("Pittard Declaration") ¶ 4 & Ex. 1 (Letter from William Pittard, Dep'y Gen. Counsel, to Salvatore G. Cincinelli, Special Agent, & Stephanie Johnson, Supervisory Special Agent, at 1 (May 8, 2013)).

The SEC first contacted the House about its investigation in or about January 2014. *See id*. ¶ 26. While the SEC asserts that, in response to its requests for cooperation short of a subpoena, "House Counsel communicated an unwillingness to produce documents or to make

Sutter available for an interview," SEC Mem. at 6, that is not accurate.  In fact, we requested

from the SEC certain information to enable the Committee and Mr. Sutter to formulate an

appropriate response to the SEC, and, in response, the SEC repeatedly declined to provide that

information.  *See* Pittard Decl. ¶¶ 5-10 & Exs. 2-7 (collecting correspondence).  The SEC then

cut short the dialogue by issuing, on May 6, 2014, the Committee and Sutter Subpoenas.

      In the meantime, on May 1, 2014, DOJ caused a grand jury subpoena *ad testificandum* to

be issued to Mr. Sutter.  *See* 160 Cong. Rec. H4048 (daily ed. May 9, 2014).  On May 28, 2014,

Mr. Sutter provided an attorney proffer to DOJ *and to the SEC* regarding the facts of which he is

aware – none of which have any apparent significance to those agencies' investigations.[8]

Shortly thereafter, DOJ withdrew its then-pending subpoena for Mr. Sutter's testimony,

presumably in recognition of the fact that Mr. Sutter does not possess information pertinent to its

investigation.

      The SEC, on the other hand – and notwithstanding that it is investigating the same

circumstances into which DOJ was inquiring – responded by initiating this litigation, *after*

walking away from the Committee's and Mr. Sutter's further efforts to reach an accommodation.

*See* Letter from William Pittard, Dep'y Gen. Counsel, to Amanda L. Straub, Esq. (June 17,

2014), attached as Ex. I to Straub Decl.

      The Committee Subpoena seeks the following documents for the time period "February

10, 2013 through and including April 10, 2013":

---

[8]  As a result, the SEC's statement that it "does not already have the . . . testimony [its] Subpoena[] seek[s]," SEC Mem. at 10-11, is misleading, at best.  In addition, because DOJ and the SEC coordinated in seeking information from the Committee and Mr. Sutter, it is likely that DOJ shared with the SEC what it learned from Mr. Sutter when the FBI questioned him on April 29, 2013.

1.  All documents concerning communications between Sutter and any member or employee of Greenberg Traurig LLP . . . ;

2.  All documents concerning communications between Sutter and CMS;

3.  All documents concerning communications to, from, copying, or blind-copying Sutter concerning (i) the preliminary 2014 Medicare Advantage payment rates announced by CMS on February 15, 2013, and/or (ii) the final 2014 Medicare Advantage payment rates announced by CMS on April 1, 2013 . . . ;

4.  All documents concerning communications to, from, copying, or blind-copying Sutter concerning the potential confirmation of Marilyn Tavenner as CMS Administrator by the U.S. Senate;

5.  All documents created by Sutter or in Sutter's files, including without limitation handwritten notes and calendar entries, concerning (i) Hayes, Taylor, or White; (ii) the Medicare Advantage Rates; and/or (iii) the potential confirmation of Marilyn Tavenner as CMS Administrator by the U.S. Senate; and

6.  All telephone records . . . from Sutter's work phones.

Comm. Subp.[9]  The Sutter Subpoena seeks from Mr. Sutter the same categories of records,

except that it seeks, in lieu of "telephone records . . . from [his] work phone," "documents

sufficient to show all of [his] personal and work telephone numbers and email addresses."  Sutter

Subp., Category 6.[10]

_____

[9]  The SEC's characterization of the Committee Subpoena as seeking "documents from the files of *one* individual," SEC Mem. at 7 (emphasis added), is incorrect.  *See also id.* at 10 (repeating mischaracterization).

We note also that the Committee Subpoena defines "Committee" to mean, in addition to the Committee itself, "any Member, employee, agent, or representative thereof."  Comm. Subp., Def. 1.  Because the Committee has no control over the personal office records of individual Committee Members, and because the House Rules differentiate between Committee records and personal office records (with the latter being the property of individual Members), *see, e.g.*, House Rule VII, we construe the Committee Subpoena not to seek the personal office records of individual Committee Members.

[10]  While Category 6 of the Sutter Subpoena is intrusive and objectionable, Mr. Sutter has provided the SEC with the phone numbers and addresses it requested (subject to an appropriate reservation of rights).

With respect to the *ad testificandum* aspect of the Sutter Subpoena, the SEC has advised us that it intends to interrogate Mr. Sutter about the same topic areas:  (i) "his communications with Mark Hayes and others at Greenberg Traurig, LLP, during the relevant time period, which is roughly February through mid-April 2013," and (ii) his "knowledge of the contents of the Rate Announcement, including . . . any communications he had on this subject with CMS."  Letter from Amanda L. Straub, Esq., to William Pittard, Dep'y Gen. Counsel, at 1 (May 8, 2014) ("SEC Specification Letter"), attached as Ex. F to Straub Decl.

While, as noted above, the SEC has not alleged any wrongdoing on the part of the Committee or Mr. Sutter, it has insinuated – citing nothing – that it has "*some* . . . information" that Mr. Sutter "*may have* been a source for the GT Lobbyist's non-public information."  SEC Mem. at 5 & n.2 (emphases added).  This sort of unsubstantiated effort to tarnish Mr. Sutter is reprehensible and wholly unbecoming an agency of the United States government.  Mr. Sutter was not a source for anyone's material non-public information, and the Court should disregard the SEC's unexplained and unsupported assertion about what "some" information "may" suggest regarding information that the SEC does not even contend is material.

Indeed, according to press reports, the SEC's investigation came up short long ago.  *See, e.g.*, Brody Mullins, et al., *Probe of How U.S. Agency's Medicare Move Reached Investors Hits Wall*, Wall St. J., Nov. 21, 2013 ("investigators are struggling over how to distinguish between illegal insider tips and accurate predictions based on research and analysis"; Mark Hayes told "congressional investigators that he . . . based his prediction [on] information gathered partly from conversations with a Senate aide"; "Investigators from the FBI, SEC, [DHHS] and the Senate itself have spoken with officials at Height, health-insurance companies and the Senate, and have determined that dozens of officials at the CMS knew about the decision before it was

made public").  Since then, as noted above, the SEC has received an attorney proffer from

counsel for Mr. Sutter, whom the SEC did not even deem significant enough to approach for the

first eight months of its investigation, and that proffer we believe confirms what the SEC has

heard from other witnesses.  As a result, this enforcement action appears to be more about

making headlines and less about obtaining information pertinent to any viable investigation.

## ARGUMENT

As an initial matter, the SEC's enforcement action should be dismissed – and its Order to

Show Cause vacated – because this action is barred by the doctrine of sovereign immunity, *see*

*infra* Argument, Part I; because this Court lacks personal jurisdiction over the Committee and

Mr. Sutter, *see infra* Argument, Part II; and/or because venue is improper here (or, if it is proper

here, is more appropriate in the District of Columbia), *see infra* Argument, Part III.  The Court is

not required, in resolving these three issues, to consider, or reach any judgments about, the

propriety of the SEC's effort to obtain information from the Committee or Mr. Sutter.[11]

If the Court determines that sovereign immunity does not bar this action, that it has

personal jurisdiction over the Committee and Mr. Sutter, and that venue is proper and most

appropriate here, it still must dismiss the SEC's enforcement action – and vacate the Order to

Show Cause – because that action is barred by the Speech or Debate Clause, *see infra* Argument,

Part IV, and because, with respect to the *ad testificandum* aspect of the Sutter Subpoena, the SEC

has not established the exceptional circumstances necessary to permit it to depose Mr. Sutter, *see*

*infra* Argument, Part V.

---

[11]  Because the first three arguments address threshold issues, the Court may select among them
as it sees fit.  *See, e.g.*, S*ynochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425,
429-31 (2007); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 588 (1999).

## I.      This Action Is Barred by the Doctrine of Sovereign Immunity.

The federal government is immune from judicial process under the doctrine of sovereign immunity,[12] absent a waiver that "cannot be implied but must be unequivocally expressed." *U.S. v. Testan*, 424 U.S. 392, 399 (1976) (quotation marks omitted).[13]   The doctrine encompasses Legislative Branch entities and officials acting, as the Committee and Mr. Sutter are here, in their official capacities.[14]   And it applies in the context of subpoena enforcement actions.  *See, e.g.*, *In*

---

[12]  *See, e.g.*, *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature.  Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." (quotation marks and brackets omitted)); *U.S. v. Mitchell*, 445 U.S. 535, 538 (1980) ("It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." (quotation marks, brackets, and ellipsis omitted)); *Kawananakoa v. Polybank*, 205 U.S. 349, 353 (1907) (Holmes, J.) ("A sovereign is exempt from suit . . . on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.").

[13]  *See also Lane v. Pena*, 518 U.S. 187, 192 (1996) (waiver of sovereign immunity must be "unequivocally expressed in statutory text"); *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 734 (1982) ("[A] waiver of the traditional sovereign immunity cannot be implied but must be unequivocally expressed." (quotation marks omitted)); *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) (same); *U.S. v. King*, 395 U.S. 1, 4 (1969) (same); *U.S. v. Sherwood*, 312 U.S. 584, 587-88 (1941) (same).  Similarly, any waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor of the sovereign."  *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999); *accord Lunney v. U.S.*, 319 F.3d 550, 554 (2d Cir. 2003).

This is true regardless of any perceived resultant inefficiencies or injustices.  *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 700-01 (1949) ("Wrongful the Secretary's conduct might be, but a suit to relieve the wrong . . . would interfere with the sovereign . . . and hence must fail."); *Mortise v. U.S.*, 102 F.3d 693, 695-96, 697 (2d Cir. 1996) ("Although the conduct of the National Guard was[] . . . outrageous, the law requires us to affirm the district court's grant of the government's [sovereign immunity] motion . . . .").

[14]  *See, e.g.*, *Maarawi v. U.S. Cong.*, 24 F. App'x 43, 44 (2d Cir. 2001) (no jurisdiction over claims against Congress because, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit" (quotation marks omitted)); *Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007) ("Sovereign immunity forecloses [plaintiff's] claims against the House of Representatives and Senate as institutions, and Representative Pearce and Senator Bingaman as individuals acting in their official capacities." (quotation marks omitted)); *Keener v. Congress*, 467 F.2d 952, 953 (5th Cir. 1972) (sovereign immunity renders Congress immune from suit).

*re S.E.C. ex rel. Glotzer*, 374 F.3d 184, 190, 192 (2d Cir. 2004) (agreeing with SEC that sovereign immunity barred enforcement of subpoena to SEC, absent express waiver); *E.P.A. v. Gen. Elec. Co.*, 197 F.3d 592, 597 (2d Cir. 1999) ("[E]nforcement of this [federal judicial] subpoena duces tecum issued by General Electric to [an EPA official] would compel the EPA to act and therefore is barred by sovereign immunity in the absence of a waiver."), *vacated in irrelevant part, on other grounds*, 212 F.3d 689 (2d Cir. 2000).[15]

Because "[t]he doctrine of sovereign immunity is jurisdictional in nature," the SEC "bears the burden of establishing that [its] claims fall within an applicable [immunity] waiver." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000); *accord Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002); *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996). The SEC cannot satisfy that burden here.

The SEC says there is an implicit exception to the sovereign immunity doctrine for actions brought by other federal government components. *See* SEC Mem. at 23. That argument, for which the SEC cites no authority, flies in the face of the Supreme Court's repeated insistence that a waiver may not be implied. *See supra* note 13 & accompanying text; *see also, e.g., S.E.C. ex rel. Glotzer*, 374 F.3d at 190 (sovereign immunity protects Article II agency against Article III subpoena, except to extent Article I branch has enacted express waiver). Indeed, in *S.E.C. ex rel. Glotzer*, the SEC itself argued, correctly, that – absent an express waiver, narrowly construed – sovereign immunity protects the SEC from an *Article III* subpoena. *See* SEC Br. (Dec. 15,

---

[15] *Accord Kasi v. Angelone*, 300 F.3d 487, 502-04 (4th Cir. 2002) (sovereign immunity barred enforcement of death penalty defendant's subpoena to third-party federal agency); *Boron Oil Co. v. Downie*, 873 F.2d 67, 71 (4th Cir. 1989) ("subpoena proceedings fall within the protection of sovereign immunity"); *see generally Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("The general rule is that a suit is against the sovereign . . . if the effect of the judgment would be . . . to compel [the Government] to act." (quotation marks omitted)).

2003), *S.E.C. ex rel. Glotzer*, at 2, 3, 15 n.6, 17-18, attached as Ex. B.  It is more than ironic that the SEC now insists that sovereign immunity provides Congress no protection as against an *administrative agency* subpoena.[16]

The only authority that *might* lend *any* credence to the SEC's argument, *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 778-79 & n.9 (9th Cir. 1994) (arguably dicta), has been expressly rejected by this Circuit (among others).  "We disagree with the Ninth Circuit's approach [in *Exxon Shipping*] and think that the only identifiable waiver of sovereign immunity that would permit a court to require a response [from a government entity] to a subpoena in an action in which the government is not a party [i.e., is the recipient of a third-party subpoena] is found in the APA [i.e., 5 U.S.C. § 702]."  *EPA*, 197 F.3d at 598; *see also COMSAT*, 190 F.3d at 277 ("We decline to follow [*Exxon Shipping*].").[17]

---

[16]  *See also E.P.A.*, 197 F.3d at 597-99 ("The only express waiver to be found in this regard is in the APA [i.e., 5 U.S.C. § 702]."); *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 277-78 (4th Cir. 1999) ("[I]t is sovereign immunity . . . that gives rise to the Government's power to refuse compliance with a subpoena."; "The APA [i.e., 5 U.S.C. § 702] waives sovereign immunity and permits a federal court to order a non-party agency to comply with a subpoena if the government has refused production in an arbitrary, capricious, or otherwise unlawful manner."; *When an agency is not a party to an action, its choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources.*" (emphasis added)); *cf. Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155, 1159-62 (10th Cir. 2014) (sovereign immunity enjoyed by Native American tribe, which immunity subject to congressionally-imposed waiver, allows tribe, in absence of such waiver, to decline compliance with federal court subpoena); *Alltel Commc'ns, LLC v. DeJordy*, 675 F.3d 1100, 1106 (8th Cir. 2012) (same for subpoena to tribal official).

The sweeping nature of the sovereign immunity doctrine, including where asserted between components of the federal government, comports with its foundations.  *See, e.g.*, Louis L. Jaffe, *Suits against Gov'ts & Officers:  Sovereign Immunity*, 77 Harv. L. Rev. 1, 9 (1963) (at early English common law, King could assert sovereign immunity to protect government officers against decisions rendered by King's Exchequer, which had judicial function).

[17]  The APA waiver does not apply to the Legislative Branch.  *See* 5 U.S.C. § 701(b)(1)(A) (defining "agency," for relevant purposes, as excluding "Congress"); *Wall v. D.O.J.*, No. 3:09-cv-1066 (DJS), 2010 WL 4923736, *8 (D. Conn. Nov. 29, 2010) (recognizing same).

The SEC's fallback argument is that the STOCK Act, Pub. L. No. 112-105, 126 Stat. 291 (2012), provides the requisite "unequivocally express" waiver of Legislative Branch sovereign immunity as to SEC administrative subpoenas.  *See* SEC Mem. at 23 n.6.  But that simply is not true.  While the STOCK Act provides that "Members of Congress and employees of Congress are not exempt from the insider trading prohibitions arising under the securities laws," STOCK Act § 4, it says absolutely nothing about waiving any privileges or immunities otherwise available to Members and employees responding to investigative subpoenas, *cf.* STOCK Act § 10 ("Nothing in this Act . . . shall be construed to . . . be in derogation of the obligations, duties, and functions of a Member of Congress . . . [or] an employee of Congress . . . arising from such person's official position.").  As the Supreme Court has stated:

> [I]t is one thing to provide a method by which a citizen may be compensated for a wrong done to him by the Government.  It is a far different matter to permit a court to exercise its compulsive powers . . . to compel [the Government] to act.  There are the strongest reasons of public policy for the rule that such relief cannot be had against the sovereign.

*Larson*, 337 U.S. at 704; *see also, e.g.*, *Catskill Dev., LLC v. Park Place Entm't Corp.*, 206 F.R.D. 78, 87 (S.D.N.Y. 2002) (quoting *U.S. v. James*, 980 F.2d 1314, 1319 (9th Cir. 1992), with approval:  "'By making Indians subject to federal prosecution for certain crimes, Congress did not address implicitly, must less explicitly, the amenability of the tribes to the processes of the court in which the prosecution is commenced.'"); *supra* note 13 & accompanying text.

## II.    This Court Lacks Personal Jurisdiction over the Committee and Mr. Sutter.

In order for this Court to exercise personal jurisdiction over the Committee and Mr. Sutter, a statute must authorize service of process on them, *see, e.g.*, *Troma Entm't, Inc. v. Centennial Pictures, Inc.*, 729 F.3d 215, 218 (2d Cir. 2013), and "the exercise of personal jurisdiction must comport with constitutional due process principles," *Licci ex rel. Licci v.*

*Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012).  The first requirement is satisfied here, *see* 15 U.S.C. § 78u(c) (authorizing nationwide service of process in actions like this one), but the second is not.

As with subject matter jurisdiction, the SEC bears the "burden of showing that the court has [personal] jurisdiction," *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) – a burden that it has not even attempted to satisfy here.  *See* Appl. . . . (June 20, 2014) (ECF No. 1) ("SEC Appl.") (silence regarding personal jurisdiction); SEC Mem. (same).

### A.  Due Process Requires Minimum Contacts and Constitutional Reasonableness.

The exercise of personal jurisdiction satisfies due process principles only when (i) "the defendant has sufficient contacts with the forum . . . to justify the court's exercise of personal jurisdiction," *and* (ii) "the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice – that is, . . . it is *reasonable* to exercise personal jurisdiction under the circumstances."  *Licci*, 673 F.3d at 60 (emphasis added & quotation marks omitted); *see also S.E.C. v. Straub*, 921 F. Supp. 2d 244, 252-53 (S.D.N.Y. 2013).

With respect to the sufficient contacts prong, this Circuit has held that, under the Securities Exchange Act of 1934, Pub. L. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a *et seq.*) ("Exchange Act"), the United States – rather than the state/judicial district where the action is brought – is the relevant "forum."  *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974).  While the Committee and Mr. Sutter disagree with that legal ruling, they acknowledge that they have sufficient contacts with the United States, and recognize that this Court is bound to apply Circuit precedent.  The Committee and Mr. Sutter expressly preserve their arguments that the entire United States is not the proper forum for purposes of the sufficient contacts analysis here, and that they have insufficient contacts with New York and this judicial district.

With respect to the reasonableness prong of the due process analysis, however, this is one of those "rare" cases in which "the reasonableness analysis defeats the exercise of personal jurisdiction," *Straub*, 921 F. Supp. 2d at 259, as we now explain.

> **B.      It Is Not Constitutionally Reasonable for This Court to Exercise Personal Jurisdiction over the Committee and Mr. Sutter.**

This Court must consider five factors to determine whether it is reasonable to exercise personal jurisdiction over the Committee and Mr. Sutter:

> (1) the burden that the exercise of jurisdiction will impose on the [respondent]; (2) the interests of the forum [district] in adjudicating the case; (3) the [petitioner's] interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quotation marks omitted).  The balance of these factors compels the conclusion that this Court may not exercise personal jurisdiction here.

1. <u>Burden on Committee and Mr. Sutter</u>.  "Congressional committees operate predominantly in the capital . . . .  The disruption to the work of Congress by the pendency of actions elsewhere than in Washington could be far more serious than in the case of the executive departments and agencies with their large staffs."  *Liberation News Serv. v. Eastland*, 426 F.2d 1379, 1384 (2d Cir. 1970).  The same goes for "Congressional employee[s]."  *Id.*

The Committee, Mr. Sutter, their documents, and their counsel all are located in the District of Columbia.  Notwithstanding "the conveniences of modern communication and transportation," *Metro. Life*, 84 F.3d at 574, litigating this dispute here unquestionably will burden the Committee and Mr. Sutter and interfere with their governmental responsibilities.  *See infra* Argument, Part V.

2.  <u>Interests of Forum</u>.  This District has no special interest in adjudicating an enforcement action involving subpoenas (i) directed to an entity and individual that "operate predominantly" in Washington, D.C., *Liberation News*, 426 F.2d at 1384, and (ii) which directed compliance to be made in Washington, D.C., *see* Comm. Subp. at 1; Sutter Subp. at 1.[18]

The Exchange Act, for its part, identifies two fora with potential interests in enforcing the SEC's subpoenas:  the jurisdiction where the "investigation or proceeding is carried on," and the jurisdiction where the Committee and Mr. Sutter "reside[] or carr[y] on business."  15 U.S.C. § 78u(c).  Both favor the District of Columbia.

First, the SEC is carrying on its investigation in the District of Columbia.  *See, e.g.*, *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 249 (D.C. Cir. 2005) ("[T]he test whether the Commission is undertaking an inquiry in a particular place is whether [the] place and the activities occurring there bear a reasonable relation to the subject matter of the investigation." (construing Federal Trade Commission Act, 15 U.S.C. § 49; quotation marks omitted)).  By all accounts, the SEC's investigation centers on people and documents located, and events that occurred, in the District of Columbia:

- CMS maintains its headquarters in the District of Columbia (with a second headquarters in Baltimore, Maryland).  *See Locations & Facilities*, CMS, http://www.cms.gov/About-CMS/Career-Information/CareersatCMS/Locations Facilities.html (last visited July 4, 2014).

- The three Greenberg Traurig lawyers of interest to the SEC – Mark Hayes, Nancy Taylor, and Danielle White, *see* Comm. Subp., Categories 1, 5; Sutter Subp., Categories 1, 5; SEC Specification Letter at 1 – are based in the firm's District of Columbia office.  *See* Greenberg Traurig, http://www.gtlaw.com/People.

- Height Securities – which allegedly tipped investors after communicating with the "GT Lobbyist," Straub Decl. ¶¶ 13-14 – is based in the District of Columbia.  *See*

---

[18]  The SEC, in this action, now seeks to compel compliance in New York, *see* SEC Appl. ¶ 8, although it has proffered no explanation for that change in position.

19

FINRA, Brokerage Firm Summary – Height Securities, LLC, http://brokercheck.finra.org/Firm/FirmSummary.aspx?SearchGroup=Firm&FirmKey=150659&BrokerKey=-1 (select "Firm," then type "Height Securities, LLC" into "Firm Name" field) (last visited July 4, 2014).

- The Committee and Mr. Sutter are located in the District of Columbia, as are the documents at issue (which overwhelmingly concern communications among individuals located, and/or events that occurred, in the same place, *see supra* Background, Part III).

Second, the Committee and Mr. Sutter both carry on their congressional business in and around the U.S. Capitol complex in Washington, D.C., and Mr. Sutter resides in the Eastern District of Virginia, just across the Potomac River from the District of Columbia.

On the other hand, there is no indication that the SEC is carrying on its investigation in the Southern District of New York, and neither the Committee nor Mr. Sutter reside or carry on their regular work activities in the Southern District of New York.  As best we can tell, this case is here solely because the SEC's New York Regional Office has been "empowered to issue subpoenas and take evidence" in this investigation.  Straub Decl. ¶ 8.  But the SEC's "ch[oice] to issue the subpoenas from its office in this district" does not mean that "this district ipso facto becomes a place within which [the SEC's] inquiry is being carried on."  *F.T.C. v. W. Gen. Dairies, Inc.*, 432 F. Supp. 31, 33 (N.D. Cal. 1977) (construing similar language under provision of Federal Trade Commission Act, 15 U.S.C. § 49).  To conclude otherwise would "make[] the choice of forum enforcement wholly capricious."  *Id.*[19]

---

[19] *Accord F.T.C. v. Jim Walter Corp.*, 651 F.2d 251, 254 (5th Cir. Unit A July 1981) ("[T]he fact that the FTC has managed this investigation from its Dallas office . . . is not necessarily dispositive if the choice of forum is otherwise unreasonable."), *abrogated on other grounds by Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982); *S.E.C. v. Fin. Insts. Assurance Corp.*, No. C85-1912A, 1985 WL 1562, at *2 (N.D. Ga. Mar. 18, 1985) ("[T]he SEC's choice to proceed in this district is an unreasonable choice.  The only connection between this case and this district is the fact that the SEC has, presumably for reasons of its own convenience, chosen to have its Atlanta office monitor this investigation.  As far as the court can see the choice of the Atlanta office is in no way related to the focus of this investigation.").

3.  <u>SEC's Interest</u>.  For the reasons just discussed, the SEC has no special interest in obtaining relief in this district.  Quite the contrary:  The SEC is headquartered in the District of Columbia; its investigation, at least in relevant part, is centered in the District of Columbia; its subpoenas directed compliance in the District of Columbia; and its entitlement to relief, if any, would be the same in the District of Columbia as it is here.

4.  <u>Efficient Resolution</u>.  "In evaluating this factor, courts generally consider where witnesses and evidence are likely to be located."  *Metro. Life*, 84 F.3d at 574.  Resolving the SEC's enforcement action in this district will not promote the efficient administration of justice because, as noted above, the Committee, Mr. Sutter, and all of their documents and counsel are located in the District of Columbia.

5.  <u>States' Social Policy Interests</u>.  This factor is not applicable here.

Accordingly, the relevant factors compel the conclusion that it would not be reasonable for this Court to exercise personal jurisdiction over the Committee and Mr. Sutter here.

## III.   Venue Is Improper Here – And, Even if It Were Proper, It Would Be More Appropriate in the District of Columbia.

The Exchange Act identifies two appropriate venues for SEC subpoena enforcement actions:  the jurisdiction where the "person" to whom the subpoena was issued "resides or carries on business" and the jurisdiction where the "investigation or proceeding is carried on." 15 U.S.C. § 78u(c).  The first plainly does not apply here, for the reasons discussed above.  *See supra* Argument, Part II(B).  And the SEC, which bears the burden of establishing that venue is proper here, *see, e.g.*, *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005), has not established that its investigation is being "carried on" in this district.  All it has said is that its order initiating the investigation "designates certain individuals in the . . . New York Regional Office . . . as officers of the Commission empowered to issue subpoenas."  Straub Decl. ¶ 8.  But

that is not enough to satisfy the statutory "carried on" requirement.  *See supra* Argument, Part
II(B).  Accordingly, the Court should dismiss.  *See* 28 U.S.C. § 1406(a); Fed. R. Civ. P. 12(b)(3).

     However, even if the Court were to conclude that venue is proper here as an initial
matter, it nonetheless should transfer this case to the District Court for the District of Columbia
because that would promote "the convenience of parties and witnesses" and serve "the interest of
justice."  28 U.S.C. § 1404(a); *see also* § 1406(a).

     In evaluating section 1404(a), the Court should consider the following factors:

> (1) the convenience of witnesses, (2) the convenience of the parties, (3)
> the location of relevant documents and the relative ease of access to
> sources of proof, (4) the locus of operative facts, (5) the availability of
> process to compel the attendance of unwilling witnesses, (6) the relative
> means of the parties, (7) the forum's familiarity with the governing law,
> (8) the weight accorded the plaintiff's choice of forum, and (9) trial
> efficiency and the interest of justice, based on the totality of the
> circumstances.

*Mohsen v. Morgan Stanley & Co.*, No. 11-cv-6751(PGG), 2013 WL 5312525, at *5 (S.D.N.Y.
Sept. 23, 2013) (Gardephe, J.) (quotation marks omitted); *accord N.Y. Marine & Gen. Ins. Co. v.
Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010).  The first factor is the most important.
*See Mohsen*, 2013 WL 5312525, at *5.

     The first and second factors favor a transfer because it would be substantially more
convenient for the Committee and Mr. Sutter (and their counsel) to litigate this matter (and for
Mr. Sutter to testify, if a Court were to so order) in the District of Columbia.  *See supra*
Argument, Part II(B).  And the SEC, of course, is headquartered in the District of Columbia.  *See
id.*  The third and fourth factors also favor a transfer because all of the documents at issue are in
the District of Columbia (and none are in this district), and all, or virtually all, of the "operative
facts" concern players – or took place – in the District of Columbia.  *See id.*

The fifth factor favors the District of Columbia, where personal jurisdiction is available. *See supra* Argument, Part II.  Otherwise, it does not cut in one direction or the other.

The sixth factor favors a transfer because Mr. Sutter is a government employee with limited financial resources.

The seventh factor also favors a transfer because, while this Court and the District Court for the District of Columbia are equally familiar with the law on some issues (e.g., sovereign immunity, personal jurisdiction), the latter is more familiar with the Speech or Debate Clause. This is so because Congress is located in the District of Columbia and, as a result, many Speech or Debate Clause cases – particularly those in the subpoena context – are litigated there.

With respect to the eighth factor, while the SEC's preference for this district is entitled to some deference, "a plaintiff's choice of forum is given less weight where [as here] the case's operative facts have little connection with the chosen forum."  *Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional*, No. 08-cv-8106(PGG), 2009 WL 2252116, at *9 (S.D.N.Y. July 28, 2009) (Gardephe, J.) (quotation marks omitted).

The ninth factor also favors transfer to the District of Columbia because the interests of justice would be better served there.  The SEC wrongly prioritizes the convenience of its own lawyers over this matter's extensive nexus to the District of Columbia.

## IV.    The Speech or Debate Clause Bars Enforcement of the SEC's Subpoenas.

This enforcement action is barred by the Speech or Debate Clause because the documents and testimony at issue are protected absolutely against compelled disclosure.  We first provide a brief overview of the relevant constitutional landscape (Part A), and then explain how the Clause applies here (Part B) and why the SEC's contrary arguments fail (Part C).

### A.    Constitutional Overview.

"[T]he whole American fabric has been erected" on the principle of Separation of Powers.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803).  "[N]one of [the three branches of the federal government] ought to possess, directly or indirectly, an overruling influence over the others, in the administration of their respective powers.  It will not be denied, that power is of an encroaching nature, and that it ought to be effactually restrained from passing the limits assigned to it."  The Federalist No. 48 (James Madison).

The Founders were acutely aware that simply dividing the government into three separate branches would not suffice to guarantee American liberty.  Accordingly, they also included in the Constitution concrete mechanisms to make the Separation of Powers principle work, mechanisms that would "provide some practical security for each [branch], against the invasion of the others."  *Id.*; *see also* The Federalist No. 51 (James Madison or Alexander Hamilton) ("[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others.").  One such concrete, practical mechanism is the Speech or Debate Clause.

### 1.    The History and Purpose of the Clause.

The Speech or Debate Clause is rooted in the epic struggle between Parliament and the Crown in 16th- and 17th-century England:  "Behind [the Clause] lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators."  *U.S. v. Johnson*, 383 U.S. 169, 178 (1966); *accord Tenney v. Brandhove*, 341 U.S. 367, 372 (1951).  As

24

a result of the English experience, "[f]reedom of speech and action in the legislature was taken as a matter of course" by the Founders, and reflected in the Speech or Debate Clause. *Id*. at 372.

"The purpose of the [Speech or Debate] Clause is to insure that the legislative function the Constitution allocates to Congress may be performed *independently*. . . . [T]he 'central role' of the Clause is to 'prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary. . . .'" *Eastland*, 421 U.S. at 502 (quoting *Gravel v. U.S.*, 408 U.S. 606, 617 (1972)); *see also U.S. v. Helstoski*, 442 U.S. 477, 491 (1979) ("This Court has reiterated the central importance of the Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere.").

"In the American governmental structure the Clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *Johnson*, 383 U.S. at 178; *see also Helstoski*, 442 U.S. at 491 ("[The] purpose [of the Clause] was to preserve the constitutional structure of separate, coequal, and independent branches of government."); *U.S. v. Myers*, 635 F.2d 932, 935-36 (2d Cir. 1980) ("Like the Speech or Debate Clause, the doctrine of separation of powers serves as a vital check upon the Executive and Judicial Branches to respect the independence of the Legislative Branch, not merely for the benefit of the Members of Congress, but, more importantly, for the right of the people to be fully and fearlessly represented by their elected Senators and Congressmen.").

Because "the guarantees of th[e Speech or Debate] Clause are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require." *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979). Accordingly, the Supreme Court has repeatedly, and "[w]ithout exception, . . . read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501; *see also Doe v. McMillan*,

412 U.S. 306, 311 (1973); *Gravel*, 408 U.S. at 617-18; *Johnson*, 383 U.S. at 179; *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880); *Myers*, 635 F.2d at 937.

This mandated broad reading has included extending the protections of the Clause "not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel*, 408 U.S. at 618. This is so because "it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants." *Id.*; *see also Eastland*, 421 U.S. at 507 (affirming dismissal of claims against Senate subcommittee, individual Senators, and subcommittee's Chief Counsel: "[The Court] draw[s] no distinction between the Members and the Chief Counsel . . . . '[T]he day-to-day work of such aides is so critical to the Members' performance that they must be treated as (the Members') alter egos.'" (quoting *Gravel*, 408 U.S. at 616-17)); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 862 (D.C. Cir. 1988) (Speech or Debate Clause protected staff activities undertaken in connection with subcommittee investigation).

## 2. The Scope of the Clause.

The three protections afforded by the Speech or Debate Clause, discussed in the next section, apply to all activities "within the 'legislative sphere,'" *McMillan*, 412 U.S. at 312-13 (quoting *Gravel*, 408 U.S. at 624-25), which includes all activities that are

> an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel*, 408 U.S. at 625; *accord Eastland*, 421 U.S. at 504.

The Courts have broadly construed the concept of "legislative activity" to include much more than words spoken in debate.  The "cases have plainly not taken a literalistic approach in applying the privilege. . . .  Committee reports, resolutions, and the act of voting are equally covered." *Gravel*, 408 U.S. at 617.  Similarly, committee investigations and hearings have been held to be activities within the legislative sphere, *see Eastland*, 421 U.S. 504-05; *McMillan*, 412 U.S. at 313, as has the collecting of information in furtherance of legislative responsibilities because "'[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change,'" *Eastland*, 421 U.S. at 504 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)).  Protected information-gathering encompasses both formal Committee processes, *see, e.g.*, *Eastland*, 421 U.S. at 504, and less formal investigations by committee and individual Members, *see, e.g.*, *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 411-12, 423 (D.C. Cir. 1995) (documents voluntarily delivered to committee by private citizen protected); *McSurely v. McClellan*, 553 F.2d 1277, 1287 (D.C. Cir. 1976) (en banc) ("[A]cquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the [Speech or Debate] privilege so that congressmen are able to discharge their constitutional duties properly." (quotation marks omitted)).[20]

---

[20]  *See also Gov't of the Virgin Islands v. Lee*, 775 F.2d 514, 520-21 (3d Cir. 1985) (fact-finding by individual legislator protected); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation or investigation is one of the 'things generally done in a session of the House,' concerning matters within the 'legitimate legislative sphere.'" (citations omitted)); *U.S. v. Dowdy*, 479 F.2d 213, 223-24 (4th Cir. 1973) (Member's informal gathering of information from federal agencies in furtherance of legislative functions protected); *Benford v. Am. Broad. Cos.*, 102 F.R.D. 208, 210 (D. Md. 1984) ("[I]nformation possessed by them [unpaid, volunteer committee investigators] and transmitted to, or received by, them in the execution of legislative functions, including legitimate information-gathering, is Constitutionally privileged from discovery in this lawsuit . . . ."); *Webster v. Sun Co.*, 561 F. Supp. 1184, 1189-90 (D.D.C. 1983) (Congressional Research Service

(*Continued . . . .*)

The Clause also bars any "'inquiry into . . . the motivation for [legislative] acts.'" *Helstoski*, 442 U.S. at 489 (quoting *U.S. v. Brewster*, 408 U.S. 501, 512 (1972)); *see also Johnson*, 383 U.S. at 180, 184-85 (such inquiry "necessarily contravenes the . . . Clause").

Finally, the Clause is not abrogated by allegations that a Legislative Branch official acted unlawfully or with an unworthy purpose.  *See, e.g.*, *McMillan*, 412 U.S. at 312-13 (Clause applies to all legislative activities "even though the[] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes."); *Tenney*, 341 U.S. at 377; *MINPECO*, 844 F.2d at 861 (once "legislative process" test met, that is "the end of the matter"); *Porteous v. Baron*, 729 F. Supp. 2d 158, 166 (D.D.C. 2010).

### 3.    The Protections Afforded by the Clause.

The Speech or Debate Clause provides three broad protections:  (i) immunity from prosecutions, or civil lawsuits, for all actions "within the 'legislative sphere,'" *McMillan*, 412 U.S. at 312-13 (quoting *Gravel*, 408 U.S. at 624-25); (ii) an evidentiary non-use protection that bars parties from advancing their cases against Legislative Branch officials by "[r]evealing information as to a legislative act," *Helstoski*, 442 U.S. at 490; and (iii) a non-disclosure protection that bars seizure of legislative materials from Members and their aides, and prevents them from being compelled to testify as to legislative matters or to produce legislative records.[21]

---

analyst's receipt of information from lobbyist protected), *vacated and remanded on other grounds*, 731 F.2d 1 (D.C. Cir. 1984); *United Transp. Union v. Springfield Terminal Ry. Co.*, Nos. 87-cv-03442P & 88-cv-0117P, 1989 WL 38131, at *1-2 (D. Me. Mar. 13, 1989) (monitoring of labor developments by individual Member and staff protected).

[21]  Testimony:  *See, e.g.*, *Dennis v. Sparks*, 449 U.S. 24, 30 (1980) (dicta); *Gravel*, 408 U.S. at 615-16; *Miller*, 709 F.2d at 528-29.

Documents:  *See, e.g.*, *Brown & Williamson*, 62 F.3d at 419; *MINPECO*, 844 F.2d at 859-61; *McSurely*, 553 F.2d at 1296-97; *Dombrowski v. Burbank*, 358 F.2d 821, 823-24 (D.C. Cir. 1966) (dicta), *aff'd in part and rev'd in part sub nom. Dombrowski v. Eastland*, 387 U.S. 82 (1967); *Hearst v. Black*, 87 F.2d 68, 71-72 (D.C. Cir. 1936); *Pentagen Techs. Int'l, Ltd. v. Comm. on*

(*Continued . . . .*)

The Supreme Court draws no distinctions between these three protections. Rather, it has stated unequivocally that when the Speech or Debate privilege applies, it is "absolute."

> The question to be resolved is whether the actions of the petitioners fall within the "sphere of legitimate legislative activity." If they do, the petitioners "shall not be questioned in any other Place" about those activities since the prohibitions of the Speech or Debate Clause are absolute.

*Eastland*, 421 U.S. at 501 (footnote omitted; quoting *McMillan*, 412 U.S. at 312-13); *see also id.* at 503, 509-10 & n.16; *Gravel*, 408 U.S. at 623 n.14; *Barr v. Matteo*, 360 U.S. 564, 569 (1959).

### B. The Speech or Debate Clause Applies Here to Bar the SEC's Enforcement Action.

In light of the Committee's legislative responsibilities and activities, described above, *see supra* Background, Parts I-II, it is abundantly clear from the face of the SEC's subpoenas (and the SEC Specification Letter) that this enforcement action is predicated on a claimed right to documents and testimony that constitute or reflect Committee legislative activities. As a result, the Committee and Mr. Sutter are immune from suit here. *See, e.g.*, *Eastland*, 421 U.S. at 501 (dismissing claims against Senate subcommittee, individual Senators, and subcommittee's Chief Counsel); *McMillan*, 412 U.S. at 312 (affirming dismissal of claims against committee Members and committee staff). Under the particular circumstances of this case, the same result obtains if the Court applies the non-disclosure protection of the Speech or Debate Clause. *See supra* note 21 & accompany text (citing cases).

The Court's role in determining whether the Committee's and Mr. Sutter's activities, into which the SEC seeks to probe, were legislative (and thus Speech or Debate protected) is

---

*Appropriations of the U.S. House of Representatives*, 20 F. Supp. 2d 41, 43-44 (D.D.C. 1998), *aff'd*, 194 F.3d 174 (D.C. Cir. 1999) (per curiam); *U.S. v. Peoples Temple of the Disciples of Christ*, 515 F. Supp. 246, 248-49 (D.D.C. 1981).

exceedingly limited.  "The courts should not go beyond the narrow confines of determining that

a committee's inquiry may fairly be deemed within its province."  *Eastland*, 421 U.S. at 506

(quotation marks omitted); *U.S. v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988) ("[T]he Speech or

Debate Clause forbids not only inquiry into acts that are manifestly legislative but also inquiry

into acts that are purportedly legislative, even to determine if they are legislative in fact . . . ."

(quotation marks omitted)); *Dowdy*, 479 F.2d at 226 ("Once it [i]s determined . . . that the

legislative function . . . was *apparently* being performed, the propriety and the motivation for the

action taken, as well as the detail of the acts performed, are immune from judicial inquiry.").[22]

    Here, all of the matters which the SEC seeks to probe are manifestly legislative – and at

the very least are apparently legislative – and, therefore, are constitutionally protected.  As

discussed above, the Committee and its Subcommittee on Health have considered, in the current

Congress alone, various legislative proposals that deal with DHHS, CMS, Medicare, MA, and,

particularly, CMS's rate-setting with respect to the SGR and MA.  *See supra* Background,

Part II.  In order to consider such proposals, the Committee necessarily had to gather information

– including from lobbyists – so that it could make informed decisions about the need for

legislative action and, where appropriate, the content of legislation.  These activities lie at the

very heart of the "sphere of legitimate legislative activity."  *See, e.g.*, *Eastland*, 421 U.S. at 504

("The power to investigate . . . plainly falls within that definition [of legitimate legislative

---

[22]  *See also, e.g.*, *Brown & Williamson*, 62 F.3d at 418-19 (quashing document subpoena to
subcommittee Members:  "Once the legislative-act test is met, . . . the privilege is absolute . . . ."
(quotation marks omitted)); *MINPECO*, 844 F.2d at 861 (quashing subpoena for subcommittee
documents:  "As the [activity] was part of the legislative process, that is the end of the matter.");
*Peoples Temple*, 515 F. Supp. at 249 (quashing subpoena for congressional documents:  "The
Supreme Court has rarely spoken with greater clarity.  Once it is determined . . . that [the
congressional individual or entity's] actions fall within the legitimate legislative sphere, judicial
inquiry is at an end." (quotation marks omitted)).

activity].”); *Dowdy*, 479 F.2d at 224 (“This evidence was an examination of defendant's actions as a Congressman, who was chairman of a subcommittee investigating a complaint, in gathering information in preparation for a possible subcommittee investigatory hearing.  As such, it was an examination of legislative acts . . . .”).

And information-gathering in furtherance of legislative activities is protected whenever the subject of the inquiry is “one ‘on which legislation could be had,’” *Eastland*, 421 U.S. at 504 n.15 (quoting *McGrain*, 273 U.S. at 177), regardless of whether legislation is actually produced, *see id.* at 509 (“Nor is the legitimacy of a congressional inquiry to be defined by what it produces.  The very nature of the investigative function – like any research – is that it takes the searchers up some ‘blind alleys’ and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result.”).  Here, there can be no question that the topics about which the SEC seeks to inquire constitute information-gathering in furtherance of matters within the Committee's jurisdiction “on which legislation could be had.”

It follows that there also is no room for the SEC to inquire into the Committee's or Mr. Sutter's purpose or motives.  “[I]n determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it.”  *Eastland*, 421 U.S. at 508-09; *accord X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71-72 (2d Cir. 1999).  Instead, “once it is determined that the Members are acting within the legitimate legislative sphere, the Speech or Debate Clause is an absolute bar to interference.”  *Eastland*, 421 U.S. at 503 (quotation marks omitted).

### C.    The SEC's Contrary Arguments Are Unavailing.

In response, the SEC initially offers two broad but facially frivolous arguments.  *First*, it says that “the Executive Branch's CMS Rate Announcement” could not itself have constituted a “legislative act.”  SEC Mem. at 15.  True, but beside the point.  What unquestionably is a

legislative act, and therefore at the heart of the Clause's "absolute" protection, is the *Committee's inquiry* into CMS's actions.  *See, e.g.*, *Eastland*, 421 U.S. at 501, 503, 509 & n.16.

 *Second*, the SEC says the protections of the Speech or Debate Clause vanish "[t]o the extent any conduct constituted a violation of the laws against insider trading."  SEC Mem. at 15. That is flatly incorrect, as we already have explained.  *See supra* Argument, Part IV(A)(2) (citing *McMillan*, 412 U.S. at 312-13, among other cases).[23]  It is also illogical because the answer to the question of whether "any conduct constituted a violation of the laws against insider trading" can only be known when enforcement proceedings (if any) are completed and, accordingly, the answer to that ultimate question cannot dictate what information the SEC is entitled to obtain on the front end of the process.  In any event, the Committee and Mr. Sutter have not engaged in any illegal conduct, and nor has the SEC alleged that they have.

 The SEC next retreats to an unavailing category-by-category defense of its subpoenas.

 1. <u>Documents Concerning the Medicare Advantage Rates</u>.  The SEC seeks all documents concerning the preliminary 2014 MA payment rates and/or the final 2014 MA payment rates, including all documents that concern any of Mr. Sutter's communications concerning those rates. *See* Comm. Subp., Categories 3, 5; Sutter Subp., Categories 3, 5.  And it seeks Mr. Sutter's testimony about those same subjects.  *See* SEC Specification Letter at 1.

---

[23]  *See also, e.g.*, *Helstoski*, 442 U.S. at 488 ("[W]ithout doubt the exclusion of such evidence [of legislative acts] will make prosecutions more difficult.  Indeed, the Speech or Debate Clause was designed to preclude prosecution of Members for legislative acts."); *id.* at 491 ("The Speech or Debate Clause was designed neither to assure fair trials nor to avoid coercion."); *Eastland*, 421 U.S. at 492-93, 501, 509-10 (Clause applies even where Committee conduct violates third party First Amendment rights); *Brewster*, 408 U.S. at 516 ("In its narrowest scope, the Clause is a very large, albeit essential, grant of privilege.  It has enabled reckless men to slander and even destroy others with impunity, but that was the conscious choice of the Framers.").

The SEC says that "there is no basis to believe that information in Sutter's files regarding the Medicare Advantage Rates . . . somehow implicates the protections of the Clause."  SEC Mem. at 20 (citing no authority).  That plainly is wrong.  The gathering of information regarding CMS's rate-setting activities plainly is in furtherance of the Committee's legislative responsibilities because the rates that CMS sets is an issue on which legislation "could be had." *Eastland*, 421 U.S. at 504 n.15 (quotation marks omitted); *supra* Argument, Part IV(A), (B). The SEC's bald assertions to the contrary merit no further response.

2. <u>Documents Concerning Potential Confirmation of Marilyn Tavenner as CMS Administrator</u>.  The SEC seeks all documents that concern the potential confirmation of a new CMS director (Marilyn Tavenner), including all documents that concern any of Mr. Sutter's communications concerning that potential confirmation.  *See* Comm. Subp., Categories 4, 5; Sutter Subp., Categories 4, 5.

The SEC begins it justification of this category of documents by acknowledging that it "has no investigative interest in the . . . confirmation of Tavenner, or the motivations or reasons behind any agreements regarding that confirmation."  SEC Mem. at 21.  It says it nevertheless wants documents that cover exactly that subject because certain lobbyists have "suggested" that the Senate's confirmation of Ms. Tavenner was "politically linked" to CMS's rate-setting with respect to the SGR and MA.  *Id.* at 20-21.  The only case it cites is *Brewster*, which is not remotely on point.[24]

---

[24]  *Brewster* held that a Member charged with bribery was not immune from prosecution where the indictment alleged that he had promised to perform a future legislative act in exchange for the receipt of money.  (In other words, actual legislative conduct – e.g., voting or information-gathering, and for what reasons – was not implicated by the allegations, which required proof only of the receipt of money and the promise of future activity, rather than actual activity.)  *See* 408 U.S. at 525-29.  *Brewster* thus has nothing to do with this matter.

The Committee and Mr. Sutter, of course, are not part of the U.S. Senate and had no role in the Senate's confirmation of Ms. Tavenner.  *See* U.S. Const. art. II, § 2, cl. 2 (assigning relevant advice and consent role exclusively to Senate).  However, to the extent that the Committee did obtain information about Ms. Tavenner and/or her potential confirmation, that was wholly appropriate because such information would be relevant to actions CMS might take under her leadership (if confirmed), and thus to whether legislation might be needed to ensure that CMS would adhere to the Committee's policy preferences, including particularly with regard to the SGR and MA.

3.  Documents Concerning Greenberg Traurig.  The SEC also seeks all documents concerning communications between Mr. Sutter and Greenberg Traurig, a lobbying firm with which Mr. Sutter dealt in gathering information regarding the impact of the MA payment rates on industry.  *See* Comm. Subp., Categories 1, 5; Sutter Subp., Categories 1, 5.  And it seeks Mr. Sutter's testimony about this same subject.  *See* SEC Specification Letter at 1.

Communications with lobbyists, of course, are a normal and routine part of Committee information-gathering.  Lobbyists present to Congress the views of various stakeholders regarding existing or potential legislation and, in that capacity, carry out a role contemplated by the First Amendment, i.e., petitioning the government for a redress of grievances.  Any communications Mr. Sutter may have had with lobbyists – or any information he may have received from them – regarding the impact of the MA payment rates on industry falls squarely within the realm of protected legislative information-gathering, i.e., the gathering of information to inform the Committee's views on the necessity for, and appropriate content of, legislation. *See supra* Argument, Part IV(A)(2), (B); *see also Brown & Williamson*, 62 F.3d at 420 (Clause

barred compelled disclosure of committee documents); *Webster*, 561 F. Supp. at 1189-90

(Clause properly invoked as to congressional staffer's communications with lobbyist).

The SEC's suggestion that, because the Committee and Mr. Sutter's communications

concerned the actions of an Executive Branch agency (CMS), those communications could not

have been legislative, *see* SEC Mem. at 18, is frivolous because, among other reasons, Congress

considers and passes every year a substantial amount of legislation that concerns the Executive

Branch of the federal government, and the multitude of programs administered by the Executive

Branch.  There is nothing talismanic about the Executive Branch insofar as the Speech or Debate

Clause is concerned.  *See, e.g.*, *Hutchinson v. Proxmire*, 443 U.S. 111, 132-33 (1979)

(emphasizing role of Congress in investigating Executive Branch activities); *Dowdy*, 479 F.2d at

222-27 (Clause properly invoked as to Member's conversations with executive agency

concerning investigation of construction company).

The three cases upon which the SEC principally relies, *Hutchinson*, *Gravel*, and

*McSurely*, *see* SEC Mem. at 17-18, do not support its position.  Those cases establish only that

the following conduct falls outside the legislative sphere:  (i) transmittal of information to

constituents, by individual Members, via "newsletters and press releases," *Hutchinson*, 443 U.S.

at 132-33; (ii) private re-publication of congressional material, *Gravel*, 408 U.S. at 622;

(iii) "cajol[ing]" or "exhort[ing]" administrative agencies "with respect to the *administration* of

an existing federal statute," *id.* at 625 (emphasis added); and (iv) distribution of documents

outside of Congress "*in the absence of a claim of legislative purpose*," *McSurely*, 553 F.2d at

1286 (emphasis added).[25]  None of these activities is remotely at issue in this case.

---

[25]  The SEC's quotation from *McSurely* comes not from the en banc D.C. Circuit opinion to
which its citation refers but instead from the opinion that the en banc decision replaced.  *See* SEC
Mem. at 17.  Respondents' quotation above is accurately attributed to the en banc opinion.

(*Continued . . . .*)

Instead, the activity at issue, into which the SEC seeks to probe, is routine information-gathering to inform the Committee regarding an issue on which legislation could be had (and, in fact, has been developed and actively pursued), and that is quintessential legislative conduct protected by the Speech or Debate Clause, as the SEC's own cases recognize.

Indeed, in emphasizing that congressional efforts to inform Members on public issues, *including particularly those on which the Executive Branch proposes to act*, fall within the Clause, *Hutchinson* vividly recounts why the Clause applies here:

> "Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct."

*Id.* at 130, 132-33 (quoting W. Wilson, Congressional Government 303 (1885)); *see also Gravel*, 408 U.S. at 618, 624 (Clause reaches "anything generally done in a session of the House by one of its members in relation to the business before it"; "Rather than giving the clause a cramped construction, the Court has sought to implement its fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." (quotation marks omitted)); *McSurely*, 553 F.2d at 1287 ("The acquisition of knowledge . . . is a necessary concomitant of legislative conduct and thus should be within the

---

The SEC also cites to *Tavoulareas v. Piro*, 527 F. Supp. 676 (D.D.C. 1981), *see* SEC Mem. at 17.  We note that the reasoning of *Tavoulareas* was subsequently rejected in part by the D.C. Circuit.  *See Brown & Williamson*, 62 F.3d at 421 (rejecting reasoning of *Tavoulareas* that Clause's application to information-gathering turns on whether Congress actively solicited information from outside party); *Jewish War Veterans of the U.S., Inc. v. Gates*, 506 F. Supp. 2d 30, 56 (D.D.C. 2007) (recognizing same).

ambit of the privilege so that congressmen are able to discharge their constitutional duties properly." (quotation marks omitted)).

Finally, the SEC notes that "constituent . . . services" may be outside the protections of the Clause.  SEC Mem. at 18.  The Supreme Court has so noted, but only in the context of pointing out that individual Members may engage in legitimate, official conduct that is not legislative, e.g., "legitimate 'errands' performed for constituents."  *Brewster*, 408 U.S. at 512.  The Committee, however, is not an individual Member, and Mr. Sutter does not work for one.  Indeed, the Committee does not engage in "constituent services" because it has no constituents.  Its sole function and purpose is legislative.  *See supra* Background, Part I.

4.  <u>Documents Concerning Communications between Mr. Sutter and CMS</u>.  The SEC seeks all documents concerning communications between Mr. Sutter and CMS, *see* Comm. Subp., Category 2; Sutter Subp., Category 2, as well as Mr. Sutter's testimony about any such communications with CMS that concerned CMS's April 1, 2013 rate announcement, *see* SEC Specification Letter at 1.  Given Mr. Sutter's role with the Committee, his communications with CMS self-evidently are Speech or Debate protected.  *See supra* Argument, Part IV(B).

While the SEC surmises that its subpoenas may encompass some documents or testimony regarding Committee "lobbying" of CMS, *see* SEC Mem. at 19, it surmises incorrectly.  The Committee, as noted immediately above, is solely a legislative entity.  It does not interface with CMS other than in its role as a House committee of legislative jurisdiction with respect to CMS.  Indeed, as we made clear above, during the relevant periods of time, the Committee interfaced with CMS on a regular and on-going basis regarding the propriety of legislation dealing with CMS's rate-setting, and specifically with respect to the SGR and MA.  Those communications, which are exactly what the SEC's subpoenas seek, are constitutionally off limits because, at an

37

absolute minimum, contacts between the Committee and CMS are "purportedly legislative,"

*Biaggi*, 853 F.2d at 103, which means that any further inquiry is forbidden by the Clause.

5.  <u>Mr. Sutter's Work Telephone Records</u>.  Finally, the SEC seeks all telephone records

from Mr. Sutter's work phones.  *See* Comm. Subp., Category 6.  In *Brown & Williamson*, the

D.C. Circuit correctly reasoned, in quashing a document subpoena to a congressional committee:

> [I]ndications as to what Congress is looking at provide clues as to what
> Congress is doing, or might be about to do – and this is true whether or not
> the documents are sought for the purpose of inquiring into (or frustrating)
> legislative conduct or to advance some other goals . . . .

62 F.3d at 420.  Because Committee toll records would reveal to whom Mr. Sutter was speaking

in the course of his employment, the date and time at which he was speaking to that person, and

the duration and frequency of such calls, they are Speech or Debate protected.  *See also United

Transp.*, 1989 WL 38131, at *4 (Clause applies to telephone toll records that pertain to

information gathering:  "[Congressional employee] telephoned Ronald Etters and Roy J. Carvatta

of the Chicago office 'to find out what was going on.'  This constitutes information gathering in

an area of potential legislation and is therefore privileged.").

This is so even if some phone calls placed or received by Mr. Sutter on his work phone

did not reflect congressional activities (e.g., calls between Mr. Sutter and his family), because the

Speech or Debate Clause does not countenance fishing trips through legislative records in the

hopes that something non-legislative may emerge:

> [T]he effect of [enforcement of a particular subpoena to a congressional
> committee] would be to authorize a fishing expedition into congressional
> files.  For a court to authorize such open-ended discovery in the face of a
> claim of privilege and in the absence of any information to suggest the
> likely existence of nonprivileged information would appear inconsistent
> with the comity that should exist among the separate branches of the
> federal government.  Such action would also be inconsistent with Supreme
> Court decisions that make clear that the Speech or Debate Clause,

designed to preserve the independence and integrity of the Legislative
Branch, [is to be] read broadly to effectuate its purposes.

*MINPECO*, 844 F.2d at 862-63 (quotation marks omitted; granting committee's motion).

## V.      Federal Common Law Bars the SEC from Deposing Mr. Sutter.

Long-settled federal common law establishes that, absent exceptional circumstances,
high-ranking government officials may not be forced to testify in litigation to which they are not
parties. *See, e.g.*, *U.S. v. Morgan*, 313 U.S. 409, 422 (1941) (discouraging practice of calling
high-ranking government officials as witnesses); *Lederman v. N.Y. City Dep't of Parks &
Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) ("We now hold that, to depose a high-ranking
government official, a party must demonstrate exceptional circumstances justifying the
deposition."), *cert. denied*, 134 S. Ct. 1510 (2014); *accord In re U.S. (Bernanke)*, 542 F. App'x
944, 948 (Fed. Cir. 2013); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *In re U.S.
(Reno & Holder)*, 197 F.3d 310, 313-14 (8th Cir. 1999); *In re F.D.I.C.*, 58 F.3d 1055, 1060 (5th
Cir. 1995); *In re U.S. (Kessler)*, 985 F.2d 510, 512-13 (11th Cir. 1993); *Franklin Sav. Ass'n v.
Ryan*, 922 F.2d 209, 211 (4th Cir. 1991); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d
575, 586 (D.C. Cir. 1985); *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979);
*Warren Bank v. Camp*, 396 F.2d 52, 56-57 (6th Cir. 1968).

The "exceptional circumstances" doctrine responds to a practical yet fundamental reality:
"High-ranking government officials are generally shielded from depositions because they have
'greater duties and time constraints than other witnesses.'" *Lederman*, 731 F.3d at 203 (quoting
*In re U.S. (Kessler)*, 985 F.2d at 512). "If courts did not limit these depositions [of high-ranking
officials], such officials would spend 'an inordinate amount of time tending to pending
litigation'" to the impairment of their official responsibilities. *Id.* (quoting *Bogan*, 489 F.3d at
423). These policy concerns apply across all branches of the federal government, and also to

state and local government officials, as this Circuit has recognized.  *See id.* at 203-04 (applying

doctrine to mayor and former deputy mayor).[26]

Courts particularly consider three factors in assessing whether a subpoenaing party has

established the requisite exceptional circumstances:  (1) whether the official possesses unique

personal knowledge (i.e., whether the information can be obtained elsewhere); (2) whether the

testimony sought is necessary or essential – not merely relevant or material – to the subpoenaing

party's case; and (3) whether the provision of the testimony would interfere with the official's

government responsibilities.  *See Lederman*, 731 F.3d at 203; *Bogan*, 489 F.3d at 423; *In re*

*F.D.I.C.*, 58 F.3d at 1061-62; *McNamee v. Massachusetts*, No. 12-cv-40050, 2012 WL 1665873,

at *1 (D. Mass. May 10, 2012); *see also Simplex*, 766 F.2d at 587; *Marisol A. v. Giuliani*, No.

95-cv-10533, 1998 WL 132810, at *2-3 (S.D.N.Y. Mar. 23, 1998) (collecting cases); *Hankins v.*

*City of Phila.*, No. 95-cv-1449, 1996 WL 524334, at *1 (E.D. Pa. Sept. 12, 1996) (same).

### A.      The Exceptional Circumstances Doctrine Applies to Mr. Sutter.

The SEC suggests, as an initial matter, that only *executive* officials may qualify as high-

ranking for purposes of this doctrine.  *See* SEC Mem. at 24.  That is incorrect.  *See, e.g.*,

*McNamee*, 2012 WL 1665873, at *1 (quashing subpoena to Congressman's former chief of staff;

applying exceptional circumstances doctrine); Order Granting Mots. to Quash Subpoenas Ad

Testificandum & Duces Tecum Served on Congressmen Berman, Filner, & Sherman at 2-3,

*Cano v. Davis*, No. 2:01-cv-08477 (C.D. Cal. Mar. 28, 2002) (quashing subpoenas to Members;

---

[26]  *See generally MINPECO*, 844 F.2d at 859 ("A litigant does not have to name members or
their staffs as parties to a suit in order to distract them from their legislative work.  Discovery
procedures can prove just as intrusive."); *accord In re U.S. (Bernanke)*, 542 F. App'x at 948
(same); *Buono v. City of Newark*, 249 F.R.D. 469, 470 n.2 (D.N.J. 2008) (same); *Warzon v.*
*Drew*, 155 F.R.D. 183, 184 (E.D. Wis. 1994) (same), *aff'd*, 60 F.3d 1234 (7th Cir. 1995); *Capitol*
*Vending Co. v. Baker*, 36 F.R.D. 45, 46 (D.D.C. 1964) (same).

applying exceptional circumstances doctrine), attached as Ex. C; *Springfield Terminal Ry. Co. v. United Transp. Union*, No. 89-0073, 1989 WL 225031, at *2 (D.D.C. May 18, 1989) (refusing to compel Legislative Branch official either to testify at deposition or to produce documents because such discovery would "disrupt [his] work").  We are aware of no authority holding that the exceptional circumstances doctrine does not apply to high-ranking Legislative Branch officials, nor has the SEC cited any.

The SEC next contends that, even if the doctrine applies to some Legislative Branch officials, Mr. Sutter is not among them.  *See* SEC Mem. at 24-25.  This too is incorrect.  The Ways and Means Committee is one of the most influential governmental bodies in the country. *See supra* Background, Parts I-II.  As the Staff Director for the Committee's Subcommittee on Health, Mr. Sutter is responsible, on a day-to-day basis, for the Committee's work on many of the most important health policy issues of our day, including issues that encompass Medicare, the changes imposed on that program via the Affordable Care Act, and oversight of the Executive Branch agencies (including DHHS and CMS) through which flow billions of taxpayer dollars marked for the health care of millions of Americans.  *See id.*  Not surprisingly given his responsibilities, the House for the past two years has classified Mr. Sutter as "very senior staff" for purposes of various internal reporting requirements.[27]

Accordingly, Mr. Sutter is a high-ranking government official for purposes of the exceptional circumstances doctrine.  That conclusion is supported by the existing case law, *see, e.g.*, *Lederman*, 731 F.3d at 203-04 (former deputy mayor qualifies as high-ranking official);

---

[27] *See, e.g.*, Mem. from Comm. on Ethics, U.S. House of Representatives, to Members, Officers, & Employees 4 (Jan. 15, 2014), http://ethics.house.gov/sites/ethics.house.gov/files/2014%20pay%20pink%20sh_0.pdf; Mem. from Comm. on Ethics, U.S. House of Representatives, to Members, Officers, & Employees 4 (Jan. 24, 2013), https://ethics.house.gov/sites/ethics.house.gov/files/pay%20rates%202013_0.pdf.

*McNamee*, 2012 WL 1665873, at *1 (Congressman's former personal office chief of staff qualifies as high-ranking official); *Bardoff v. U.S.*, 628 A.2d 86, 90 (D.C. 1993) (affirming order quashing testimonial subpoena to congressional committee staffer because, *inter alia*, defendants "failed to proffer any reason why others present who did not hold such high office could not provide the testimony"), and the SEC has not cited anything to the contrary.

### B.     The Information the SEC Seeks Can Be Obtained Elsewhere.

It is clear that Mr. Sutter does not have any "unique first-hand knowledge" regarding the issues in which the SEC claims an interest. *Lederman*, 731 F.3d at 203.  First, Mr. Sutter does not have any non-public information about who, if anyone, at CMS may have leaked the contents of its rate announcement and whether, and if so how, a particular lobbyist may have come by that information – as Mr. Sutter already has informed the SEC via an attorney proffer, *see supra* Background, Part III.  Second, even if Mr. Sutter had any such information (which, again, he does not), that information necessarily would have come from others (i.e., officials at CMS or the lobbyist).  The SEC is perfectly capable of speaking with those individuals, and indeed purports already to have done so, *see* SEC Mem. at 4, thereby further exposing the impropriety of its efforts to obtain Mr. Sutter's testimony.  *See, e.g.*, *Lederman*, 731 F.3d at 203 (no depositions allowed where subpoenaing parties failed to establish that proposed deponents necessarily possessed desired information, even where subpoenaing parties already had tried, and failed, to obtain information from lower-ranking officials:  "[The subpoenaing parties] did not show . . . that [high-ranking government officials] had the information they [had sought unsuccessfully] from Benepe [a lower-ranking government official].").

The same is true as to the SEC's demand to speak with Mr. Sutter about "the Rate Announcement" generally, "including without limitation any communications he had on this

subject with CMS employees." SEC Specification Letter at 1. To the extent the SEC wants to understand the Rate Announcement, self-evidently many other individuals (i.e., the relevant CMS officials) are more familiar with it, since they propounded it. *See, e.g.*, *Buono*, 249 F.R.D. at 470 n.2 ("[M]ere knowledge or awareness of information that may be helpful if discovered . . . will not justify ordering a deposition of [a high ranking government] official.").

And, to the extent the SEC seeks to question Mr. Sutter about communications with CMS employees about the "Rate Announcement," the SEC again can direct its questions to the relevant CMS employees. *See also, e.g.*, *Bogan*, 489 F.3d at 423 ("[D]iscovery is permitted only where it is shown that . . . persons [other than high-ranking government official] cannot provide the necessary information."); *In re F.D.I.C.*, 58 F.3d at 1061-62 ("We think it will be the rarest of cases – and the present action is not one – in which exceptional circumstances can be shown where the testimony is available from an alternate witness."); *Buono*, 249 F.R.D. at 470 n.2 ("[T]he deponent's alleged statements are at best based upon information that he obtained from others who are likely to be closer to the sources of the information. Because the deponent would at best be relaying information he received from others and because the identity of [those others] and what they told deponent can be secured in a less disruptive and more efficient way, the Court will not require the deponent to participate in a deposition."); *Marisol A.*, 1998 WL 132810, at *3 ("[W]hen applying the first prong, courts only permit the deposition of a high ranking government official if he has unique personal knowledge that cannot be obtained elsewhere.").

### C.   The Information Sought Is Not Necessary or Essential to the SEC's Investigation.

The SEC also has not demonstrated that the information it seeks from Mr. Sutter is "necessary," *Lederman*, 731 F.3d at 203, or "essential" to its investigation, *In re U.S. (Reno & Holder)*, 197 F.3d at 314; *McNamee*, 2012 WL 1665873, at *1 ("A subpoena issued against a

high-ranking official will be quashed unless . . . the information sought is essential (not merely relevant) to the case . . . ."); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1049 (E.D. Cal. 2010) ("A party seeking the deposition of a high-ranking government official must show . . . the testimony is essential to the case at hand . . . ."); *Buono*, 249 F.R.D. at 470 n.2 (same).

The SEC purports to be investigating an alleged leak of a particular health care reimbursement rate which, if it occurred at all, must have originated at CMS (where Mr. Sutter does not work) and which resulted in the trading of certain stocks (and there is no suggestion that Mr. Sutter did that). Mr. Sutter's only alleged connection to this investigation is a tangential one, at best, i.e., that, during the relevant time period, he allegedly spoke with individuals at CMS and with a health care lobbyist (which discussions Mr. Sutter necessarily would have had on a regular and on-going basis in furtherance of his Committee job responsibilities, *see supra* Background, Part II). Furthermore, the SEC already knows, via the attorney proffer, what Mr. Sutter knows – essentially nothing, as discussed above – and it has not suggested, because it cannot suggest, that that information is necessary or essential to its investigation.

### D.    Compliance with the Subpoena Would Interfere with Mr. Sutter's Official Responsibilities.

Mr. Sutter's schedule is heavily, and nearly permanently, booked with official activities. To take the past month as an example, the Subcommittee on Health held two hearings, one on the Verification of Income and Insurance Information under the Affordable Care Act, *see Boustany & Brady Announce Hr'g on the Verification of Income & Insurance Information under the Affordable Care Act*, Comm. on Ways & Means, June 3, 2014, http://waysandmeans. house.gov/news/documentsingle.aspx?DocumentID=383430, and one on MedPAC's June [2014] Report to Congress, *see Chairman Brady Announces Hr'g on MedPAC's June Report to Congress*, Comm. on Ways & Means, June 11, 2014, http://waysandmeans.house.gov/news/

documentsingle.aspx?DocumentID=384200.  Those hearings required detailed preparation (not unlike that done by a litigator in advance of trial), including review of relevant documents, coordination of witness testimony, and extensive consultation with policy experts both inside and outside of Congress.

Mr. Sutter also has been heavily involved in developing the Improving Medicare Post-Acute Care Transformation Act of 2014 (IMPACT Act), a bipartisan bill introduced by Chairman Camp in late June.  *See Bipartisan, Bicameral Bill Strengthens Medicare's Post-Acute Care*, Comm. on Ways & Means, June 26, 2014, http://waysandmeans.house.gov/news/ documentsingle.aspx?DocumentID=386094.  Beyond that, Mr. Sutter has been, and will be, engaged in a constant stream of meetings to gather information for other legislative proposals under consideration by the Committee, including with stakeholders ranging from patients, doctors, hospitals, other health providers, administrators, insurers, federal and state regulators, and representatives from each of these groups.

Unquestionably, therefore, requiring Mr. Sutter to sit for an SEC deposition would interfere with his work for the Committee.[28]

## CONCLUSION

For all the foregoing reasons, this Court should dismiss (or transfer) this action and vacate its Order to Show Cause.

---

[28]  The SEC says that, as of April 1, 2013, Mr. Sutter had not been named the Health Subcommittee's Staff Director.  *See* SEC Mem. at 25.  As of April 1, 2013, however, the former Staff Director had departed and Mr. Sutter was performing many of the duties of that position. He was formally elevated to the Staff Director position later that month, effective April 1, 2013. *See* Payroll Authorization Form of Brian D. Sutter (Apr. 16, 2013), attached as Ex. D.

Respectfully submitted,

Kerry W. Kircher, General Counsel
*/s/ William Pittard*
William Pittard, Deputy General Counsel
Todd B. Tatelman, Assistant Counsel
Mary Beth Walker, Assistant Counsel
Eleni M. Roumel, Assistant Counsel
Isaac B. Rosenberg, Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone:    (202) 225-9700
Facsimile:      (202) 226-1360
william.pittard@mail.house.gov

*Counsel for the Committee on Ways and Means
of the U.S. House of Representatives, and Brian
Sutter*

July 4, 2014

## CERTIFICATE OF SERVICE

I certify that on July 4, 2014, I filed via the Court's CM/ECF system the foregoing

Respondents' Consolidated (i) Response to Order to Show Cause, and (ii) Memorandum in

Support of Motion to Dismiss or, in the Alternative, to Transfer ("Response and Memorandum"),

which I understand caused service of the Response and Memorandum on all registered users,

including those identified below:

> Sanjay Wadhwa, Esq.
> Richard G. Primoff, Esq.
> Michael David Birnbaum, Esq.
> Amanda L. Straub, Esq.
> New York Regional Office
> SECURITIES AND EXCHANGE COMMISSION
> Three World Financial Center
> New York City, NY 10281


*/s/ William Pittard*
William Pittard