UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                Applicant,

        - against -

THE COMMITTEE ON WAYS AND
MEANS OF THE U.S. HOUSE OF
REPRESENTATIVES and BRIAN SUTTER,

             Respondents.

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>November 13, 2015</u> |

**MEMORANDUM**
**<u>OPINION & ORDER</u>**

14 Misc. 193 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        This case concerns, <u>inter</u> <u>alia</u>, the scope of Congressional immunity under the

Speech or Debate Clause of the United States Constitution, art. I, § 6, cl. 1.

        The Securities and Exchange Commission ("SEC") seeks an order, pursuant to

Section 21(c) of the Exchange Act, 15 U.S.C. § 78u(c), requiring the Committee on Ways and

Means of the U.S. House of Representatives (the "Committee") and Brian Sutter – the former

Staff Director of the Committee's Health Subcommittee – to comply with investigative

subpoenas served on them pursuant to a Formal Order issued by the SEC under Section 21(a) of

the Exchange Act, 15 U.S.C. § 78u(a).

        In response to an Order to Show Cause issued by this Court – which directed the

Committee and Sutter (collectively, "Respondents") to show cause why they should not be

ordered to comply with the SEC subpoenas – Respondents have moved to dismiss the SEC's

enforcement application pursuant to Fed. R. Civ. P. 12(b)(1), (2), (3), and (6).  (Dkt. No. 14)

Respondents argue that (1) the application is barred by the doctrine of sovereign immunity; (2)

this Court lacks personal jurisdiction over Respondents; (3) venue is improper in this District;

and (4) even if venue is proper here, the case should be transferred to the U.S. District Court for the District of Columbia under 28 U.S.C. § 1404(a).  (Resp. Br. (Dkt. No. 17) at 2)  Respondents also contend that the SEC's application should be denied because (1) the information sought in the subpoenas is protected from disclosure under the Speech or Debate Clause; and (2) the SEC has not established the "exceptional circumstances" necessary under United States v. Morgan, 313 U.S. 409 (1941), to justify an SEC deposition of Sutter.  (Id.)  For the reasons stated below, Respondents' motion to dismiss or transfer will be denied, and the SEC's application for an order requiring Respondents to comply with the investigative subpoenas will be granted in part and denied in part.

## BACKGROUND

### I.      THE HUMANA INVESTIGATION

The SEC's application relates to In the Matter of Humana Inc. (SEC Internal File No. NY-8910) (the "Humana Investigation"), a non-public SEC investigation.  The investigation is aimed at determining "whether any persons or entities have violated Section 10(b) of the Securities Exchange Act of 1934 . . . , and Rule 10b-5 promulgated thereunder, . . . by, among other things, trading in the securities of Humana or other issuers on the basis of material nonpublic information, or disclosing to others material nonpublic information regarding Humana or other issuers, in breach of a fiduciary or other duty arising out of a relationship of trust and confidence."  (Straub Decl. (Dkt. No. 3) ¶ 3)

The Humana Investigation is being conducted by the SEC's New York Regional Office.  That Office has issued "[a]ll subpoenas, informal requests for information, and other investigational correspondence in [the] investigation."  (Wadhwa Decl. (Dkt. No. 22) ¶ 3)  The

material non-public information at issue concerns payment rates for physicians serving Medicare patients.

On April 1, 2013, at approximately 4:15 p.m., the U.S. Centers for Medicare and Medicaid Services ("CMS") – a federal agency within the U.S. Department of Health and Human Services ("HHS") – issued the final 2014 Medicare Advantage ("MA") rate announcement (the "CMS Rate Announcement").  (Straub Decl. (Dkt. No. 3) ¶ 9, Ex. A)  The CMS Rate Announcement informs all MA organizations, prescription drug plan sponsors, and other interested parties of the annual MA "capitation rate"[1] for the calendar year 2014.  (Id. at 1)  In the CMS Rate Announcement, CMS states that "[t]he basis for the [National Per Capita Medicare Advantage and the National Medicare Fee-for-Service] Growth Percentage for 2014 has been changed to incorporate an assumption that Congress will act to prevent the scheduled 25-percent reduction in Medicare physician payment rates from occurring."  According to CMS, this assumption was a "more reasonable expectation than the reduction required under the statutory 'sustainable growth rate' (SGR) formula."  (Id.)

The CMS Rate Announcement differs significantly from preliminary Medicare payment rates that CMS had announced six weeks earlier (the "Advance Notice").  (Straub Decl. (Dkt. No. 3) ¶¶ 9-11)  In the February 15, 2013 Advance Notice, CMS applied the statutory SGR formula, which resulted in a 25-percent reduction in physician payment rates.  (Straub Decl. (Dkt. No. 3), Ex. A, at 1)  In the April 1, 2013 final CMS Rate Announcement, however, CMS assumed that Congress would override the use of the SGR formula and prevent the reduction in

---

[1]  The Medicare capitation rate is the monthly payment that a provider receives per enrollee to be provided with services under Medicare's covered benefit package.  The payment is fixed based on the number of persons covered, not the number of services provided.  See Community Health Association of New York v. Mahon, 106 F. Supp. 2d 523, 533 (S.D.N.Y. 2000) (explaining Medicaid capitation rates).

physician payment rates.  (Id.)  This change in methodology results in payment rates that are more favorable to insurers than the preliminary payment rates that CMS had announced in the Advance Notice.  (Straub Decl. (Dkt. No. 3) ¶ 10) ("According to the Advance Notice, certain payments from Medicare Advantage to insurers would have declined by 2.3% from the prior year.  According to the rates released in the final Rate Announcement on April 1, those payments, in contrast, were set to increase by 3.5% from the prior year.")

## II.    THE ALLEGED MATERIAL NON-PUBLIC INFORMATION

At 3:11 p.m. on April 1, 2013 – approximately one hour before the release of the CMS Rate Announcement – a lobbyist at Greenberg Traurig, LLP ("Greenberg") sent an email to an analyst at Height Securities, LLC, stating:

> Our intel is that a deal was already hatched by [Senator] Hatch to smooth the way for Tavenner[2] as long as they address the MA rates in the final notice.  We have heard from very credible sources that the final notice will adjust the phase in on risk adjustment and take into account the likelihood/certainty of an SGR fix.

(Id. ¶ 12)

At 3:40 p.m. on April 1, 2013, the Height Securities analyst sent a "flash report" by email and instant message to nearly 200 clients.  The "flash report" states:

> (1)    We now believe that a deal has been hatched to protect Medicare Advantage rates from the -2.3% rate update issued in the advanced notice mid-February

> (2)    We believe that the SGR will be assumed in the trends going forward resulting in roughly a 4% increase in cost trends

---

[2]  At that time, Marilyn Tavenner was awaiting Senate confirmation as CMS Administrator.  See Straub Decl. (Dkt. No. 3) ¶ 28; Presidential Nominations Sent to the Senate (Feb. 7, 2013), https://www.whitehouse.gov/the-press-office/2013/02/07/presidential-nominations-sent-senate-0 (last visited Nov. 8, 2015); Nomination of Marilyn B. Tavenner, to be Administrator, Centers for Medicare and Medicaid Services, Department of Health and Human Services: Hearing Before the Senate Committee on Finance, 113th Congress (2013), http://www.gpo.gov/fdsys/pkg/CHRG-113shrg86938/html/CHRG-113shrg86938.htm (last visited Nov. 8, 2015).

  (3)  This is a drastic change in historical policy aimed to smooth the confirmation of Marylyn Tavernier [sic]

  (4)  We are supportive of MA related stocks (HUM, HNT) under this circumstance[.]

(Id. ¶ 13)

  Within five minutes of the release of this "flash report" – and before the CMS Rate Announcement was issued at 4:15 p.m. – the prices and trading volume of stocks of certain health insurers rose dramatically.  Humana's stock appreciated by approximately seven percent within twelve minutes of the issuance of the "flash report."  (Id. ¶ 14, Ex. B)

## III. THE SEC'S ALLEGATIONS CONCERNING BRIAN SUTTER

  During the time period at issue in the Humana Investigation, Brian Sutter served on the Professional Staff of the House Ways and Means Committee's Health Subcommittee.  As of April 1, 2013, Sutter was performing many of the duties of the Subcommittee's Staff Director, and on April 22, 2013, he was named to that position.  (Straub Decl. (Dkt. No. 3) ¶ 6; see also Resp. Br. (Dkt. No. 17) at 45 n. 28)  On December 16, 2014, Sutter resigned.  (Dec. 19, 2014 Comm. Ltr. (Dkt. No. 28) at 1)

  The SEC represents that it possesses information and emails indicating that – in March 2013 – Sutter spoke several times with a colleague of the Greenberg lobbyist who sent the April 1, 2013 email to the Height Securities analyst.  Sutter also communicated with at least two CMS employees in the week before the CMS Rate Announcement.[3]  (Straub Decl. (Dkt. No. 3) ¶¶ 16-17)  Moreover, at 11:07 a.m. on April 1, 2013 – the day of the CMS Rate Announcement – Sutter emailed the Greenberg lobbyist "about the termination of one of the lobbyist's clients

---

[3]  The subject matter of Sutter's communications with CMS employees is not disclosed in the SEC's application.

from the Medicare Advantage program." (Id. ¶ 18)  The Greenberg lobbyist states that he and

Sutter spoke by telephone at approximately 3:00 p.m. on April 1, 2013 – ten minutes before the

Greenberg lobbyist emailed the Height Securities analyst – and that they discussed the CMS Rate

Announcement at that time.  (Id. ¶¶ 19-20)

        A few weeks after the CMS Rate Announcement, an agent of the Federal Bureau

of Investigation ("FBI") and an investigator from the Office of the Inspector General at HHS

("HHS OIG") interviewed Sutter about these communications.  During the interview, Sutter said

that "he did not recall speaking to the [Greenberg] [l]obbyist about the Rate Announcement."

(Id. ¶ 21)

        A few days after the Sutter interview, William Pittard – Deputy Counsel of the

U.S. House of Representatives – sent a letter to the FBI and HHS OIG stating the following:

> I understand that you may have asked Mr. Sutter whether he ever had used his
> mobile telephone to speak with [the Greenberg lobbyist].  Mr. Sutter may have
> answered that he could not recall doing so, which would have been a correct
> statement of Mr. Sutter's memory at the time.  With the benefit of some time for
> reflection, Mr. Sutter's best recollection now is that he previously may have used
> his mobile telephone to speak with [the Greenberg lobbyist], although he is not
> certain.  It is also possible that Mr. Sutter may have made other statements in the
> course of his interrogation that, while an accurate reflection of his memory at the
> time, might merit clarification if, for example, Mr. Sutter were to review records
> that could refresh his memory.

(Id. ¶ 22)  The SEC claims that it has "additional information indicating that Sutter may have

been a source of the information in the [Greenberg] [l]obbyist's email to the Height [Securities]

[a]nalyst," but notes that the SEC is not at liberty to specify this information due to a

confidentiality agreement.  (Id. ¶ 24)

## IV.    THE SEC INVESTIGATIVE SUBPOENAS

        On April 9, 2013, the SEC issued an Order Directing Private Investigation and

Designating Officers to Take Testimony (the "Formal Order"), pursuant to Section 21(a) of the

Exchange Act, 15 U.S.C. § 78u(a).  (Id. ¶ 7)  The Formal Order "designates certain individuals in the [SEC's] New York Regional Office . . . [as] empowered to issue subpoenas and take evidence" in connection with the SEC's Humana Investigation.  (Id. ¶ 8)

Between January 31, 2014, and April 25, 2014, SEC counsel and Respondents exchanged a number of letters regarding the SEC's request for a voluntary production of documents from Sutter's files and an interview of Sutter.  (Id. ¶ 26; Pittard Decl. (Dkt. No. 16), Ex. 2-7)  Sutter refused to produce any documents or appear for an interview on a voluntary basis.  (Straub Decl. (Dkt. No. 3) ¶ 26)

On May 6, 2014, the SEC served investigative subpoenas on the Committee and Sutter, pursuant to the Formal Order.  (Id. ¶ 27; Ex. C-D)  Each subpoena seeks the following documents and records for the time period between February 10, 2013 and April 10, 2013:

(1)     all documents containing communications between Sutter and any member or employee of Greenberg Traurig LLP, including without limitation Mark Hayes ("Hayes"), Nancy Taylor ("Taylor"), or Danielle White ("White");

(2)     all documents concerning communications between Sutter and CMS;

(3)     all documents concerning communications to, from, copying, or blind-copying Sutter concerning (i) the preliminary 2014 Medicare Advantage payment rates announced by CMS on February 15, 2013, and/or (ii) the final 2014 Medicare Advantage payment rates announced by CMS on April 1, 2013 (together, the "Medicare Advantage Rates");

(4)     all documents concerning communications to, from, copying, or blind-copying Sutter concerning the potential confirmation of Marilyn Tavenner as CMS Administrator by the U.S. Senate;

(5)     all documents created by Sutter or in Sutter's files, including without limitation handwritten notes and calendar entries, concerning (i) Hayes, Taylor, or White; (ii) the Medicare Advantage Rates; and/or (iii) the potential confirmation of Marilyn Tavenner as CMS Administrator by the U.S. Senate; and

(6)     all telephone records, including without limitation mobile phone records, from Sutter's work telephones.

(<u>Id.</u>, Ex. C-D)  The subpoena to Sutter calls for documents sufficient to show all of Sutter's personal and work telephone numbers and email addresses.  (<u>Id.</u>, Ex. D)  The subpoenas direct the Committee and Sutter to produce the requested documents by 5:00 p.m. on May 19, 2014, and instruct Sutter to appear for testimony at the SEC on May 21, 2014.  (<u>Id.</u>, Ex. C-D)

        Between May 7, 2014, and May 19, 2014, the SEC and Respondents exchanged a series of letters (<u>id.</u>, Ex. E-G) in which, <u>inter alia</u>, Respondents request further information about the anticipated subject matter of Sutter's testimony.  Respondents also assert that "at least some, and perhaps all, of the documents that [the SEC] has demanded are protected by the Speech or Debate Clause" of the U.S. Constitution.  (<u>Id.</u>, Ex. E)  The SEC informed Respondents that it intended to ask Sutter about his "knowledge of the contents of the Rate Announcement, including without limitation any communications he had on this subject with CMS employees," and argued that the requested documents and testimony are not protected by the Speech or Debate Clause.  (<u>Id.</u>, Ex. F)

        In a May 19, 2014 letter, Respondents informed the SEC that "neither the Committee nor Mr. Sutter intends to produce documents or to provide testimony in response to the subpoenas."  (<u>Id.</u>, Ex. G)  Respondents argued that:  (1) the subpoenas are barred by sovereign immunity; (2) the information sought by the subpoenas is protected from disclosure by the Speech or Debate Clause; (3) the subpoena to Sutter is improper "because high-ranking government officials may not be compelled to testify absent extraordinary circumstances, not present here"; (4) the subpoenas are vague and unduly burdensome; (5) the subpoenas constitute unwarranted intrusions into Sutter's privacy; (6) the subpoenas improperly demand documents and/or testimony irrelevant to the Humana Investigation; and (7) the subpoenas are "repugnant to public policy."  (<u>Id.</u>, Ex. G)

On June 11, 2014 – in an effort to avoid litigation – the SEC proposed a number of procedural and substantive modifications to the subpoenas.  (Id., Ex. H)  The SEC offered to (1) review documents responsive to the subpoenas on-site at the Committee's premises; (2) narrow the time period of the subpoenas; (3) limit production to those documents that are "highly relevant" to the Humana Investigation; (4) agree that the SEC's review of documents at the Committee's offices would not constitute a waiver by Respondents of "any applicable protection of the Speech or Debate Clause or any other privilege or protection from discovery"; and (5) suspend enforcement of Sutter's testimonial subpoena.  (Id., Ex. H)  On June 17, 2014, Respondents rejected the SEC's proposal.  (Id., Ex. I)

## V.  THE SEC'S APPLICATION FOR AN ORDER<br>REQUIRING COMPLIANCE WITH THE SUBPOENAS

On June 20, 2014, the SEC filed the instant application for an order requiring compliance with the subpoenas, pursuant to Section 21(c) of the Exchange Act, 15 U.S.C. § 78u(c).  (Dkt. No. 1)  In its memorandum of law, the SEC addresses Respondents' objections to the subpoenas as set forth in their May 19, 2014 letter.  (Dkt. No. 2)  That same day, this Court issued directed Respondents to show cause why they should not be ordered to produce documents responsive to the subpoenas.  (Dkt. No. 6)

On July 4, 2014, Respondents filed a motion to dismiss the SEC's enforcement application or, in the alternative, to transfer the case to the U.S. District Court for the District of Columbia.  (Dkt. No. 14)  Respondents argue that the SEC's enforcement application should be dismissed because (1) it is barred by the doctrine of sovereign immunity; (2) this Court lacks personal jurisdiction over Respondents; (3) venue is improper in the Southern District of New York; and (4) even if venue is proper in this District, the District of Columbia is a more appropriate venue.  (Dkt. No. 17 at 2)  Respondents also contend that the application must be

9

denied because (1) Respondents are immune from subpoena under the Speech or Debate Clause,

U.S. Const. art. I, § 6, cl. 1; and (2) "the SEC has not established the exceptional circumstances

necessary to permit it to depose Mr. Sutter regarding the matters about which it says it wishes to

interrogate him."  (Id.)

## DISCUSSION

## I.   LEGAL STANDARD

"'The courts' role in a proceeding to enforce an administrative subpoena is

extremely limited.'"  RNR Enterprises, Inc. v. S.E.C., 122 F.3d 93, 96 (2d Cir. 1997) (quoting In

re McVane, 44 F.3d 1127, 1135 (2d Cir. 1995) (internal quotation marks omitted)).  "To win

judicial enforcement of an administrative subpoena, the SEC 'must show (1) that the

investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be

relevant to the purpose, (3) that the information sought is not already within the Commissioner's

possession, and (4) that the administrative steps required have been followed. . . .'"  RNR

Enterprises, 122 F.3d at 96-97 (quoting United States v. Powell, 379 U.S. 48, 57-58 (1964)).

"'[A] governmental investigation . . . may be of such a sweeping nature and so

unrelated to the matter properly under inquiry as to exceed the investigatory power.'"  Id. at 97

(quoting United States v. Morton Salt Co., 338 U.S. 632, 652 (1950)).  "However, 'it is sufficient

if the inquiry is within the authority of the agency, the demand is not too indefinite and the

information sought is reasonably relevant.'"  Id. (quoting Morton Salt Co., 338 U.S. at 652).

"The respondent opposing enforcement must shoulder the burden of showing that the subpoena

is 'unreasonabl[e]' or was issued in bad faith or for an 'improper purpose,' or that compliance

would be 'unnecessarily burdensome.'"  Id. (quoting S.E.C. v. Brigadoon Scotch Distrib. Co.,

480 F.2d 1047, 1053-56 (2d Cir. 1973)) (emphasis in original).

## II.    RESPONDENTS' OBJECTIONS TO THE SEC'S APPLICATION

The SEC states that it is "investigating whether material nonpublic information concerning the [CMS Rate Announcement] . . . was leaked improperly to certain members of the public in advance of CMS's announcement, and whether such action resulted in insider trading in violation of the federal securities laws."  (SEC Br. (Dkt. No. 2) at 1)  The Humana Investigation is aimed at determining, inter alia, "the source(s) of information in the email sent from the [Greenberg] Lobbyist to Height [Securities], the circumstances surrounding the transmittal of that information, and whether any conduct relating to the transmittal constituted insider trading."  (Id. at 3)

Respondents do not dispute that the Humana Investigation has a legitimate purpose and that the requested documents would be relevant to that purpose.  Respondents likewise do not contend that (1) the SEC already possesses the information sought in the subpoenas, (2) the Commission failed to follow proper administrative procedures, or (3) the subpoenas are "unreasonabl[e]" or "unnecessarily burdensome."  See RNR Enterprises, 122 F.3d at 96-97 (quoting Brigadoon Scotch Distrib. Co., 480 F.2d at 1056)) (emphasis in original).  Respondents argue, however, that the SEC's enforcement application should be dismissed based on the doctrine of sovereign immunity, lack of personal jurisdiction, and improper venue.  Respondents further contend that they are immune from the subpoenas under the Speech or Debate Clause, and that the SEC's request to depose Sutter should be denied, because the Commission has not demonstrated the necessary "exceptional circumstances" to justify a deposition of Sutter.

A.    **Sovereign Immunity**

Respondents argue that sovereign immunity bars enforcement of the SEC's subpoenas because the doctrine (1) "encompasses Legislative Branch entities and officials acting, as the Committee and Mr. Sutter are here, in their official capacities," and (2) applies in the context of a subpoena enforcement action brought by a Federal agency.  (Resp. Br. (Dkt. No. 17) at 13)

1.    **Applicability of the Sovereign Immunity Doctrine to Inter-branch Subpoenas**

This Court construes Respondents' sovereign immunity argument as a Rule 12(b)(1) motion contending that this Court lacks subject matter jurisdiction.  See, e.g., Spinale v. U.S. Dept. of Agriculture, 621 F.Supp.2d 112, 117-18 (S.D.N.Y. 2009) (concluding that court lacked subject matter jurisdiction where the United States had not waived sovereign immunity as to defamation suits).  On such a motion, the plaintiff or applicant must demonstrate **"**by a preponderance of the evidence that subject matter jurisdiction exists. . . ."  Id. at 117 (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996) ("The burden of proving jurisdiction is on the party asserting it.")); see also Chayoon v. Chao, 355 F.3d 141, 143 (2d Cir. 2004) ("'On a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists.'") (quoting Garcia v. Akwesasne Hous. Auth., 268 F.3d 76, 84 (2d Cir. 2001)); Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (party asserting that a court has subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that [subject matter jurisdiction] exists").[4]

_____

[4]  The allocation of burden is different under the Foreign Sovereign Immunities Act ("FSIA"). In cases where a party seeks dismissal for lack of subject matter jurisdiction based on the FSIA,

Most of the case law addressing sovereign immunity has involved private party lawsuits brought against a Federal agency or a Federal official in the individual defendant's official capacity.  In that context, a number of basic principles are well settled.  "'[T]he United States, as sovereign, "is immune from suit save as it consents to be sued. . . ."'"  Lehman v. Nakshian, 453 U.S. 156, 160 (1981) (quoting United States v. Testan, 424 U.S. 392, 399 (1976) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941))); see also F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.") (citing Loeffler v. Frank, 486 U.S. 549, 554 (1988); Federal Hous. Admin., Region No. 4 v. Burr, 309 U.S. 242, 244 (1940)).  Moreover, "an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States. . . ."  Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994).  Accordingly, in the context of a private party suit against a Federal agency or officer – absent a waiver of sovereign immunity – subject matter jurisdiction does not exist.  See, e.g., Spinale, 621 F.Supp.2d at 117-18.  Finally, the doctrine of sovereign immunity applies with equal force to a private party's claims against a Federal agency or officer and to subpoenas for documents or testimony.  See United States E.P.A. v. Gen. Elec. Co., 197 F.3d 592, 597 (2d Cir. 1999), opinion amended on reh'g, 212 F.3d 689 (2d Cir. 2000) (absent express waiver of sovereign immunity, a court may not enforce a subpoena duces tecum issued by a private party to a Federal agency); In re S.E.C. ex rel. Glotzer, 374 F.3d 184, 190 n.7 (2d Cir. 2004) (sovereign immunity bars a subpoena for testimony because such a subpoena "constitutes an attempt to compel the [government] to act").

---

"[t]he burden is on the defendant seeking sovereign immunity to show it is a foreign sovereign." Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 175 (2d Cir. 2010).

In contending that the SEC subpoenas are barred by the doctrine of sovereign

immunity, Respondents rely on a host of cases brought by private parties against Congress,

members of Congress, and Federal agencies.  (See Resp. Br. (Dkt. No. 17) at 13-15)[5]

_____

[5] Respondents cite the following cases:  In re S.E.C. ex rel. Glotzer, 374 F.3d at 190-92 (sovereign immunity barred enforcement of a subpoena where private party had not exhausted her administrative remedies under the Administrative Procedure Act); Lunney v. United States, 319 F.3d 550, 551 (2d Cir. 2003) (absent waiver, sovereign immunity bars suit by administrator of estate to compel delivery of military medal to deceased recipient's next of kin); Maarawi v. U.S. Cong., 24 F. App'x 43, 44 (2d Cir. 2001) (Congress and members of Congress are entitled to sovereign immunity as to tort claims brought by private party); Gen. Elec. Co., 197 F.3d at 597-99 (addressing General Electric's subpoena to EPA and waiver of sovereign immunity under the Administrative Procedure Act); Dept. of the Army v. Blue Fox, Inc., 525 U.S. 255, 258, 260 (1999) (sovereign immunity barred subcontractor from enforcing lien against the government); Lane v. Pena, 518 U.S. 187, 189, 192 (1996) (Congress had not waived sovereign immunity for claim by former Merchant Marine Academy student for disability discrimination); Mortise v. United States, 102 F.3d 693, 695-96 (2d Cir. 1996) (tort action for assault by private citizens did not fall within the sovereign immunity waiver in the Federal Tort Claims Act); Meyer, 510 U.S. at 471, 475 (sovereign immunity barred action against federal agency by fired employee); Army & Air Force Exch. Serv. v. Sheehan, 456 U.S. 728, 734 (1982) (Tucker Act waiver of sovereign immunity did not apply to former military exchange employee's suit); Lehman, 453 U.S. at 160 (United States' waiver of sovereign immunity for former employee's age discrimination claim was conditioned on the waiver of a jury trial); United States v. Mitchell, 445 U.S. 535, 537-38 (1980) (sovereign immunity barred suit against the United States for money damages by individual allottees of land for "alleged mismanagement of timber resources"); Testan, 424 U.S. at 399 (sovereign immunity barred suit by government employees over allegedly improper pay classifications); United States v. King, 395 U.S. 1, 1, 4 (1969) (Declaratory Judgment Act did not waive sovereign immunity for purposes of retired military officer's suit for money allegedly due); Dugan v. Rank, 372 U.S. 609, 610-11 (1963) (sovereign immunity barred suit against the United States by water rights claimants); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 684, 703-04 (1949) (suit by private corporation against head of War Assets Administration was barred by sovereign immunity); Sherwood, 312 U.S. at 586-87 (1941) (absent waiver, sovereign immunity would bar breach of contract claim by creditor of the party to the contract against the U.S.); Kawananakoa v. Polyblank, 205 U.S. 349, 353 (1907) (Holmes, J.) (sovereign immunity barred suit against territory by individual land purchasers); Bonnet v. Harvest (U.S.) Holdings, Inc., 741 F.3d 1155, 1156 (10th Cir. 2014) (subpoena duces tecum served on an Indian tribe by a private party triggered tribal sovereign immunity); Alltel Comm., LLC v. DeJordy, 675 F.3d 1100, 1102 (8th Cir. 2012) (private corporation's third-party subpoena served on Indian tribe was barred by sovereign immunity); Wall v. D.O.J., No. 3:09CV1066 (DJS), 2010 WL 4923736 (D. Conn. Nov. 29, 2010) (sovereign immunity barred pro se plaintiff's suit against Department of Justice and defendants in official capacities); Rockefeller v. Bingaman, 234 F. App'x 852, 855 (10th Cir. 2007) (sovereign immunity barred claims brought against Congress and two members by a former federal employee); Kasi v.

Considered together, these cases demonstrate that the doctrine of sovereign immunity (1) encompasses Congress and members of Congress acting in their official capacities; and (2) applies where private parties have brought subpoena enforcement actions against Federal agencies.  This case does not involve a claim or application brought by a private party, however, and accordingly cases involving private party litigants are of limited value here.

The litigants in this action are components of co-equal legislative and executive branches of the Federal government.  While cases exist involving inter-branch subpoenas of the sort at issue here, no court has suggested – much less held – that sovereign immunity bars the enforcement of such subpoenas.  Given that sovereign immunity presents a threshold issue of subject matter jurisdiction, the absence of case law applying this doctrine in the context of inter-branch subpoenas cannot be ignored.

In Gravel v. United States, 408 U.S. 606 (1972), for example, Senator Gravel moved to quash a grand jury subpoena served on a member of his staff in connection with an investigation of possible crimes relating to the release and dissemination of the Pentagon Papers. Gravel, 408 U.S. at 608-09.  The Supreme Court ruled that the Speech or Debate Clause of the U.S. Constitution applies both to members of Congress and to a Member's staff, insofar as the conduct at issue would constitute a protected legislative act if performed by the Member.  Id. at 621-22.  The Court went on to hold that the Speech or Debate Clause did not prevent

---

Angelone, 300 F.3d 487, 502-04 (4th Cir. 2002) (death penalty inmate could not compel FBI to comply with subpoena); COMSTAT Corp. v. Nat'l Sci. Found., 190 F.3d 269, 277-78 (4th Cir. 1999) (at the request of a private corporation, arbitrator issued subpoena to the National Science Foundation; noting that where "the non-party recipient of a subpoena is a government agency, principles of sovereign immunity apply"); Boron Oil Co. v. Downie, 873 F.2d 67, 68, 71 (4th Cir. 1989) (subpoena against a federal agency employee issued on behalf of oil company falls within the protection of sovereign immunity); and Keener v. Congress, 467 F.2d 952, 952 (5th Cir. 1972) (per curiam) (sovereign immunity barred suit for mandamus brought by a private citizen against Congress).

enforcement of the grand jury subpoena at issue, however, because the alleged private

publication of the Pentagon Papers did not constitute a legislative act.  Id. at 625-26.  There is no

suggestion in Gravel that sovereign immunity barred enforcement of the grand jury subpoena.

Similarly, in In re Sealed Case, 121 F.3d 729 (D.C. Cir. 1997), the Office of the

Independent Counsel moved to enforce a grand jury subpoena seeking documents from the

White House Counsel.  In re Sealed Case, 121 F.3d at 734-36.  In vacating the district court's

denial of the Independent Counsel's motion, the D.C. Circuit addressed at length the presidential

communications privilege.  Id. at 736-40.  There is no suggestion in In re Sealed Case that the

doctrine of sovereign immunity barred enforcement of the subpoena served on the White House

Counsel, however.

Likewise, when Congressional committee subpoenas have been challenged by the

executive branch, no court has conducted a sovereign immunity analysis.  See, e.g., Comm. on

Oversight and Gov't Reform v. Holder, 979 F. Supp. 2d 1, 5-7, 17-20 (D.D.C. 2013) (House

Committee action seeking to enforce congressional subpoena issued to the U.S. Attorney General

for documents related to Operation Fast and Furious); Comm. on Judiciary, U.S. House of

Representatives v. Miers, 558 F. Supp. 2d 53, 55-56 (D.D.C. 2008) (motion to compel

compliance with a congressional subpoena issued to former White House counsel); United States

v. House of Representatives, 556 F. Supp. 150, 151 (D.D.C. 1983) (EPA Administrator sought a

declaratory judgment that she was entitled to withhold "sensitive" documents subpoenaed by a

House subcommittee); Senate Select Comm. on Presidential Campaigns v. Nixon, 498 F.2d 725,

726 (D.C. Cir. 1974) (Senate committee sought to enforce a subpoena issued to the President).[6]

---

[6] Respondents argue that cases involving the enforcement of congressional subpoenas are
inapposite because "the common law doctrine of sovereign immunity" is "displac[ed]" by the
Constitutional authority underlying the issuance of congressional subpoenas.  (Resp. Reply Br.

It is true, of course, that "'[w]hen questions of jurisdiction have been passed on in prior decisions <u>sub</u> <u>silentio</u>,'" courts are not bound when a "'subsequent case finally [raises] the jurisdictional issue,'" <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 119 (1984) (quoting <u>Hagans v. Lavine</u>, 415 U.S. 528, 533 n.5 (1974)).  Nonetheless, it bears mention that none of the courts that have considered inter-branch subpoenas have conducted a sovereign immunity analysis.

It is also worth noting that Rule VIII of the Rules of the U.S. House of Representatives indicates that the House itself does not believe that House members and staff have blanket sovereign immunity from administrative subpoenas issued by federal agencies such as the SEC.[7]  House Rule VIII states:

> When <u>a Member</u>, Delegate, Resident Commissioner, officer, <u>or employee</u> of the House is properly served with a judicial or <u>administrative</u> <u>subpoena</u> or judicial order directing appearance as a witness relating to the official functions of the House or for the production or disclosure of any document relating to the official functions of the House, such Member, Delegate, Resident Commissioner, officer, or employee <u>shall</u> <u>comply</u>, consistently with the privileges and rights of the House, with the judicial or <u>administrative</u> <u>subpoena</u> or judicial order as hereinafter provided, unless otherwise determined under this rule.

Rule VIII.1, Rules of the House of Representatives, 114th Cong. (Jan. 6, 2015) (emphasis added).[8]  Although Rule VIII.8 states that "[n]othing in this rule shall be construed to deprive, condition or waive the constitutional or legal privileges or rights applicable or available at any time to a Member, Delegate, Resident Commissioner, officer, or employee of the House, or of

---

(Dkt. No. 24) at 4)  As discussed above, however, no court has addressed sovereign immunity in the context of an inter-branch subpoena enforcement action, whether the subpoena was issued by an Executive Branch agency or by a Congressional committee.

[7]  The House Rules are provided for in Article I, Section 5 of the U.S. Constitution, which states that "[e]ach House may determine the rules of its proceedings. . . ."  U.S. Const. art. I, § 5, cl. 2.

[8]  The House Rules are available at http://clerk.house.gov/legislative/house-rules.pdf (last visited Nov. 10, 2015).

the House itself[,]" the language concerning compliance with an administrative subpoena is inconsistent with the notion that blanket sovereign immunity applies.  If the House, House Members, and House staff enjoy immunity from administrative subpoenas under the doctrine of sovereign immunity – as Respondents argue – the language stating that a Member or House employee "shall comply . . . with [an] . . . administrative subpoena" would serve no purpose.

Given that no court has ever held that sovereign immunity applies to an inter-branch subpoena, and given that the House rules appear to acknowledge that no blanket sovereign immunity applies to an administrative subpoena issued by a Federal agency to the House, a House member, or House staff, this Court concludes that sovereign immunity has no application here.[9]

### 2.    Sovereign Immunity Has Been Waived

Even if sovereign immunity applied to inter-branch subpoenas, Congress waived any such immunity as to an SEC investigation involving allegations of insider trading.

"A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied."  Lane, 518 U.S. at 192 (citing United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992); Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990)) (internal citations omitted).  "Moreover, [any] waiver of the

---

[9]  Defense Supplies Corp. v. U.S. Lines Co., 148 F.2d 311 (2d Cir. 1945), cited by Respondents (Resp. Reply Br. (Dkt. No. 24) at 3), does not address sovereign immunity.  In that case, Defense Supplies Corporation – "a corporation created by the Reconstruction Finance Corporation," a Federal agency – brought an admiralty action against the United States. The Second Circuit affirmed a district court order dismissing the case.  Given "the complete ownership of the Defense Supplies Corporation by the United States," the court ruled that the action was "nothing more than an action by the United States against the United States," and that "there [was] no real case or controversy."  Defense Supplies Corp., 148 F.2d at 312-13.  This case does not shed light on the question of whether sovereign immunity applies to a Federal agency's administrative subpoena addressed to a House committee and a member of the House committee's staff.

Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the

sovereign." Id.  Finally, "the doctrine of sovereign immunity is jurisdictional in nature . . . [and]

the [proponent of waiver] bears the burden of establishing that her claims fall within an

applicable waiver."  Makarova, 201 F.3d at 113; see also Spinale, 621 F. Supp. 2d at 117 ("It is

Plaintiffs' burden to demonstrate that sovereign immunity has been waived.").

In the Stop Trading on Congressional Knowledge Act of 2012 ("STOCK Act"),

Pub. L. No. 112-105, 126 Stat. 291 (2012), Congress provided that

> each Member of Congress or employee of Congress owes a duty arising from a
> relationship of trust and confidence to the Congress, the United States
> Government, and the citizens of the United States with respect to material,
> nonpublic information derived from such person's position as a Member of
> Congress or employee of Congress or gained from the performance of such
> person's official responsibilities.

STOCK Act, § 4, 15 U.S.C. § 78u-1.[10]  In recognition of, and in furtherance of that duty, the

STOCK Act states that "Members of Congress and employees of Congress are not exempt from

the insider trading prohibitions arising under the securities laws, including section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 thereunder."  STOCK Act § 4.

---

[10]  The STOCK Act was enacted in April 2012.  Int'l Fed'n of Prof'l & Technical Eng'rs et al v.
Haas, 599 F. App'x 477, 478 (4th Cir. 2014).  Although the legislation was originally introduced
in 2004, the bill languished until a November 13, 2011 "60 Minutes" report on alleged
Congressional insider trading "elicited outrage" at the suggestion that Members of Congress and
their staffs were benefiting financially because of their knowledge of future legislative acts.
Brianna Lee, Renewed push to curb insider trading in Congress after '60 Minutes' exposé,
PBS.org (Dec. 6, 2011), http://www.pbs.org/wnet/need-to-know/the-daily-need/renewed-push-
to-curb-insider-trading-in-congress-after-60-minutes-expose/12564/; Insiders: The Road to the
STOCK Act, CBS News (June 17, 2012), http://www.cbsnews.com/news/insiders-the-road-to-
the-stock-act/.

Even prior to the passage of the STOCK Act, however, it was the SEC's position that Section
10(b) of the Exchange Act and Rule 10b-5 applied to prohibit Members of Congress and their
staffs from insider trading.  See Testimony of Robert Khuzami, Director, Division of
Enforcement, SEC, Statement on the Application of Insider Trading Law to Trading by Members
of Congress and Their Staffs, before the House Committee on Financial Services (Dec. 1, 2011),
https://www.sec.gov/news/testimony/2011/ts120111rsk.htm (last visited November 2, 2015).

The effect of the Stock Act is to make applicable to members of Congress and their staff those provisions of the securities laws that govern insider trading, including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  Section 10(b) and Rule 10b-5 are the provisions under which the SEC is conducting the Humana Investigation.  Respondents argue, however, that although Congress, its members, and staff are now subject to the insider trading laws, the STOCK Act does not render them subject to an SEC investigative subpoena.

Section 21(a) of the Exchange Act, 15 U.S.C. § 78u(a)(1), gives the SEC authority to

> make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter [or] the rules or regulations thereunder, . . . the rules of a national securities exchange or registered securities association of which such person is a member or a person associated . . . and may require or permit any person to file with it a statement in writing, under oath or otherwise as the Commission shall determine, as to all the facts and circumstances concerning the matter to be investigated.

15 U.S.C. § 78u(a)(1).  Section 21(b) of the Exchange Act authorizes the SEC, "[f]or the purpose of any such investigation, or any other proceeding under this chapter . . . [to] subp[o]ena witnesses, compel their attendance, take evidence, and require the production of any [documents] . . . which the Commission deems relevant or material to the inquiry."  15 U.S.C. § 78u(b).

The plain language of the STOCK Act provides that members of Congress and Congressional employees "are not exempt from the insider trading prohibitions arising under the securities laws."  STOCK Act § 4.  Stated another way, members of Congress and Congressional employees are subject to the laws governing insider trading.  Section 21(a) and 21(b) of the Exchange Act are two provisions of the law that govern insider trading.  Section 21(a) authorizes the SEC to investigate suspected violations of the insider trading laws, and Section 21(b)

authorizes the SEC to use certain investigative tools and techniques in connection with an insider trading investigation, including depositions and document requests.

In the context of a civil enforcement action under Section 10(b) and Rule 10b-5, it is clear that the SEC could serve – consistent with the STOCK Act – document requests, interrogatories and deposition notices on Members of Congress and their staff.  Another aspect of not being "exempt from the insider trading prohibitions" is that a person is subject to (1) investigation by the SEC for suspected insider trading pursuant to Section 21(a) of the Exchange Act; and (2) the investigative tools authorized in Section 21(b) of the Exchange Act, including depositions and document requests.  Respondents' interpretation of the STOCK Act – that it makes Members of Congress and their staff subject to SEC civil enforcement actions and criminal prosecutions regarding insider trading but not to SEC investigations of insider trading – is not a tenable reading of the STOCK Act and is not consistent with its plain language

In sum, even if the doctrine of sovereign immunity applied to inter-branch subpoenas, this Court would find that Congress waived any such immunity in enacting the STOCK Act.

## B.    Personal Jurisdiction

Respondents contend that this action must be dismissed because this Court lacks personal jurisdiction over them.  (Resp. Br. (Dkt. No. 17) at 16-21)

### 1.    Legal Standard

"The plaintiff [or applicant] bears the burden of establishing that the court has jurisdiction over the defendant [or the respondent] when served with a Rule 12(b)(2) motion to dismiss."  Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001).  "A plaintiff may carry this burden 'by pleading in good faith . . . legally sufficient allegations of jurisdiction, i.e.,

by making a "prima facie showing" of jurisdiction.'"  Id. at 208 (quoting Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir. 1998) (quoting Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990))).  "A district court has 'broad discretion' in deciding such a motion, including the discretion to conduct an evidentiary hearing if the Court believes one is warranted."  Realuyo v. Villa Abrille, 01 Civ. 10158(JGK), 2003 WL 21537754, at *2 (S.D.N.Y. July 8, 2003), aff'd sub nom. Realuyo v. Abrille, 93 F. App'x 297 (2d Cir. 2004) (quoting CutCo Indus. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986)).

> ## 2.  Analysis

"The Exchange Act permits the exercise of personal jurisdiction 'to the limit of the Due Process Clause of the Fifth Amendment.'"  S.E.C. v. Compania Internacional Financiera S.A., 11 Civ. 4904 (DLC), 2011 WL 3251813, at *4 (S.D.N.Y. July 29, 2011) (quoting S.E.C. v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990)); see also 15 U.S.C. § 78u(c) ("In case of . . . refusal to obey a subp[o]ena issued to[] any person, the [SEC] may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of [documents]. . . .")  "'The due process test for personal jurisdiction has two related components:  the 'minimum contacts inquiry' and the 'reasonableness' inquiry.'"  Compania, 2011 WL 3251813, at *4 (quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996)).  "The former looks to 'whether the defendant has certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  In re Parmalat Securities Litigation, 376 F. Supp. 2d 449, 453 (S.D.N.Y. 2005) (quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002)).  "The latter 'asks . . .

whether it is reasonable under the circumstances of the particular case' to assert personal jurisdiction."  Id. (quoting Bank Brussels Lambert, 305 F.3d at 129).

Because the Exchange Act "authorize[s] nationwide service of process . . . [i]t is not the State of New York but the United States which would exercise its jurisdiction over [Respondents]."  Mariash v. Morrill, 496 F.2d 1138, 1143 (2d Cir. 1974) (internal citations omitted).  "And plainly, where, as here, the [Respondents] reside within the territorial boundaries of the United States, the minimal contacts, required to justify the federal government's exercise of power over them, are present."  Id. at 1143 (internal citations omitted); see also S.E.C. v. Straub, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("'When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.'") (quoting S.E.C. v. Morton, No. 10 Civ. 1720(LAK)(MHD), 2011 WL 1344259, at *12 (S.D.N.Y. Mar. 31, 2011), adopted, No. 10 Civ. 1720(LAK), 2011 WL 11768504 (S.D.N.Y. Nov. 3, 2011).  Accordingly, the first prong of the due process test for the exercise of personal jurisdiction is satisfied.

"Once it has been decided that [respondents] purposefully established minimum contacts within the forum . . . , these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)).  "The Supreme Court has held that the court must evaluate the following factors as part of this 'reasonableness' analysis:  (1) the burden that the exercise of jurisdiction will impose on the [respondents]; (2) the interests of the forum state

23

in adjudicating the case; (3) the [applicant]'s interest in obtaining convenient and effective relief;

(4) the interstate judicial system's interest in obtaining the most efficient resolution of the

controversy; and (5) the shared interest of the states in furthering substantive social policies."

Metro. Life Ins. Co., 84 F.3d at 568 (citing Asahi Metal Indus. Co., Ltd. v. Superior Court, 480

U.S. 102, 113-114 (1987)).  "'The reasonableness inquiry is largely academic in non-diversity

cases brought under a federal law which provides for nationwide service of process[, however,]

because of the strong federal interests involved.'"  Straub, 921 F. Supp. 2d at 259 (quoting

S.E.C. v. Syndicated Food Servs. Int'l, Inc., No. 04 Civ. 1303 (NGG)(ALC), 2010 WL 3528406,

at *3 (E.D.N.Y. Sept. 3, 2010)).  "'To date, while most courts continue to apply the test as a

constitutional floor to protect litigants from truly undue burdens, few . . . have ever declined

jurisdiction, on fairness grounds, in such cases.'"  Id. (quoting Syndicated Food Servs. Int'l,

2010 WL 3528406, at *3 (internal quotation marks omitted)).

        Respondents recognize that sufficient minimum contacts with the forum state

exist, but argue that it is not constitutionally reasonable for this Court to exercise personal

jurisdiction over them.  (Resp. Br. (Dkt. No. 17) at 18-21)  They assert that "litigating this

dispute [in New York] unquestionably will burden the Committee and Mr. Sutter and interfere

with their governmental responsibilities," and that "[t]his District has no special interest in

adjudicating an enforcement action involving subpoenas (i) directed to an entity and individual

that 'operate predominantly' in Washington, D.C. . . . and (ii) which directed compliance to be

made in Washington, D.C."  (Id. at 18-19)  Respondents have not demonstrated, however, that

litigating this dispute in New York would be "'so gravely difficult and inconvenient' that [they

would be] . . . at a 'severe disadvantage' in comparison to [the SEC]."  See Burger King, 471

U.S. at 478 (quoting The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 18 (1972); McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223-24 (1957)).

Acknowledging that (1) Respondents are located in or around the District of the District of Columbia; (2) many of the events at issue in the Humana Investigation took place in that District, and (3) many of the documents at issue are located in the District of Columbia, litigating this case in New York will not put Respondents at a "severe disadvantage."

"[T]he realities of modern transportation and communication, as well as the nature of civil litigation . . ., serve to reduce the burdens of litigating in a distant forum." S.E.C. v. Softpoint, Inc., No. 95 Civ. 2951 (GEL), 2001 WL 43611, at *6 (S.D.N.Y. Jan. 18, 2001) (citing Burnham v. Superior Court, 495 U.S. 604, 638-39 & n.1 (1990) (noting that "any [such] burdens that do arise can be ameliorated by a variety of procedural devices") (Brennan, J., concurring in the judgment)).

Moreover, all twelve SEC attorneys working on the Humana Investigation are "employed exclusively within the Commission's New York Regional Office." (Wadhwa Decl. (Dkt. No. 22) ¶ 2) These attorneys issued the subpoenas at issue here, as well as all other subpoenas and informal requests for information that have been disseminated in this investigation. These attorneys have also conducted a number of interviews in New York. (Id. ¶¶ 2-3) In addition, more than half of the investment funds and other entities that received the April 1, 2013 Height Securities analyst's email are headquartered in New York, and only one is located in the District of Columbia. (Id. ¶ 5) Although "[t]he determination of the locale of [an SEC] investigation is based on a standard of reasonableness," S.E.C. v. Financial InstitutionsAssur. Corp., 1985 WL 1562, at *2 (N.D. Ga. Mar. 18, 1985), the choice of New

York as a forum in this case is not unreasonable given the Humana Investigation's connections

to New York.

      The Court also notes that this is a subpoena enforcement application and not a

plenary civil lawsuit, and that "enforcement proceedings may be summary in nature," S.E.C. v.

Knopfler, 658 F.2d 25, 26 (2d Cir. 1981), and "do not typically involve discovery, testimony

from parties or witnesses, or the presentation of evidence." S.E.C. v. Jones, No. CV 13-08314

DDP (Ex.), 2013 WL 6536085, at *2 (C.D. Cal. Dec. 13, 2013) (citing U.S. v. Firestone Tire &

Rubber Co., 455 F. Supp. 1072, 1078 (D.D.C. 1978) ("A proceeding to enforce a subpoena or a

special order is summary in nature, and except in the most extraordinary circumstances,

discovery and testimony are not allowed.")).  "As a result, the inconvenience to parties and

witnesses associated with litigation . . . is largely eliminated." Id.

      Accordingly, this Court has personal jurisdiction over Respondents for purposes

of resolving the SEC's enforcement application pursuant to Section 21(c) of the Exchange Act,

15 U.S.C. § 78u(c).

      **C.**    **Venue**

      Respondents also contend that venue in the Southern District of New York is

improper.  (Resp. Br. (Dkt. No. 17) at 21-23)

      Section 21(c) of the Exchange Act, 15 U.S.C. § 78u(c), governs the venue

determination here.  That provision states:

> [i]n case of contumacy by, or refusal to obey a subp[o]ena issued to, any person,
> the Commission may invoke the aid of any court of the United States within the
> jurisdiction of which such investigation or proceeding is carried on, or where such
> person resides or carries on business, in requiring the attendance and testimony of
> witnesses and the production of [documents].  And such court may issue an order
> requiring such person to appear before the [SEC] or member or officer designated
> by the [SEC], there to produce records, if so ordered, or to give testimony
> touching the matter under investigation or in question. . . .

15 U.S.C. § 78u(c).

Respondents argue that the SEC has not demonstrated that its investigation is being "carried on" in the Southern District of New York, as required by Section 21(c), and that authorizing officials in the SEC's New York Regional Office to issue subpoenas "is not enough to satisfy the statutory 'carried on' requirement." (Resp. Br. (Dkt. No 17) at 21-22) Respondents also assert that "neither the Committee nor Mr. Sutter reside or carry on their regular work activities in the Southern District of New York." (Id. at 20)

As discussed above, however, the SEC has shown that the Humana Investigation is being conducted by SEC staff in the New York Regional Office, and that "New York has been the hub of the [SEC's] investigative activity in the Humana investigation." (Wadhwa Decl. (Dkt. No. 22) ¶¶ 3-5) The fact that Respondents are located in the District of Columbia does not prevent the SEC from conducting its investigation in New York, nor does it require the SEC to submit its enforcement application to a court in the District of Columbia. "The [S.E.C.] should not be required to go to each jurisdiction where documents are supposedly kept to secure enforcement of a subpoena when [Section 21(c)] of the Act allows the Commission to require the production of records from anywhere in the United States at any designated place of hearing." F.T.C. v. MacArthur, 532 F.2d 1135, 1141 (7th Cir. 1976) (construing similar language under the Federal Trade Commission Act, 15 U.S.C. § 49); cf. F.E.C. v. Committee to Elect Lyndon La Rouche, 613 F.2d 849, 854-57 (D.C. Cir. 1979) (Federal Election Commission investigation was "carried on" in the District of Columbia where D.C. "was the hub of the Commission's investigative activity" and was "where the Commission authorized the auditing of [one appellant's] records and the interviewing of its contributors, where the Commission determined that there was reason to believe that appellants may have violated the federal election laws,

where all correspondence regarding those possible violations emanated, and where the subpoenas were in fact issued"). Here, the Humana Investigation "concerns not only the Respondents, but numerous other participants, witnesses and custodians of documents," including investment funds and other entities headquartered predominantly in New York, but also in Connecticut, Massachusetts, Illinois, and California.[11] (Wadhwa Decl. (Dkt. No. 22) ¶¶ 4-5) In such a nationwide inquiry, it would be impractical for the SEC to enter each forum to enforce the subpoenas related to the Humana Investigation.

Because the SEC is carrying on the Humana Investigation in New York, venue in this District is proper pursuant to 15 U.S.C. § 78u(c).

### D. Transfer of Venue

Respondents argue that – even if venue is proper in this District – this Court should transfer this case to the U.S. District Court for the District of Columbia, pursuant to 28 U.S.C. § 1404(a). (Resp. Br. (Dkt. No. 17) at 22)

#### 1. Legal Standard

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "The purpose of § 1404(a) is 'to prevent waste of "time, energy and money" and "to protect litigants, witnesses and the public against unnecessary inconvenience and expense."'" In re Stillwater Min. Co. Sec. Litig., No. 02

---

[11] Moreover, CMS's headquarters and email servers are located in Baltimore, Maryland, and "the issuers affected by the subject trading activity on April 1, 2013," including Humana, "are headquartered in Kentucky, Florida, Minnesota and Connecticut. . . ." (Wadhwa Decl. (Dkt. No. 22) ¶¶ 6-7) The SEC's New York office has also issued subpoenas and voluntary requests for information to individuals in New Jersey, Kansas, Nebraska, Colorado, Texas and Florida. (Id. ¶ 8)

Civ. 2806(DC), 2003 WL 21087953, at *2 (S.D.N.Y. May 12, 2003) (quoting Trehern v. OMI Corp., No. 98 Civ. 0242 RWS, 1999 WL 47303, at *1 (S.D.N.Y. Feb. 1, 1999) (quoting Wilshire Credit Corp. v. Barrett Capital Mgmt. Corp., 976 F. Supp. 174, 180 (W.D.N.Y. 1997))).

"A court performs a two-part inquiry to determine whether transfer is appropriate [under Section 1404(a)]. First, the court must determine whether the action sought to be transferred is one that 'might have been brought' in the transferee court." In re Collins & Aikman Corp. Sec. Litig., 438 F. Supp. 2d 392, 394 (S.D.N.Y. 2006) (citing 28 U.S.C. § 1404(a); In re Nematron Corp. Sec. Litig., 30 F. Supp. 2d 397, 400 (S.D.N.Y. 1998)). Second, "the court must evaluate whether transfer is warranted using several factors relating to the convenience of transfer and the interests of justice." Id. (citing In re Nematron Corp. Sec. Litig., 30 F. Supp. 2d at 400; Lewis v. C.R.I., Inc., No. 03 Civ. 651(MBM), 2003 WL 1900859, at *2 (S.D.N.Y. Apr. 17, 2003)).

Under Section 1404(a), the party seeking transfer has the burden of demonstrating that transfer is appropriate. See New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 114 (2d Cir. 2010) ("[T]he party requesting transfer [under § 1404(a)] carries the 'burden of making out a strong case for transfer.'") (quoting Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 521 (2d Cir. 1989)). "A motion to transfer pursuant to 1404(a) rests within the 'sound discretion' of the district court." Montgomery v. Tap Enters., Inc., No. 06 CV 5799 (HB), 2007 WL 576128, at *2 (S.D.N.Y. Feb. 26, 2007) (quoting Schwartz v. R.H. Macy's Inc., 791 F. Supp. 94, 94 (S.D.N.Y. 1992)). Making this determination "lie[s] within the broad discretion of the district court and [is] determined upon notions of convenience and fairness on a case-by-case basis." In re Cuyahoga Equip. Corp., 980 F.2d 110, 117 (2d Cir. 1992) (citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 28 (1988)).

2.      **Analysis**

(a)      **The SEC's Application "Could Have**
**Been Brought" in the District of Columbia**

"'The threshold question in a transfer motion [under § 1404(a)] is whether the

action could have been brought in the district to which transfer is proposed.'"  Freeman v.

Hoffman-La Roche, Inc., No. 06CIV13497(RMB)(RLE), 2007 WL 895282, at *2 (S.D.N.Y.

Mar. 21, 2007) (quoting Arrow Elecs., Inc. v. Docommun, Inc., 724 F. Supp. 264, 265 (S.D.N.Y.

1989)) (alterations in original).

As noted above, Section 21(c) of the Exchange Act provides that the SEC "may

invoke the aid of any court of the United States within the jurisdiction of which such

investigation or proceeding is carried on, or where [the person who refuses to obey an SEC

subpoena] resides or carries on business. . . ."  15 U.S.C. § 78u(c).  The SEC does not dispute

Respondents' assertion that "the Committee and Mr. Sutter both carry on their congressional

business in and around the U.S. Capitol complex in Washington, D.C. . . . ."  (See Resp. Br.

(Dkt. No. 17) at 20)  Because Section 21(c) provides that venue is proper where the person

refusing to obey an SEC subpoena "carries on business," see 15 U.S.C. § 78u(c), and because

Respondents indisputably carry on business in the District of Columbia, this enforcement

application "'could have been brought'" in the District of Columbia.  See Freeman, 2007 WL

895282, at *2 (quoting Arrow Elecs., 724 F. Supp. at 265).  Accordingly, the District of

Columbia is a proper venue.

(b)      **Consideration of Section 1404(a) Factors**

After determining that "the action could have been brought in the proposed-

transferee court," a judge must next "consider whether a transfer serves the 'convenience of the

parties and witnesses' and the 'interest of justice.'"  Capitol Records, LLC v. VideoEgg, Inc.,

611 F. Supp. 2d 349, 365-66 (S.D.N.Y. 2009) (quoting <u>Berman v. Informix Corp.</u>, 30 F. Supp. 2d 653, 656 (S.D.N.Y. 1998)).  In making this determination, courts generally consider the following factors:

> (1) the convenience of witnesses, (2) the convenience of the parties, (3) the location of relevant documents and the relative ease of access to sources of proof, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded the plaintiff's choice of forum, and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

<u>Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional</u>, No. 08 Civ. 8106 (PGG), 2009 WL 2252116, at *4 (S.D.N.Y. 2009) (quoting <u>Berman</u>, 30 F. Supp. 2d at 657).  "There is no rigid formula for balancing these factors and no single one is determinative."  <u>Citigroup Inc. v. City Holding Co.</u>, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000) (citing <u>S & S Mach. Corp. v. Gen. Motors Corp.</u>, No. 93 Civ. 3237 (CSH), 1994 WL 529867, at *7 (S.D.N.Y. Sept. 28, 1994)).  "Instead, weighing the balance 'is essentially an equitable task' left to the Court's discretion."  <u>Id.</u> (quoting <u>First City Nat. Bank & Tr. Co. v. Simmons</u>, 878 F.2d 76, 80 (2d Cir. 1989)).

### (i)      Convenience of Witnesses and Parties

"Courts typically regard the convenience of witnesses as the most important factor in considering a § 1404(a) motion to transfer."  <u>Herbert Ltd. P'ship v. Elec. Arts Inc.</u>, 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004).  In summary enforcement proceedings such as this, however, courts have held that "the inconvenience to parties and witnesses associated with litigation, as may be considered under § 1404(a), is largely eliminated."  <u>See</u> <u>Jones</u>, 2013 WL 6536085, at *2 (citing <u>F.T.C. v. Carter</u>, 464 F. Supp. 633, 637 (D.D.C. 1979) ("[I]n summary proceedings such as this[,] testimony from parties or witnesses is rarely necessary. . . . This of course eliminates a significant convenience factor involved in § 1404(a) determinations.")

(internal citations omitted)).  Thus, "such convenience factors carry little weight in the context of

a summary enforcement proceeding such as the present one."  Id., 2013 WL 6536085, at *2.  To

the extent that these factors do matter, "[t]he convenience to the SEC in litigating near the situs

of its investigation and staff personnel should [also] be accorded some weight on a transfer

motion."  S.E.C. v. Captain Crab, Inc., 655 F. Supp. 615, 617 n.2 (S.D.N.Y. 1986).  In short, the

convenience of witnesses and parties does not weigh in favor of transfer.

(ii)      **Location of Relevant Documents<br>and Locus of Operative Facts**

"The location of documents and sources of proof is another consideration in the

§ 1404(a) calculus," Berger v. Cushman & Wakefield of Pa., Inc., No. 12 Civ. 9224 (JPO), 2013

WL 4565256, at *10 (S.D.N.Y. Aug. 28, 2013), and "[t]he locus of operative facts is an

'important factor to be considered in deciding where a case should be tried.'"  Age Grp. Ltd. v.

Regal Logistics, Corp., No. 06 Civ. 4328 (PKL), 2007 WL 2274024, at *3 (S.D.N.Y. Aug. 8,

2007) (quoting 800-Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128, 134

(S.D.N.Y. 1994)).  Respondents argue that "all of the documents at issue are in the District of

Columbia (and none are in [the Southern District of New York]), and all, or virtually all, of the

'operative facts' concern players – or took place – in the District of Columbia."  (Resp. Br. (Dkt.

No. 17) at 22)

Although most of the documents requested in the subpoenas are likely located in

or near the District of Columbia – whether in the Committee's files, or in Sutter's personal or

work files – "'[t]he location of documents and records "is not a compelling consideration when

records are easily portable."'"  Berger, 2013 WL 4565256, at *10 (quoting Am. Eagle Outfitters,

Inc. v. Tala Bros. Corp., 457 F. Supp. 2d 474, 478 (S.D.N.Y. 2006) (quoting Astor Holdings, Inc.

v. Roski, No. 01 CIV.1905(GEL), 2002 WL 72936, at *12 (S.D.N.Y. Jan. 17, 2012); see also

32

<u>Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.</u>, 474 F. Supp. 2d

474, 484 (S.D.N.Y. 2007), <u>aff'd</u> <u>sub</u> <u>nom</u> <u>New York Marine & Gen. Ins. Co.</u>, 599 F.3d at 114

("The location of relevant documents is largely a neutral factor in today's world of faxing,

scanning, and emailing documents.").  Most of the requests in the subpoenas seek documents

reflecting communications between Sutter and other individuals or entities.  Given that these

communications are likely available electronically, the location of any physical copies of these

communications is not determinative for purposes of the Section 1404(a) analysis.

   "To determine where the locus of operative facts lies, courts look to 'the site of

events from which the claim arises.'"  <u>Age Group Ltd.</u>, 2007 WL 2274024, at *3 (quoting <u>800-</u>

<u>Flowers</u>, 860 F. Supp. at 134).  Given that this case involves a subpoena enforcement application

and not a plenary lawsuit, there is no "claim" at issue.  Instead, the SEC has "invoke[d] the aid of

[a] court of the United States . . . in requiring the attendance and testimony of witnesses and the

production of [documents]" pursuant to its authority under Section 21(c) of the Exchange Act.

<u>See</u> 15 U.S.C. § 78u(c).  In cases where the enforcement of a subpoena is at issue, courts have

considered the place where the recipient of the subpoena was ordered to produce testimony

and/or witnesses, whether a related case is being heard or has been heard in another district,

whether transfer will serve the interests of judicial economy and consistency, and whether the

subpoena was issued in connection with litigation pending in another district.  <u>See</u> <u>Bent v.</u>

<u>Berman</u>, 859 F. Supp. 84, 88 (S.D.N.Y. 1994); <u>In re Subpoena Issued to Boies, Schiller &</u>

<u>Flexner LLP</u>, No. M8-85, 2003 WL 1831426, at *1 (S.D.N.Y. Apr. 3, 2003).

   Accepting Respondents' assertion that the facts and events underlying the SEC's

application "concern players – or took place – in the District of Columbia" (Resp. Br. (Dkt. No.

17) at 22), resolving the SEC's application does not require this Court to engage in a fact-finding

exercise.  Because a court's "'role in a proceeding to enforce an administrative subpoena is extremely limited,'" RNR Enterprises, Inc., 122 F.3d at 96 (quoting In re McVane, 44 F.3d at 1135), and "'it is sufficient if the [subpoena's] inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant,'" id. at 97 (quoting Morton Salt Co., 338 U.S. at 653), it is not necessary or appropriate for this Court to delve into the operative facts in the same manner that it would in a plenary civil lawsuit.

Because the documents relevant to the SEC's application are likely available electronically, and because the locus of operative facts is a neutral factor in a subpoena enforcement application such as this, these factors do not favor transfer.

### (iii)     Relative Means of the Parties

In analyzing whether the relative means of the parties favors transfer, a court should determine whether a party's "financial situation would meaningfully impede its ability to litigate this case in either forum." In re Collins & Aikman Sec. Litig., 438 F. Supp. 2d at 398. "[T]his factor has 'rarely been a dispositive reason to grant or deny a transfer motion' . . . ." Schoenfeld v. New York, No. 08 Civ. 3269(NRB), 2009 WL 1069159, at *3 (S.D.N.Y. Apr. 16, 2009) (quoting Thomas Am. Corp. v. Fitzgerald, No. 94 Civ. 0262 (CBM), 1994 WL 440935, at *5 (S.D.N.Y. Aug. 11, 1994)).  Although Respondents argue that this factor "favors a transfer because Mr. Sutter is a government employee with limited financial resources" (Resp. Br. (Dkt. No. 17) at 23), there is no suggestion that Sutter will be required to travel to New York for purposes of this litigation.  The relative means of the parties is a neutral factor here.

### (iv)     Plaintiff's Choice of Forum

Ordinarily, "[a] plaintiff's choice of forum 'is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer.'"  Hershman v.

UnumProvident Corp., 658 F. Supp. 2d 598, 601 (S.D.N.Y. 2009) (quoting Royal & Sunalliance v. British Airways, 167 F. Supp. 2d 573, 576) (S.D.N.Y. 2001)); see also DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 28 (2d Cir. 2002).  Respondents argue, however, that "'a plaintiff's choice of forum is given less weight where [as here] the case's operative facts have little connection with the chosen forum.'"  (Resp. Br. (Dkt. No. 17) at 23 (quoting Ivy Soc'y Sports Grp., LLC, 2009 WL 2252116, at *9))

        As discussed above, the locus of operative facts is not a significant factor in the Section 1404(a) analysis in the context of a subpoena enforcement application.  The SEC has chosen an appropriate venue for its enforcement application pursuant to Section 21(c) of the Exchange Act, because its "investigation . . . [has been] carried on" in New York.  See 15 U.S.C. § 78u(c).  Accordingly, this factor weighs in favor of denying the transfer motion.

### (v)     The Forum's Familiarity with the Governing Law, and Judicial Economy and Trial Efficiency

        Where a case raises a federal question, the "governing law" factor generally provides no basis for granting a transfer motion, because "all federal courts are presumed to be equally familiar with federal law."  Barnum v. Mosca, No. 1:08-CV-567 (LEK/RFT), 2009 WL 982579, at *6 (N.D.N.Y. Apr. 13, 2009); see also In re Collins & Aikman Corp. Securities Litig., 438 F. Supp. 2d at 398; Fuji Photo Film Co., Ltd. v. Lexar Media, Inc., 415 F. Supp. 2d 370, 376 (S.D.N.Y. 2006); AGCS Marine Ins. Co. v. Associated Gas & Oil Co., Ltd., 775 F. Supp. 2d 640, 649 (S.D.N.Y. 2011).  Despite this principle, Respondents argue that "while this Court and the District Court for the District of Columbia are equally familiar with the law on some issues (e.g., sovereign immunity, personal jurisdiction), the latter is more familiar with the Speech or Debate Clause" because "Congress is located in the District of Columbia and, as a result, many Speech or Debate Clause cases – particularly those in the subpoena context – are litigated there."

(Resp. Br. (Dkt. No. 17) at 23)  Although the U.S. District Court for the District of Columbia may have decided more cases relating to the Speech or Debate Clause, this Court is capable of applying the relevant authority.  Moreover, Speech or Debate Clause jurisprudence has largely emerged through Supreme Court case law, rather than in the lower courts.

Finally, Respondents provide no support for their assertion that "the interests of justice" would be better served if this case were transferred to the District Court for the District of Columbia.  (See Resp. Br. (Dkt. No. 17) at 23)  Trial efficiency is not a concern, of course, given that this is a subpoena enforcement proceeding and not a plenary civil lawsuit.

In sum, familiarity with governing law, judicial efficiency, and the interests of justice do not favor a transfer.

*     *     *     *

None of the Section 1404(a) factors suggests that a transfer would be appropriate here.  Those factors are either neutral or favor denial of the transfer motion.  Accordingly, Respondents' motion to transfer this action to the U.S. District Court for the District of Columbia will be denied.

### E.     The Speech or Debate Clause

Respondents argue that the SEC's application is barred by the U.S. Constitution's Speech or Debate Clause, "because the documents and testimony at issue are protected absolutely against compelled disclosure."  (Resp. Br. (Dkt. No. 17) at 23)

#### 1.     The Ways and Means Committee's Legislative Responsibilities

The House has delegated to the Committee on Ways and Means (the "Committee") significant legislative responsibilities over a wide swath of subjects, including "[r]evenue measures generally" and "health care . . . programs that are supported from . . .

payroll deductions," such as Medicare.  Rule X.1(t), House of Representatives, 114th Congress

(Jan. 6, 2015).  The Committee is responsible for "review[ing] and study[ing] on a continuing

basis –

> (A) the application, administration, execution, and effectiveness of laws
> and programs addressing subjects within its jurisdiction;
>
> (B) the organization and operation of Federal agencies and entities having
> responsibilities for the administration and execution of laws and programs
> addressing subjects within its jurisdiction;
>
> (C) any conditions or circumstances that may indicate the necessity or
> desirability of enacting new or additional legislation addressing subjects
> within its jurisdiction (whether or not a bill or resolution has been
> introduced with respect thereto); and
>
> (D) future research and forecasting on subjects within its jurisdiction.

House Rule X.2(b)(1).  The Committee must also determine "whether laws and programs

addressing subjects within the jurisdiction of [the Committee] are being implemented and carried

out in accordance with the intent of Congress and whether they should be continued, curtailed, or

eliminated. . . ."  Id.

The Ways and Means Committee's Subcommittee on Health (the

"Subcommittee") has jurisdiction over Committee matters "that relate to the health care

programs of the Social Security Act," including Medicare ("title . . . XVIII"), as well as over

matters "that relate to programs providing payments (from any source) for health care, health

delivery systems, or health research."  Rule 8.3, Manual of Rules of the Committee on Ways &

Means, 114th Congress (Jan. 21, 2015).[12]

---

[12] The Rules of the Committee on Ways and Means for the 114th Congress are available at
http://waysandmeans.house.gov/wp-content/uploads/2015/06/114th-WM-Rules-FINAL.pdf (last
visited Nov. 10, 2015).

The Committee's legislative responsibilities require that it collect and analyze information from a variety of sources in order to meet its obligation to "review and study on a continuing basis" Federal programs relating to health care, health delivery systems, and health-related research. The Committee gathers information through formal investigations,[13] but also obtains information in a number of other ways, including through requests made to relevant Federal agencies, to lobbyists with expertise in a particular field, and to stakeholders.

The Committee and its Subcommittee on Health were involved in legislative activity related to Medicare physician reimbursement rates before, during, and after the time period at issue in the SEC's subpoena (i.e., between February 10, 2013 and April 10, 2013). As an initial matter, at the outset of that Congress, the Committee proposed an oversight plan indicating its intention to investigate, inter alia, reimbursement under Medicare, including physician reimbursement. Letter from Hon. Dave Camp, Chairman, Comm. on Ways & Means, to Hon. Darrell Issa, Chairman, Comm. on Oversight & Gov't Reform, & Hon. Candice S. Miller, Chairman, Comm. on House Admin., at 3-4 (Feb. 15, 2013), http://waysandmeans.house.gov/UploadedFiles/113th_Oversight_Plan_FINAL.pdf.

On February 7, 2013, the Subcommittee – along with the Committee on Ways and Means, the Energy and Commerce Committee, and the Energy and Commerce Committee's Health Subcommittee – issued a statement setting forth a framework for repealing the Sustainable Growth Rate Formula ("SGR") for Medicare physician reimbursement. The statement discusses the committees' joint efforts to repeal the scheduled 25-percent reduction in Medicare physician payment rates and replace the SGR formula with a new Medicare physician

---

[13] The Chairman of the Committee has the power to authorize and issue subpoenas. Rule 15, Manual of Rules of the Committee on Ways & Means, 114th Congress (Jan. 21, 2015).

payment system.  Energy and Commerce & Ways and Means Outline Collaborative Medicare

Physician Payment Reform Effort (Feb. 7, 2013), http://waysandmeans.house.gov/energy-and-

commerce-ways-and-means-outline-collaborative-medicare-physician-payment-reform-effort/.

In the release, the committees state that they are "committed to developing [] a reform proposal"

to address the SGR formula.  See id., "Overview of SGR Repeal and Reform Proposal" (the

"Overview").

   In the Overview, the committees discuss the formal and informal information

gathering they conducted in preparation for issuing their "repeal and reform proposal."  Those

efforts included, inter alia, staff meetings with physicians, physician organizations and other

stakeholders; "a series of Health Subcommittee hearings in Ways and Means and Energy and

Commerce on reforming the Medicare physician payment system"; and soliciting views from

more than 70 physician organizations about how the Medicare physician payment system could

be improved.  Id.

   On March 15, 2013, the Subcommittee held a hearing regarding the Medicare

Payment Advisory Commission's (MedPAC) Annual Report to Congress.  159 Cong. Rec. D226

(2013).  The "principal focus" of MedPAC's Annual Report was "the Commission's

recommendations for the annual rate updates under Medicare's various FFS payment systems."

Statement of Glenn M. Hackbarth, Chairman, MedPAC, Report to Congress: Medicare Payment

Policy: Hearing before the Subcommittee on Health of the House Comm. on Ways & Means,

113th Cong. 3, 8-10 (2013),

waysandmeans.house.gov/UploadedFiles/Hackbarth_Testimony_Final_03.15.2013.pdf.

MedPAC recommended that Congress repeal the SGR and revise the Medicare physician

payment system.  Id. at 8-10.

39

On April 3, 2013, the same committees released a second draft of their proposal to repeal and reform the SGR and revise the Medicare physician payment system.  Memorandum from Kevin Brady, Chairman, Committee on Ways and Means, Subcommittee on Health, et al., to Provider Community 1-2 (Apr. 3, 2013), waysandmeans.house.gov/UploadedFiles/SGR_Joint_Release_Document.pdf.  The April 3, 2013 statement from the committees indicates that their informal information gathering had continued during the period from February 7, 2013 to April 3, 2013.  Id. ("On February 7, 2013, we requested stakeholder input on an overview of a permanent solution to the SGR.  We appreciate the many thoughtful responses we received, as they have been instrumental in formulating the more detailed and refined proposal that is attached.").  The committees requested additional "feedback on [their] more detailed [second] proposal" for "repeal and reform."  Id.

Legislative attention on the SGR continued until April 16, 2015, when the Medicare Access and CHIP Reauthorization Act of 2015 – which revises the method by which Medicare payments to physicians are determined – was signed into law.  Public Law 114-10 § 101 (codified in Title 42, U.S.C.).

In sum, Respondents have demonstrated that during the period between February 10, 2013, and April 10, 2013, the Committee and its Health Subcommittee were actively considering potential legislation to address the scheduled 25-percent reduction in Medicare physician payment rates, and were engaged in formal and informal information gathering designed to inform that effort.  The issue of reforming the Medicare physician payment system was not only one "'on which legislation could be had,'" Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 504 n.15 (1975) (quoting McGrain v. Daugherty, 273 U.S. 135, 177 (1927)), but was later the subject of actual legislation.

2.      **The Speech or Debate Clause's Protections for Conduct and Materials That Are Within the "Sphere of Legitimate Legislative Activity"**

The Speech or Debate Clause of the U.S. Constitution provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const., art. I, § 6, cl. 1.  The presence of this provision in our Constitution – as is the case with so much else found in the Articles and early amendments – reflects abuses of the English Crown.

The Clause is strikingly similar to the English Bill of Rights of 1689, which provides "'[t]hat the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament.'"  United States v. Johnson, 383 U.S. 169, 178 (1966) (quoting English Bill of Rights of 1689, 1 W. & M., Sess. 2, c. 2).  As Justice Harlan explained in Johnson,

> [t]his formulation of 1689 was the culmination of a long struggle for parliamentary supremacy.  Behind these simple phrases lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators.  Since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature.  See, e.g., Story, Commentaries on the Constitution s 866; II The Works of James Wilson 37-38 (Andrews ed. 1896).  In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders.

Johnson, 383 U.S. at 178 (footnote omitted); see also Kilbourn v. Thompson, 103 U.S. 168, 201-02 (1880) (acknowledging that Speech or Debate Clause was "borrowed" from English Bill of Rights).  As Justice Harlan further noted, "it is apparent from the history of the Clause that the privilege was not born primarily of a desire to avoid private suits . . . , but rather to prevent

intimidation by the executive and accountability before a possibly hostile judiciary."[14]  Id. at 180-81.

Accordingly, "the central role of the Speech or Debate Clause [is] to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary . . . ."  Gravel v. United States, 408 U.S. 606, 617 (1972) (citing Johnson, 383 U.S. at 181).  The Clause "was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch.  It thus protects Members against prosecutions that directly impinge upon or threaten the legislative process."  Id. at 616; see also United States v. Helstoski, 442 U.S. 477, 491 (1979) ("This Court has reiterated the central importance of the Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere."); United States v. Brewster, 408 U.S. 501, 507 (1972) (the purpose of the Clause is "to protect the integrity of the legislative process by insuring the independence of individual legislators").

Moreover, because "it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants," Gravel, 408 U.S. at 616, the Clause's protections

---

[14]  Justice Harlan alludes to the "notorious proceedings of King Charles I against Eliot, Hollis, and Valentine, 3 How.St.Tr. 294 (1629), [in which] the Crown was able to imprison members of Commons on charges of seditious libel and conspiracy to detain the Speaker in the chair to prevent adjournment.  Even after the Restoration, as Holdsworth noted, '(t)he law of seditious libel was interpreted with the utmost harshness against those whose political or religious tenets were distasteful to the government.'  VI Holdsworth, A History of English Law 214 (1927).  It was not only fear of the executive that caused concern in Parliament but of the judiciary as well, for the judges were often lackeys of the Stuart monarchs, levying punishment more 'to the wishes of the crown than to the gravity of the offence.'  Id., at 214-215."  Johnson, 383 U.S. at 181-82 (footnotes omitted).

extend beyond Members of Congress to Congressional aides and staff members, "insofar as [the action at issue] . . . would be a protected legislative act if performed by [a] Member himself [or herself]."  Id.; see also McSurely v. McClellan, 553 F.2d 1277, 1285 (D.C. Cir. 1976) (en banc) ("Aides are protected for conduct which would enjoy immunity if performed by Members of Congress themselves.").

"The Speech or Debate Clause has been read 'broadly to effectuate its purposes.'" Doe v. McMillan, 412 U.S. 306, 311 (1973) (quoting Johnson, 383 U.S. at 180; Gravel, 408 U.S. at 624).  "In reading the Clause broadly[,] [the Supreme Court has] said that legislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.'" Eastland, 421 U.S. at 503 (quoting Dombrowski v. Eastland, 387 U.S. 82, 85 (1967)).  Criminal or civil actions against legislators based on conduct "within the sphere of legitimate legislative activity" – including legal proceedings that "create[] a distraction and force[] Members to divert their time, energy and attention from their legislative tasks" – violate the Speech or Debate Clause.  Id.

"[O]nce it is determined that Members [or their staff] are acting within the 'legitimate legislative sphere[,]' the Speech or Debate Clause is an absolute bar to interference." Eastland, 421 U.S. at 503 (citing McMillan, 412 U.S. at 314).  "Congressmen and their aides are immune from liability for their actions within the 'legislative sphere,' even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes."  McMillan, 412 U.S. at 312-13 (quoting Gravel, 408 U.S. at 624-25) (internal citations omitted).  Actions that fall within the "sphere of legitimate legislative activity" – even if illegal – are likewise immune from "questioning" under the Clause.

See, e.g., Fields v. Office of Eddie Bernice Johnson, 459 F.3d 1, 13 (D.C. Cir. 2006) ("The

Speech or Debate Clause operates as a jurisdictional bar when 'the actions upon which [a party

seeks] to predicate liability [are] 'legislative acts.'") (quoting McMillan, 412 U.S. at 318

(quoting Gravel, 408 U.S. at 618)); Rangel v. Boehner, 785 F.3d 19, 28 (D.C. Cir. 2015) ("An

act does not lose its legislative character simply because a plaintiff alleges that it violated the

House Rules, or even the Constitution.  Such is the nature of absolute immunity, which is – in a

word – absolute.") (internal citations omitted).[15]

### a.   Applicability of Speech or Debate Clause Protections to Subpoena Enforcement Actions

Speech or Debate Clause analysis has been conducted in a variety of subpoena

enforcement proceedings involving members of Congress, including in actions concerning grand

jury subpoenas and private party civil action subpoenas.

In Gravel, for example, the Supreme Court considered a motion to quash – and a

cross-motion to enforce – a subpoena for testimony issued by a grand jury investigating the

dissemination of classified material included in the Pentagon Papers.  Subpoenas were issued to

---

[15]  Moreover, where an "activity is arguably within the 'legitimate legislative sphere[,]' the
Speech or Debate Clause bars inquiry even in the face of a claim of 'unworthy motive.'"
McSurely, 553 F.2d at 1295; see also Eastland, 421 U.S. at 508 ("Our cases make clear that in
determining the legitimacy of a congressional act we do not look to the motives alleged to have
prompted it."); Brewster, 408 U.S. at 525 ("[T]he Speech or Debate Clause protects against
inquiry into acts that occur in the regular course of the legislative process and into the motivation
for those acts."); Tenney v. Brandhove, 341 U.S. 367, 377 (1951) ("The claim of an unworthy
purpose does not destroy the privilege."); United States v. Biaggi, 853 F.2d 89, 103 (2d Cir.
1988) ("[I]t is generally true that the Speech or Debate Clause forbids not only inquiry into acts
that are manifestly legislative, but also inquiry into acts that are purportedly legislative, 'even to
determine if they are legislative in fact. . . .'" (quoting United States v. Dowdy, 479 F.2d 213,
226 (4th Cir. 1973)); Dowdy, 479 F.2d at 226 (where it is undisputed that a defendant Member's
actions are legislative on their face, Clause prohibits inquiry into the defendant's "actual motives
in communicating with various government officials and in obtaining certain government
documents," even if he was motivated by "improper non-legislative purposes").

members of Senator Gravel's staff, and the Senator moved to quash those subpoenas.  Gravel,
408 U.S. at 608-09.  Because Senator Gravel's aides argued that "a Member's aide shares the
Member's constitutional privilege" under the Speech or Debate Clause (id. at 613), the Court
first considered whether Senator Gravel could be questioned about his introduction of the
Pentagon Papers at a Senate subcommittee hearing.  The Court concluded that, under the Speech
or Debate Clause, "Senator Gravel [could] not be made to answer – either in terms of questions
or in terms of defending himself from prosecution – for the events that occurred at the
subcommittee hearing."  Id. at 616.  The Court reached the same conclusion as to "'inquiry into
things done by [the Senator's aide] which would have been legislative acts, and therefore
privileged, if performed by the Senator personally.'"  Id. at 616 (quoting United States v. Doe,
332 F. Supp. 930, 937-38 (D. Mass 1971)).  As to the alleged private publication of the Pentagon
Papers, however, the Court held that no privilege ran to either Senator Gravel or his aides,
because the private publication "was in no way essential to the deliberations of the Senate," and
"questioning as to the private publication [did not] threaten the integrity or independence of the
Senate by impermissibly exposing its deliberations to executive influence."  (Id. at 625).

 Similarly, in MINPECO, S.A. v. Conticommodity Services, Inc., 844 F.2d 856
(D.C. Cir. 1988), the D.C. Circuit considered subpoenas duces tecum served on a congressional
subcommittee.  MINPECO, S.A., 844 F.2d at 857-58.  Conticommodity argued that the Speech
or Debate Clause was not implicated by the subpoenas, because the subcommittee and its staff
had not been named as parties to the underlying litigation.  MINPECO, 844 F.2d at 858.  The
court rejected the argument "that Speech or Debate Clause immunity is available only if
Congress can demonstrate that it faces the burden of defending a lawsuit[, however]."  Because a
civil subpoena, has the potential to "'create [ ] a distraction and force[ ] Members to divert their

time, energy, and attention from their legislative tasks to defend the litigation,'" the court concluded that the Speech or Debate Clause applies with equal force in this context.  Id. at 859 (quoting Eastland, 421 U.S. at 503).

Likewise, in Brown & Williamson Tobacco Corp v. Williams, 62 F.3d 408 (D.C. Cir. 1995), the D.C. Circuit considered subpoenas duces tecum issued by a state court judge to two House Members.  Brown & Williamson, 62 F.3d at 412.  The underlying litigation involved a tobacco company's efforts to retrieve documents stolen by a paralegal who was formerly employed by the company's law firm.  Id. at 411-12.  The stolen documents had been provided to House Members, and a state court judge ordered the Members to produce the company's documents and to sit for deposition.  Id. 412.  After removal, a district court quashed the subpoenas as to both documents and testimony.  Maddox v. Williams, 855 F. Supp. 406, 411 (D.D.C. 1994).  In affirming, the D.C. Circuit noted that the "Speech or Debate Clause applies in civil cases as well as criminal prosecutions," and that "[t]he privilege . . . permits Congress to conduct investigations and obtain information without interference from the courts. . . ."  Id. at 416.  The court also noted that the Clause provides that Members "'shall not be questioned in any other place' about legislative actions," indicating "that the immunity from suit derives from the testimonial privilege, [and] not the other way around."  Id. at 418 (quoting U.S. Const. art. I, § 6, cl. 1) (emphasis in Brown & Williamson).  The D.C. Circuit further concluded that the privilege applies not only where "Members or their aides are personally questioned," but also where subpoenas seek only documents.  Id. at 420-21.

This Court concludes that the SEC subpoenas at issue here – which seek testimony from a House subcommittee staff member and documents currently held by the

subcommittee – implicate the protections provided by the Speech or Debate Clause.

Accordingly, the precise contours of the privilege provided by the Clause are considered below.

**b.**      **Activities Protected Under the Speech or Debate Clause**

In determining whether a particular activity falls within the "legitimate legislative sphere," courts consider whether that activity is "'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'" Eastland, 421 U.S. at 504 (quoting Gravel, 408 U.S. at 625 and citing McMillan, 412 U.S. at 313).

The Clause "includes within its protections anything 'generally done in a session of the House by one of its members in relation to the business before it.'" McMillan, 412 U.S. at 311 (citing Kilbourn, 103 U.S. at 204; Johnson, 383 U.S. at 179; Gravel, 408 U.S. at 624; Powell v. McCormack, 395 U.S. 486, 502 (1969); Brewster, 408 U.S. at 509, 512-13). "'[V]oting by Members and committee reports are protected,'" as is "'a Member's conduct at legislative committee hearings. . . .'" Id. (citing Gravel, 408 U.S. at 624). Speech or Debate Clause protection also extends to the following activities in Congress: "'delivering an opinion, uttering a speech, or haranguing in debate'; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and 'introducing material at committee hearings.'" Fields, 459 F.3d at 10-11 (footnotes omitted). All of this "'conduct is within the "sphere of legitimate legislative activity."'" McMillan, 412 U.S. at 312 (quoting Gravel, 408 U.S. at 624).

The protections of the Speech or Debate Clause also extend to Congressional information gathering activities.  As the Supreme Court noted in Eastland, "the power to investigate is inherent in the power to make laws[,] because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'"  Eastland, 421 U.S. at 504 (quoting McGrain, 273 U.S. at 175).  Accordingly, a House committee's formal investigative activities – including the issuance of subpoenas – "plainly fall[] within th[e] definition" of "legitimate legislative sphere." Id.

Moreover, the applicability of the Speech or Debate Clause's protections does not hinge on the formality of the investigation.  In United States v. Biaggi, 853 F.2d 89, for example, the Second Circuit concluded that informal "legislative factfinding conducted by [Congressman] Biaggi during his Florida trips was protected [under the Speech or Debate Clause]."  Id. at 103; see also McSurely, 553 F.2d at 1286-87 ("We have no doubt that information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation. . . . 'The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly.'") (quoting Reinstein & Silverglate, Legislative Privilege and the Separation of Powers, 86 Harv. L. Rev. 1113, 1154 (1973)).[16]

---

[16]  In Bastien v. Office of Campbell, 390 F.3d 1301, 1316 (10th Cir. 2004), the Tenth Circuit concludes that the Clause's protections do not extend to "the everyday task of gathering views and information from constituents and others through informal contacts."  To the extent that Bastien is inconsistent with Biaggi, this Court is, of course, bound by the Second Circuit's view that informal legislative factfinding activity is protected under the Speech or Debate Clause.

The Clause's protections also extend to a legislator's gathering of information from federal agencies and from lobbyists.  See Dowdy, 479 F.2d at 223-24 (Clause protected Congressman's meetings with Federal prosecutor and Federal housing agency officials; the "Congressman, who was chairman of a subcommittee investigating a complaint [against a construction company], [was] gathering information in preparation for a possible subcommittee investigatory hearing"); Jewish War Veterans v. Gates, 506 F. Supp. 2d 30, 57 (D.D.C. 2007) (the Clause protects legislators' contacts with "interested organizations and members of the public," including lobbyists, "[t]o the extent that [legislators'] communications, discussions, or other contacts . . . constitute information gathering in connection with or in aid of [] legislative acts").  The "controlling principle" for determining whether informal information gathering falls within the Clause's protections is whether "the information is acquired in connection with or in aid of an activity that qualifies as 'legislative' in nature,"[17] not what the source of the information is.  Jewish War Veterans, 506 F. Supp. 2d at 57 (citing Brown & Williamson, 62 F.3d at 419; Benford v. American Broadcasting Companies, 102 F.R.D. 208, 210 (D. Md. 1984), rev'd on jurisdictional grounds by In re Guthrie, 733 F.2d 634,639 (4th Cir. 1984)).

### c.   Activities Not Protected by the Speech or Debate Clause

Although the Speech or Debate Clause is "read broadly to effectuate its purposes," Johnson, 383 U.S. at 180, see also Eastland, 421 U.S. at 501, "the Clause has not been extended beyond the legislative sphere"; the term "[l]egislative acts [is] not all-encompassing,"

---

[17]  For immunity to attach, it is sufficient that future legislation is contemplated.  "The very nature of the investigative function – like any research – is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result."  Eastland, 421 U.S. at 509.  "The subject of any inquiry always must be one 'on which legislation could be had[, however].'"  Id. at 504 n.15 (quoting McGrain, 273 U.S. at 177.

see Gravel, 408 U.S. at 624-25; and the Clause "does not protect 'all conduct relating to the legislative process.'" Biaggi, 853 F.2d at 102 (quoting Brewster, 408 U.S. at 515) (emphasis in Brewster).

> As the Supreme Court explained in Brewster,
>
> [m]embers of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate "errands" performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called "news letters" to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. . . . But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause.

Brewster, 408 U.S. at 512; see also Gravel, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature. Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies – they may cajole, and exhort with respect to the administration of a federal statute – but such conduct, though generally done, is not protected legislative activity."); McMillan, 412 U.S. at 313 ("[E]verything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause.").

"The Speech or Debate Clause [likewise] does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions." Brewster, 408 U.S. at 528. Moreover, the Clause "does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but are not a part of the legislative process itself." Id.; see id. at 517 (the Clause's "shield does not extend beyond what is necessary to preserve the integrity of the legislative process"); Fields, 459 F.3d at 10 (Clause does not protect activity that "is merely

'related to,' as opposed to 'part of,' the 'due functioning' of the 'legislative process'") (quoting

Brewster, 408 U.S. at 514, 528) (emphasis in original removed).

      The Clause also does not protect the dissemination of information outside of

Congress.  See Hutchinson v. Proxmire, 443 U.S. 111, 133 (1979) ("[T]he transmittal of . . .

information [about their activities] by individual Members in order to inform the public and other

Members is not a part of the legislative function or the deliberations that make up the legislative

process.  As a result, transmittal of such information by press releases and newsletters is not

protected by the Speech or Debate Clause.") (footnote omitted); McMillan, 412 U.S. at 316

("[W]e cannot accept the proposition that in order to perform its legislative function Congress

not only must at times consider and use actionable material but also must be free to disseminate

it to the public at large, no matter how injurious to private reputation that material might be.  We

cannot believe that the purpose of the Clause – 'to prevent intimidation of legislators by the

Executive and accountability before a possibly hostile judiciary' – will suffer in the slightest if it

is held that those who, at the direction of Congress or otherwise, distribute actionable material to

the public at large have no automatic immunity under the Speech or Debate Clause but must

respond to private suits to the extent that others must respond in light of the Constitution and

applicable laws.") (internal citations omitted); Brown & Williamson, 62 F.3d at 417 n.6 ("Uses

that fall outside the confines of 'legislative action,' however – such as the dissemination of

investigatory information outside Congress – are not protected."); McSurely, 553 F.2d at 1285

("To the extent plaintiffs charge dissemination outside of the Halls of Congress, the federal

defendants are not immune to further questioning.").

> **(d)     Whether the Speech or Debate Clause Provides a
> Non-Disclosure Privilege for Legislative Documents**

Before applying the law to the SEC's subpoenas, it is necessary to address one remaining issue:  whether the Clause's protections include a privilege not to disclose documents that fall "within the sphere of legitimate legislative activity," see Eastland, 421 U.S. at 503, as opposed to a privilege that merely bars the evidentiary use of such documents.  Neither the Supreme Court nor the Second Circuit has addressed this issue.  While other Circuits have addressed this issue, they do not agree.

> **(i)     The D.C. Circuit's Application of a Broad Non-
> Disclosure Privilege Under the Speech or Debate Clause**

The D.C. Circuit has determined that the Speech or Debate Clause provides a broad non-disclosure privilege for documents that fall "within the sphere of legitimate legislative activity."

In MINPECO, S.A. v. Conticommodity Services, Inc., 844 F.2d 856, for example, Conticommodity – a defendant in a civil case – served subpoenas duces tecum on a congressional subcommittee seeking the disclosure of information and documents, including materials relating to statements taken by the subcommittee's staff in connection with an investigation of the silver market.  MINPECO, S.A., 844 F.2d at 857-58.  Conticommodity asserted that a sworn statement published in the subcommittee's report would be used against it at trial, and claimed that the witness's statement had been altered prior to publication of the report by the subcommittee.  Id.

In holding that Conticommodity's subpoenas were not enforceable as to either testimony or documents, the D.C. Circuit found that "the process by which a committee takes statements and prepares them for publication clearly qualifies as an activity 'within the

"legislative sphere."'"   Id. at 860.  Because "the preparation of the statement for publication in

the subcommittee report was part of the legislative process, that is the end of the matter [under

the Speech or Debate Clause]."   Id. at 861.  In reaching this decision, the D.C. Circuit

emphasized that Speech or Debate Clause protections apply not only when Congress faces the

burden of defending a lawsuit.  The Clause also operates

> to shield legislators from private civil actions that "create [ ] a distraction and
> force[ ] Members to divert their time, energy, and attention from their legislative
> tasks to defend the litigation.". . . . A litigant does not have to name members or
> their staffs as parties to a suit in order to distract them from their legislative work.
> Discovery procedures can prove just as intrusive.

Id. at 859 (quoting Eastland, 421 U.S. at 503).

      The broad Speech or Debate Clause non-disclosure privilege applied in

MINPECO has been confirmed in subsequent D.C. Circuit cases.  For example, in Brown &

Williamson Tobacco Corp. v. Williams, 62 F.3d 408 (D.C. Cir. 1995), the court applied a broad

non-disclosure privilege for legislative materials in a context in which a tobacco company was

merely attempting to gain access to its stolen documents, which had been delivered to a House

subcommittee.  Brown & Williamson, 62 F.3d at 421; see id. at 418 ("all that is sought is access

to [the company's] own documents").  The D.C. Circuit held, however, that the Speech or

Debate Clause barred the subpoenas duces tecum issued by a state court judge to two Members

of Congress:

> We do not accept the proposition that the testimonial immunity of the Speech or
> Debate Clause only applies when Members or their aides are personally
> questioned.  Documentary evidence can certainly be as revealing as oral
> communications – even if only indirectly when, as here, the documents in
> question . . . do not detail specific congressional actions.  But indications as to
> what Congress is looking at provide clues as to what Congress is doing, or might
> be about to do – and this is true whether or not the documents are sought for the
> purpose of inquiring into (or frustrating) legislative conduct or to advance some
> other goal[]. . . .

Id. at 420.

The court also found the breadth of the privilege to be coextensive, whether the context is testimony from Members or their staff, the production of documents from Congress, or a suit against Congress, its Members, or staff:

> A party is no more entitled to compel congressional testimony – or production of documents – than it is to sue congressmen [in connection with legislative acts]. We do not perceive a difference in the vigor with which the privilege protects against compelling a congressman's testimony as opposed to the protection it provides against suit.

Id. at 421.

As to subpoenas to Congress demanding documents, the court held that "documents or other material that comes into the hands of congressmen may be reached either in a direct suit or a subpoena only if the circumstances by which they come can be thought to fall outside "legislative acts" or the legitimate legislative sphere." Id. at 421.

Finally, in United States v. Rayburn House Office Building, Room 2113, Washington, D.C. 20515, 497 F.3d 654 (D.C. Cir. 2007), which involved the execution of a search warrant at a congressman's office, the D.C. Circuit reiterated "that the testimonial privilege under the [Speech or Debate] Clause extends to non-disclosure of written legislative materials." Rayburn, 497 F.3d at 655. The court noted that

> a key purpose of the [Speech or Debate Clause] privilege is to prevent intrusions in the legislative process and that the legislative process is disrupted by the disclosure of legislative material, regardless of the use to which the disclosed materials are put. . . .The bar on compelled disclosure is absolute. . . .

Id. at 660 (citing Brown & Williamson, 62 F.3d at 419 and Eastland, 421 U.S. at 503) (citation omitted); see also Jewish War Veterans, 506 F. Supp.2d at 53 (the Speech or Debate Clause "affords a testimonial (or 'non-disclosure') privilege pursuant to which Members cannot be required either to produce documents or to answer questions, whether in a deposition or on the

witness stand"); <u>United States v. People's Temple</u>, 515 F. Supp. 246, 248-49 (D.D.C. 1981)

(granting motion to quash subpoena for documents concerning House committee's investigation

of congressman's death in Guyana; "Once it is determined . . . that [a Member's] actions fall

within the 'legitimate legislative sphere,' judicial inquiry is at an end.  Otherwise, Members of

Congress conducting investigations would be forced to consider at every turn whether evidence

received pursuant to the investigation would subsequently have to be produced in court.  This

would 'imperil' the legislative independence protected by the Clause.")

### (ii)    Other Circuits' Rejection of a Non-Disclosure Privilege

The Ninth and Third Circuits have held that the Speech or Debate Clause does not

provide a non-disclosure privilege for "legislative act" documents.

In <u>United States v. Renzi</u>, 651 F.3d 1012 (9th Cir. 2011), a former congressman

charged with extortion, wire fraud and other crimes moved to dismiss the indictment, arguing

that the Speech or Debate Clause precluded his prosecution.  <u>Renzi</u>, 651 F.2d at 1016.  The

Government alleged that Renzi had entered into a corrupt <u>quid</u> <u>pro</u> <u>quo</u> arrangement with two

private parties in which (1) they agreed to purchase land from Renzi's debtor – which would

permit the debtor to repay Renzi – and (2) Renzi would support future public land exchange

legislation that would be favorable to the purchasers.  <u>Id.</u>  Renzi argued that "legislative act"

evidence had been improperly presented to the grand jury, and he requested a "<u>Kastigar</u>-like

hearing."  <u>Id.</u> at 1016, 1018.  The district court concluded that no such hearing was necessary,

however, because the Speech or Debate Clause's privilege "is one of use, not non-disclosure."

<u>United States v. Renzi</u>, 686 F. Supp. 2d 991, 996 (D. Ariz. 2010).

In affirming, the Ninth Circuit rejected Renzi's argument that the Speech or

Debate Clause provides a non-disclosure privilege that "precludes the Government from

reviewing documentary evidence referencing 'legislative acts' . . . ." Renzi, 651 F.3d at 1032.

As to Rayburn, the Renzi court states that that case "rests on the notion that 'distraction' of

Members and their staffs from legislative tasks is a principal concern of the Clause, and that

distraction alone can therefore serve as a touchstone for application of the Clause's testimonial

privilege." Id. at 1034 (emphasis in original).  In rejecting Rayburn, the Ninth Circuit asserts

that "legislative distraction is not the primary ill the Clause seeks to cure," and that instead the

key issue is whether "the underlying action is itself precluded":

> When the Clause bars the underlying action, any investigation and litigation serve
> only as wasted exercises that unnecessarily distract Members from their
> legislative tasks. . . . They work only as tools by which the Executive and
> Judiciary might harass their Legislative brother.
>
> When the underlying action is not precluded by the Clause, however, the calculus
> is much different.  In that circumstance, the Court has demonstrated that other
> legitimate interests exist, most notably the ability of the Executive to adequately
> investigate and prosecute corrupt legislators for non-protected activity.

Id. at 1035-36 (citations omitted) (emphasis in original).  In holding that the Speech or Debate

Clause does not bar compelled disclosure of documentary "legislative act" evidence "when it

takes place as part of an investigation into otherwise unprotected activity," the Renzi court

asserts that Helstoski, Johnson, and Gravel all involve documentary "legislative act" evidence,

and that the Supreme Court "never said a word about the compelled disclosure or the

Government's review of that evidence." Id. at 1037.

   In In re Fattah, 802 F.3d 516 (3d Cir. 2015), the Third Circuit considered a

motion to quash a warrant to search the e-mail account of Congressman Fattah, who was under

investigation for fraud, extortion, and bribery.  Fattah, 802 F.3d at 521.  In considering Fattah's

arguments under the Speech or Debate Clause, the court concluded that the Clause provides no

non-disclosure privilege:

It cannot be . . . that the [Speech or Debate Clause] privilege prohibits disclosure of evidentiary records to the Government during the course of an investigation. . . . If it were any other way, investigations into corrupt Members could be easily avoided by mere assertion of this privilege. Members could, in effect, shield themselves fully from criminal investigations by simply citing to the Speech or Debate Clause. We do not believe the Speech or Debate Clause was meant to effectuate such deception. Rather, the "purpose of the Speech or Debate Clause is to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process." That is, the Clause was meant to free "the legislator from the executive and judicial oversight that realistically threatens to control his conduct as a legislator." The crux of the Clause is to "prevent intimidation by the executive and accountability [for legislative acts] before a possibly hostile judiciary." It is clear that the purpose, however, has never been to shelter a Member from potential criminal responsibility.

Id. at 528-29.

The Third Circuit went on to hold that

while the Speech or Debate Clause prohibits hostile questioning [of Members] regarding legislative acts in the form of testimony to a jury, it does not prohibit disclosure of Speech or Debate Clause privileged documents to the Government. Instead, . . . it merely prohibits the evidentiary submission and use of those documents.

Id. at 529.                    *       *       *       *

In this Court's view, the D.C. Circuit has the better of the argument. At its essence, the Speech or Debate Clause's "purpose [is to] preserve the constitutional structure of separate, co[-]equal, and independent branches of Government," and to protect Congress from interference, intimidation, and intrusion by the other branches of Government. Helstoski, 442 U.S. at 491. The Framers were well aware of the English Crown's efforts to intimidate those in Parliament through the use of criminal prosecutions and sanctions. Acknowledging that "the predominate thrust of the Speech or Debate Clause" is a concern about "the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum," Johnson, 383 U.S. at 182, it cannot be gainsaid that the Framers chose to provide that, "for any

Speech or Debate in either House, [Members] <u>shall</u> <u>not</u> <u>be</u> <u>questioned</u> in any other Place" about

legislative actions.  U.S. Const., art. I, § 6, cl. 1 (emphasis added).  Testimonial privilege is thus

at the heart of Speech or Debate Clause protections.  And when the Executive Branch seeks the

assistance of the Judiciary to enforce a subpoena issued to the Legislative Branch, the "central

importance" of protecting Congress from "intrusion" by the Executive and the Judiciary is

implicated.  <u>Helstoski</u>, 442 U.S. at 491.

 A question is a request for information, and a subpoena constitutes an effort to

compel the disclosure of information.  Whether an Executive Branch subpoena seeks testimony

from a Member concerning a "legislative act" or documents that fall "within the sphere of

legitimate legislative activity" is, in this Court's view, immaterial under the Speech or Debate

Clause.  The Executive Branch's issuance of such a subpoena, and the Judiciary's enforcement

of it, constitutes interference with the legislative process forbidden by the Speech or Debate

Clause.  The issuance of such subpoenas, and a judicial practice of enforcing them, also presents

a significant risk of intimidation, and upsets the checks and balances the Framers envisioned and

put in place.

 For example, as discussed above, the power to investigate and gather information

"is inherent in the power to make laws[,] because '[a] legislative body cannot legislate wisely or

effectively in the absence of information respecting the conditions which the legislation is

intended to affect or change.'"  <u>Eastland</u>, 421 U.S. at 504 (quoting <u>McGrain</u>, 273 U.S. at 175)).

Accordingly, legislative information gathering, whether formal or informal, is protected under

the Speech or Debate Clause.  <u>See</u> <u>Biaggi</u>, 853 F.2d at 103; <u>McSurely</u>, 553 F.2d at 1286-87

("[I]nformation gathering, whether by issuance of subpoenas or field work by a Senator or his

staff, is essential to informed deliberation over proposed legislation. . . . 'The acquisition of

knowledge through informal sources is a necessary concomitant of legislative conduct. . . .'")
(quoting Reinstein, <u>supra</u>, 86 Harv. L. Rev. at 1154).  A ruling that documents falling "within the
sphere of legitimate legislative activity" can be obtained through subpoena, however, presents a
significant risk of interfering with this critical legislative activity, and imperils the legislative
independence protected by the Clause.  Members or aides conducting investigations or gathering
information "in an area where legislation may be had," <u>see</u> <u>Eastland</u>, 421 U.S. at 506, "would be
forced to consider at every turn" whether documents and information collected "would
subsequently have to be produced in court [or to a Federal agency]."  <u>People's Temple</u>, 515 F.
Supp. at 249.  Congress's ability to collect necessary information concerning "an area where
legislation may be had," and sources' willingness to provide such information, would be
compromised were such a regime to be adopted.

   Enforcing a subpoena for "legislative act" documents is also contrary to the
language of the Clause, which – as the Supreme Court has repeatedly recognized – speaks in
absolute terms.  <u>See</u> <u>Eastland</u>, 421 U.S. at 503 ("once it is determined that Members are acting
within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to
interference"); <u>McMillan</u>, 412 U.S. at 324 ("The business of Congress is to legislate;
Congressmen and aides are absolutely immune when they are legislating."); <u>see</u> <u>also</u> <u>Brewster</u>,
408 U.S. at 516 ("[T]he Clause is a very large, albeit essential, grant of privilege. It has enabled
reckless men to slander and even destroy others with impunity.").  Interpreting the Clause to
permit compelled disclosure of legislative materials is also inconsistent with the Supreme
Court's directive that the Clause be read "'broadly to effectuate its purposes.'"  <u>McMillan</u>, 412
U.S. at 311 (quoting <u>Johnson</u>, 383 U.S. at 180).

Given these precedents, <u>Renzi</u> and <u>In re Fattah</u> are not persuasive to this Court. <u>Renzi</u> posits a sliding scale of protection in which "the calculus" under the Speech or Debate Clause changes, and the Executive Branch's interest supersedes that of the Legislative Branch, where (1) the underlying action is not precluded by the Clause, and (2) the Executive Branch seeks documents as part of an effort to prosecute an allegedly corrupt legislator for non-protected activity. <u>See</u> <u>Renzi</u>, 651 F.3d at 1036. The language "shall not be questioned" does not suggest a sliding scale of protection, however, nor does it suggest that the Clause's protections may be compromised where the Executive Branch seeks to compel the disclosure of legislative documents rather than a Member's testimony. To the contrary, the peremptory words "shall not" suggest that the Clause does not brook compromise, and that the Clause does not offer less protection where the Executive Branch is investigating, or purports to be investigating, a legislator's allegedly illegal activity.[18]

The approach of the <u>Renzi</u> and <u>In re Fattah</u> courts appears to be premised on the notion that the Executive Branch will always proceed in good faith, but the Framers did not proceed on that assumption.[19] Indeed, the Framers wisely assumed that each branch would seek to encroach on the authority and powers granted to the others, and intentionally adopted a separation of powers model – of which the Speech or Debate Clause is a critical component – to counteract such efforts.[20]

---

[18] When the Stuart kings brought seditious libel charges against disfavored legislators, they asserted that the legislators had engaged in criminal activity. It was in this context that the English Bill of Rights of 1689 – the intellectual predecessor of the Speech or Debate Clause – was enacted by Parliament. <u>Johnson</u>, 383 U.S. at 178, 181.

[19] "It does not undermine the validity of the Framers' concern for the independence of the Legislative Branch to acknowledge that our history does not reflect a catalogue of abuses at the hands of the Executive that gave rise to the privilege in England." <u>Brewster</u>, 408 U.S. at 508.

[20] It is agreed on all sides, that the powers properly belonging to one of the departments, ought not to be directly and completely administered by either of the

To the extent that <u>Renzi</u> asserts that <u>Helstoski</u>, <u>Johnson</u>, and <u>Gravel</u> demonstrate that no non-disclosure privilege exists under the Speech or Debate Clause, this Court disagrees. These cases do not address that issue.  For example, although the <u>Renzi</u> court states that "<u>Helstoski</u> is particularly insightful" concerning the non-disclosure privilege issue, <u>see</u> <u>Renzi</u>, 651 F.3d at 1037 – because "Congressman Helstoski [had been] compelled to turn over 'files on numerous private bills," <u>id.</u>  – the Supreme Court does not address in any fashion the propriety of this production.  <u>Helstoski</u>, <u>Johnson</u>, and <u>Gravel</u> all acknowledge and apply the Speech or Debate Clause's prohibition against the introduction of evidence of legislative acts against a Member, but these cases do not address whether the Clause grants Congress, Members, and their aides a privilege not to disclose legislative materials.  <u>See</u> <u>Helstoski</u>, 442 U.S. at 487-93; <u>Gravel</u>, 408 U.S. at 615-16; <u>Johnson</u>, 383 U.S. at 184-85.

The reasoning of <u>In re Fattah</u>, and of <u>Renzi</u> to a lesser extent, is premised on the notion that the investigation and prosecution of corrupt Members would be impossible if a non-disclosure privilege exists under the Speech or Debate Clause.  <u>See</u> <u>In re Fattah</u>, 802 F.3d at 528 ("If it were any other way, investigations into corrupt Members could easily be avoided by mere assertion of this privilege."); <u>see</u> <u>also</u> <u>Renzi</u>, 651 F.3d at 1036 (asserting that non-disclosure

---

other departments.  It is equally evident, that neither of them ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers.  It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.  After discriminating, therefore, in theory, the several classes of power, as they may in their nature be legislative, executive, or judiciary; the next, and most difficult task, is to provide some practical security for each, against the invasion of the others.  What this security ought to be, is the great problem to be solved.

The Federalist No. 48, at 256 (James Madison) (Gideon ed., 2001).

privilege would "harm legislative independence" because it would make "an investigation into unprotected activity" more difficult).

Countless successful prosecutions have been brought against corrupt legislators without resort to "legislative act" documents, however, in large part because the elements necessary to prove crimes of corruption do not involve "legislative acts." The Supreme Court made this clear in Brewster, where the defendant – a former senator – was charged with bribery:

> Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act. It is not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator. It is not an "act resulting from the nature, and in the execution, of the office." Nor is it a "thing said or done by him, as a representative, in the exercise of the functions of that office.". . . . Nor is inquiry into a legislative act or the motivation for a legislative act necessary to a prosecution under this statute or this indictment. When a bribe is taken, it does not matter whether the promise for which the bribe was given was for the performance of a legislative act as here or, as in Johnson, for use of a Congressman's influence with the Executive Branch. And an inquiry into the purpose of a bribe "does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them." . . . .
>
> Nor does it matter if the Member defaults on his illegal bargain. To make a prima facie case under this indictment, the Government need not show any act of appellee subsequent to the corrupt promise for payment, for it is taking the bribe, not performance of the illicit compact, that is a criminal act.

Brewster, 408 U.S. at 526 (citations omitted). Similarly, "[p]romises by a Member to perform an act in the future are not legislative acts." Helstoski, 442 U.S. at 489.

In sum, history demonstrates that prosecutors have all the tools necessary to prove an "'illicit compact' . . . without impinging on the legislative function" by issuing subpoenas for documents that fall within the "sphere of legitimate legislative activity." See id. (quoting Brewster, 408 U.S. at 526).

Although Speech or Debate Clause protections may make prosecutions of legislators more difficult, this effect was not lost on the Framers. See Brewster, 408 U.S. at 516

("In its narrowest scope, the Clause is a very large, albeit essential, grant of privilege.  It has enabled reckless men to slander and even destroy others with impunity, but that was the conscious choice of the Framers."); see also Helstoski. 442 U.S. at 489 ("without doubt the exclusion of [] evidence [under the Speech or Debate Clause] will make prosecutions more difficult").  And given that it is well settled that documents that fall within the "legitimate legislative sphere" cannot be used in a prosecution of a Member, see In re Fattah, 802 F.3d at 529 ("[T]he Speech or Debate Clause. . . . prohibits the evidentiary submission and use of . . . [Speech or Debate Clause privileged] documents."), it is not apparent how the recognition of a non-disclosure privilege will make prosecutions of corrupt legislators impossible.

To the extent that the In re Fattah court holds that "the Speech or Debate Clause prohibits hostile questioning [of Members] regarding legislative acts in the form of testimony to a jury, [but] does not prohibit disclosure of Speech or Debate Clause privileged documents to the Government," see id., the distinction drawn is not persuasive to this Court.  It has been clear since Kilbourn in 1880 that the Clause's protections extend beyond a Member being "questioned." Kilbourn, 103 U.S. at 202 (affirming judgment in favor of Members and concluding that they were immune from false imprisonment action premised on House contempt order).  Enforcing subpoenas for documents that fall within the "legitimate legislative sphere" promises as much or more interference with the legislative process as requiring a Member to sit for a deposition or appear in court.

This Court concludes that the Speech or Debate Clause provides a non-disclosure privilege for documents that fall within the "sphere of legitimate legislative activity."

3.     **Application of Law to SEC Subpoenas**

The Court considers below each category of documents sought by the SEC.  <u>See</u> Straub Decl., Exhs. C, D.

(a)     **documents containing communications between Sutter and <u>any member or employee of Greenberg Traurig LLP</u>**

As discussed above, the Speech or Debate Clause does not provide protection for information communicated by a Member or aide to a member of the public.  <u>See</u> <u>Hutchinson</u>, 443 U.S. at 133; <u>Gravel</u>, 408 U.S. at 625; <u>Brewster</u>, 408 U.S. at 512; <u>Chastain v. Sundquist</u>, 833 F.2d 311, 314 (D.C. Cir. 1987) ("[Member's] statements to the public . . . do not constitute legislative activity and therefore do not fall within the scope of the Speech or Debate Clause."). Accordingly, Sutter's statements to members or employees of Greenberg are not protected, and documents "relating to, referring to, describing, evidencing, reflecting or constituting" such statements must be produced.  (<u>See</u> Straub Decl., Exs. C, D)  To the extent that responsive documents reflect communications from Greenberg to Sutter that are part of the Subcommittee's informal information gathering concerning a matter that might be the subject of legislation, such documents need not be produced.  <u>McSurely</u>, 553 F.2d at 1287.  Documents that do not constitute or reflect such informal information gathering must be produced.

(b)     **documents concerning communications <u>between Sutter and CMS</u>**

This request is overbroad, because its scope goes beyond the subject matter of the SEC's investigation.  Accordingly, this request will be modified to address documents concerning communications between Sutter and CMS regarding the SGR formula, physician reimbursement rates under Medicare, and the Medicare rate announcements referenced elsewhere in the SEC subpoenas.

To the extent that documents responsive to this request – as narrowed by this Court – reflect Respondents' "cajol[ing]" or "exhort[ing] with respect to the administration of a federal statute," they must be produced.  Gravel, 408 U.S. at 625.  An "attempt to influence the [Executive Branch]" is not protected legislative activity, and documents reflecting such an effort must be produced.  Id.; see also Chastain, 833 F.2d at 315 ("attempt[s] to influence the conduct of federal agencies" are not protected activity under the Speech or Debate Clause).

Responsive documents that do not have legislation as their subject, but are merely administrative or personal in nature, are not protected and must be produced.  See Government of Virgin Islands v. Lee, 775 F.2d 514, 522 (3d Cir. 1985) ("Private conversations – even between officials of governments – do not necessarily involve official business."); Fields, 459 F.3d at 11 (personnel decisions lacking a nexus to legislative acts are beyond the scope of the Clause's protections).

To the extent that documents responsive to this request reflect the Committee's or the Subcommittee's gathering of information to aid in legislating on the issue of Medicare reimbursement rates – whether according to formal congressional processes, Eastland, 421 U.S. at 506-07, or informal efforts, Biaggi, 853 F.2d at 103 – they are protected under the Clause and need not be produced.  Moreover, internal documents between Committee Members or their staff, or between Members or staff of the Subcommittee on Health and members or staff of another congressional committee or subcommittee, are protected to the extent that they include information concerning planned future legislative activity or relate to information-gathering relevant to such activity.

To the extent that responsive documents do not fall within the "legitimate legislative sphere," as discussed earlier in this opinion, they must be produced.

> **(c)** **documents concerning communications to, from, copying, or blind-copying Sutter concerning (i) the preliminary 2014 Medicare Advantage payment rates announced by CMS on February 15, 2013, and/or (ii) the final 2014 Medicare Advantage payment rates announced by CMS on April 1, 2013**

The guidelines discussed above apply with equal force here. Documents that evidence legislative activity, including the gathering of information to aid in legislating, are protected under the Clause. However, a responsive document that lacks a sufficient connection to legislative activity – for example, because it documents an instance of "cajol[ing]" the Executive Branch, Gravel, 408 U.S. at 625, a personal communication, Lee, 775 F.2d at 522, or the administrative functioning of the Committee or Subcommittee, Fields, 459 F.3d at 10-11 – is not protected and must be produced.

> **(d)** **documents concerning communications to, from, copying, or blind-copying Sutter concerning the potential confirmation of Marilyn Tavenner as CMS Administrator by the U.S. Senate**

A House committee or subcommittee has no direct role to play in connection with the confirmation of a Presidential nominee. Accordingly, documents responsive to this request fall outside the sphere of "legislative activity" protected by the Clause, unless these documents concern, refer, or relate to a legislative plan related to Tavenner's confirmation.

Respondents argue that documents relating to Tavenner's confirmation "would be relevant to actions CMS might take under her leadership (if confirmed), and thus to whether legislation might be needed to ensure that CMS would adhere to the Committee's policy preferences. . . ." (Resp. Br. (Dkt. No. 17) at 34) Such documents are protected only to the extent that they reflect a linkage between Tavenner's confirmation and a need for legislation, however. Absent such linkage, the connection to legislation is too attenuated to constitute an "'integral part of the deliberative and communicative processes by which Members participate in

66

committee and House proceedings.'"  Eastland, 421 U.S. at 504 (quoting Gravel, 408 U.S. at 625).  As a general matter, the Supreme Court has rejected efforts to bring within the Clause's protection activities in which legislators can claim no legislative participation; the effect that such activities would have on future legislative plans has not been viewed as sufficient to justify protection under the Clause.  Hutchinson, 443 U.S. at 133 (communications with constituents); Johnson, 383 U.S. at 172 (attempts to influence the Department of Justice).

<blockquote>

**(e)     telephone records, including without limitation mobile phone records, concerning Sutter's work telephones**

</blockquote>

The SEC subpoenas seek disclosure of Sutter's personal and work telephone numbers and email addresses.  This information is not even arguably legislative, and it must be produced.

As to records concerning Sutter's work telephones, Respondents argue that "[b]ecause Committee toll records would reveal to whom Mr. Sutter was speaking in the course of his employment, the date and time at which he was speaking to that person, and the duration and frequency of such calls, they are Speech or Debate protected."  (Resp. Br. (Dkt. No. 17) at 38)  This argument reflects a misapprehension as to the scope of the Clause's protection.

The Clause does not protect a myriad of activities that may hint at a Member's legislative plans, including activities that are public in nature (e.g., "'news letters' to constituents," Brewster, 408 U.S. at 512) as well as those intended to remain confidential (e.g., agreeing to accept a bribe in exchange for a favorable vote, id. at 527).  Accordingly, the relevant inquiry is not whether knowledge of an activity would permit someone to infer a Member's legislative plans, but rather whether the activity at issue is legislative in nature.  If the underlying activity is legislative in nature, it is protected.  If the underlying activity is not legislative in nature, it is not protected.

Courts have acknowledged that telephone calls memorialized in subpoenaed telephone records may constitute legislative acts, but these courts have nonetheless concluded that it is not appropriate to apply a blanket privilege to the telephone records of Members and their aides.  See In re Grand Jury Investigation, 587 F.2d 589, 595 (3d Cir. 1978) ("[W]e reject . . . [the Congressman's] basic position[] that because some of the calls reflected in a telephone bill reflect legislative acts the entire bill should be suppressed."); In re Possible Violations of 18 U.S.C. §§ 201, 371, 491 F. Supp. 211, 212-14 (D.D.C. 1980) (grand jury subpoena to congressional aide for, inter alia, a "telephone message book"; requiring Congressman to submit a privilege log listing "all material which is an 'integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings . . . .'"; ordering that an in camera hearing would be conducted to consider whether the records were privileged under the Speech or Debate Clause) (quoting Gravel, 408 U.S. at 625).[21]

A similar procedure will be utilized here.  Responsive records are to be produced subject to redaction.  To the extent that telephone records are redacted, Respondents will

_____

[21]  United Transp. Union v. Springfield Terminal Ry. Co., Civ. Nos. 87-03442 P, 88-0117 P., 1989 WL 38131 (D. Me. Mar. 13, 1989), cited by Respondents (Resp. Br. (Dkt. No. 17) at 38), is consistent with the cases discussed above.  Although the United Transp. Union court found that the subpoenas for telephone records in that case were unduly burdensome – and suggested that the party requesting production limit its request to "the specific telephone numbers of persons or groups involved in the underlying dispute" – the court ruled that "[t]elephone logs[,] . . . message slips[,] [telephone bills, and telephone company records] pertaining to the requested subjects should be provided [but] should be re[d]acted, if necessary, to excise evidence of legislative acts."  United Transp. Union, 1989 WL 38131, at *3, 5.  Once a narrower category of responsive documents had been identified, the Senator and Congressman who were the recipients of the subpoenas would have an opportunity, before production, to "make claims of privilege [by affidavit] for those records which document legislative acts."  Id. at *5 (citing In re Grand Jury Investigation, 587 F.2d at 597).

In sum, United Transp. Union does not hold that a blanket privilege under the Speech or Debate Clause applies to Congressional telephone records.  As to burden, Respondents have not demonstrated that the subpoenas at issue are unduly burdensome.

demonstrate by affidavit that the redacted material documents a call that is a legislative act.  See

In re Grand Jury Investigation, 587 F.2d at 597.

> **(f)** **documents created by Sutter or in Sutter's files, including without limitation handwritten notes and calendar entries, concerning (i) [Greenberg employees] Hayes, Taylor, or White; (ii) the Medicare Advantage Rates; and/or (iii) the potential confirmation of Marilyn Tavenner as CMS Administrator by the U.S. Senate**

This request is a catch-all provision that is duplicative of one or more of the

requests cited above.  Production of documents in response to this request is governed by the

rulings set forth above.[22]

### 4.      Submission of a Privilege Log

Responsive documents that do not fall within the "legitimate legislative sphere"

must be produced.  To the extent Respondents believe that responsive documents are protected

by the Speech or Debate Clause, they are directed to list those documents in a privilege log.

This Court has endeavored to provide sufficient guidance to permit Respondents

to produce unprivileged, responsive documents.  To the extent that (1) the Court has not

provided sufficient guidance, or (2) the SEC challenges Respondents' privilege designations, this

Court may conduct an in camera review of documents withheld on privilege grounds.  See

Rayburn, 497 F.3d at 658 (remanding with instructions that the district court "'review in camera

any specific documents or records identified as legislative and make findings regarding whether

the specific documents are legislative in nature'"); Jewish War Veterans, 506 F. Supp. 2d at 62

(rejecting "the Members' contention that the Constitution categorically bars courts from deciding

---

[22]  Sutter's deposition will likewise be governed by the Court's rulings concerning the production of documents.  Sutter need not testify about matters that fall within the "legitimate legislative sphere," but he is required to testify concerning matters that this Court has ruled fall outside of this protected area.

whether individual documents are legislative in nature, and hence within the ambit of the Speech or Debate Clause"); see also Benford v. American Broadcasting Companies., Inc., 98 F.R.D. 42, 45 (D. Md. 1983) (rejecting argument that the court should "blindly accept [Members'] conclusory and seemingly self-serving suggestion that they will screen what is and what is not protected [under the Speech or Debate Clause]") (emphasis in original), rev'd on jurisdictional grounds by In re Guthrie, 733 F.2d 634, 639 (4th Cir. 1984) (finding that the district court lacked jurisdiction to issue the subpoenas at issue).  Whether in camera review is necessary will become more clear after Respondents respond to this Opinion and Order.  See Jewish War Veterans, 506 F. Supp. 2d at 62.

### F.   The "Exceptional Circumstances" Doctrine

Respondents argue that the SEC is required to demonstrate that "exceptional circumstances" exist which justify taking Sutter's deposition, and that the Commission has not done so.  (Resp. Br. (Dkt. No. 17) at 39)

#### 1.   Legal Standard

In Lederman v. New York City Dept. of Parks and Recreation, 731 F.3d 199 (2d Cir. 2013), the Second Circuit held that "to depose a high-ranking government official, a party must demonstrate exceptional circumstances justifying the deposition – for example, that the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means."  Lederman, 731 F.3d at 203 (citing Bogan v. City of Boston, 489 F.3d 417, 423 (1st Cir. 2007); In re United States (Reno & Holder), 197 F.3d 310, 316 (8th Cir. 1999)).  "High-ranking government officials are generally shielded from depositions because they have 'greater duties and time constraints than other witnesses.'"  Id. (quoting In re United States (Kessler), 985 F.2d 510, 512 (11th Cir.

70

1993)).  "If courts did not limit these depositions, such officials would spend 'an inordinate amount of time tending to pending litigation.'"  Id. (quoting Bogan, 489 F.3d at 423).

"This doctrine applies to both current and former high-ranking officials."  Moriah v. Bank of China Ltd., No. 12 Civ. 1594(SAS), 2014 WL 7183962, at *2 (S.D.N.Y. Dec. 17, 2014) (citing Lederman, 731 F.3d at 203).  "Although the doctrine applies to former officials, the fact that they are not current high-ranking officials is a factor when considering whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties."  Id. (citing United States v. Sensient Colors, Inc., 649 F. Supp. 2d 309, 322, 325-27 (D.N.J. 2009)).

## 2.   **Analysis**

### a.      **Applicability of the "Exceptional Circumstances" Doctrine**

As an initial matter, this Court must determine whether Sutter – in serving as Staff Director for the Health Subcommittee of the Ways and Means Committee – qualifies as a "high-ranking government official" under Lederman.

"Whether an official is a 'high ranking government officer' . . . is determined on a 'case-by-case basis.'"  McNamee v. Massachusetts, No. 12-40050-FDS, 2012 WL 1665873, at *2 (D. Mass. May 10, 2012) (quoting Sensient Colors, Inc., 649 F. Supp. at 321).  "The doctrine certainly is not limited to constitutional officers of the United States."  Id. (citing Toussie v. County of Suffolk, No. CV 05-1814(JS)(ARL), 2006 WL 1982687, at *1 (E.D.N.Y. July 13, 2006)).

Respondents argue that, in his Staff Director position, Sutter was "responsible, on a day-to-day basis, for the Committee's work on many of the most important health policy issues of our day, including issues that encompass Medicare, the changes imposed on that program via

the Affordable Care Act, and oversight of the Executive Branch agencies . . . through which flow billions of taxpayer dollars marked for the health care of millions of Americans." (Resp. Br. (Dkt. No. 17) at 41) Respondents also note that the House classified Sutter as "very senior staff" "for purposes of various internal reporting requirements." (Id.) The SEC responds that the "very senior staff" designation "applies to all congressional staff earning at least 75% of Members' salaries," and that this designation applies to "hundreds of congressional staffers." (SEC Reply Br. (Dkt. No. 21) at 29 n.20)

A survey of the relevant case law indicates that a staff director of a congressional subcommittee does not qualify as a "high-ranking government official" for purposes of the "exceptional circumstances" doctrine. This designation has generally only been applied to government officials who are at the apex of their organization. See, e.g., Lederman, 731 F.3d at 203-04 (New York City mayor and former Deputy Mayor are high-ranking government officials); Bogan, 489 F.3d at 423 (Boston mayor is a high-ranking government official); In re United States (Reno & Holder), 197 F.3d at 314 (Attorney General and Deputy Attorney General are high-ranking government officials); In re F.D.I.C., 58 F.3d 1055, 1059-60 (5th Cir. 1995) (members of the FDIC's Board of Directors are high-ranking government officials); In re United States (Kessler), 985 F.2d at 512 (Commissioner of the Food and Drug Administration is a high-ranking government official); Franklin Sav. Ass'n v. Ryan, 922 F.2d 209, 209, 211 (4th Cir. 1991) (Director of the Office of Thrift Savings is a high-ranking government official); Simplex Time Recorder Co. v. Secretary of Labor, 766 F.2d 575, 586 (D.C. Cir. 1985) (the Solicitor of the U.S. Department of Labor, the Secretary of Labor's chief of staff, the Regional Administrator for the Occupational Safety and Health Administration ("OSHA"), and OSHA's Area Director are high-ranking government officials).

With respect to Congressional staff, the designation has been applied to a Congressman's chief of staff, see McNamee, 2012 WL 1665873, at *1-2, but research has not revealed any case in which the staff director of a House subcommittee has been found to be a "high-ranking government official" for purposes of the "exceptional circumstances" doctrine. The Committee's Health Subcommittee is one of six subcommittees of the Ways and Means Committee, which itself is one of dozens of House committees.[23]  As Staff Director of the Health Subcommittee, this Court concludes that Sutter was not a "high-ranking government official" for purposes of the "exceptional circumstances" doctrine.

### b.   Even if the "Exceptional Circumstances" Doctrine Applied, it Would Not Preclude Sutter's Deposition

"Like the determination of whether an individual is a high-ranking government official, the determination of whether extraordinary circumstances exist is done on a case-by-case basis."  Sensient Colors, Inc., 649 F. Supp. 2d at 322.  Several factors – including the rationale for the "exceptional circumstances" doctrine, Sutter's resignation from his former position, and his personal knowledge of the subject matter of the SEC subpoenas – indicate that "exceptional circumstances" exist for deposing Sutter.

In United States v. Morgan, 313 U.S. 409 (1941), the Supreme Court explained why certain high-ranking government officials should not be compelled to testify:

> [The Secretary of Agriculture] was questioned at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates. . . . The proceeding [in this case] has a quality resembling that of a judicial proceeding. . . . Such an examination of a judge would be destructive of judicial responsibility.  We have explicitly held in this very litigation that it was not the function of the court to probe the mental processes of the Secretary. . . . Just as a judge cannot be

---

[23]  See Committees, United States House of Representatives, http://www.house.gov/committees/ (last visited Nov. 11, 2015).

subjected to such a scrutiny, so the integrity of the administrative process must be equally respected.

Morgan, 313 U.S. at 422 (internal citations and quotation marks omitted).  In stating that the "mental processes of the Secretary" should not have been probed, the Court indicated that "regular examination of high officials concerning the reasons for their official actions would undermine the integrity of the administrative process."  In re United States (Reno & Holder), 197 F.3d at 313 (citing Morgan, 313 U.S. at 422).

Subsequent case law regarding the "exceptional circumstances" doctrine demonstrates that the purpose of the doctrine is to protect the integrity of the administrative or legislative process.  See Franklin Sav. Ass'n, 922 F.2d at 211 ("'This salutary rule forecloses investigation into the methods by which a decision is reached, the matters considered, the contributing influences, or the role played by the work of others – results demanded by the exigencies of the most imperative character.  No judge could tolerate an inquisition into the elements comprising his decision – indeed, '[s]uch an examination of a judge would be destructive of judicial responsibility' – and by the same token 'the integrity of the administrative process must be equally respected.'") (quoting Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, 325-26 (D.D.C. 1966) (quoting Morgan, 313 U.S. at 422)) (emphasis omitted); see also Lederman, 731 F.3d at 203 ("[A] high-ranking government official should not – absent exceptional circumstances – be deposed or called to testify regarding the reasons for taking official action. . . ."); Simplex Time Recorder Co., 766 F.2d at 586 ("[T]op executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.") (citing Morgan, 313 U.S. at 422); Warren Bank v. Camp, 396 F.2d 52, 56 (6th Cir. 1968) ("What appellant seems to us to seek is an opportunity to depose

74

the Comptroller in order to probe his mind as to exactly why he saw fit to exercise his discretion as he did in relation to the grant of this charter.  This appellant clearly was not entitled to do.").

Morgan and its progeny make clear that the "exceptional circumstances" doctrine is premised on the notion that high-ranking officials should not be required to testify regarding their official decision-making processes.  There is no evidence here, however, that the SEC intends to question Sutter about anyone's decision-making process.  The primary focus of the SEC's inquiry as to Sutter appears to be whether Sutter informed a Greenberg employee – prior to CMS's public announcement – that CMS had incorporated in its Rate Announcement the assumption that Congress would override the scheduled 25% reduction in Medicare payments to physicians.  In seeking to elicit testimony concerning this issue, the SEC does not seek to discover Sutter's "reasons for taking official action," see Lederman, 731 F.3d at 203, nor does it appear that eliciting such testimony will compromise the integrity of the legislative process in any way.

The other rationale for the "exceptional circumstances" doctrine – the need to "protect officials from the constant distraction of testifying in lawsuits" by requiring that "a special need or situation compelling such testimony" be shown – is also not applicable.  See In re United States (Kessler), 985 F.2d at 512; see also Lederman, 731 F.3d at 203 ("High-ranking government officials are generally shielded from depositions because they have 'greater duties and time constraints than other witnesses.' . . . If courts did not limit these depositions, such officials would spend 'an inordinate amount of time tending to pending litigation.'") (quoting In re United States (Kessler), 985 F.2d at 512; Bogan, 489 F.3d at 423).  Given that Sutter has resigned from his position on the Subcommittee, he no longer has government duties with which a deposition might interfere.  See Moriah, 2014 WL 7183962, at *2 ("[T]he fact that [a proposed

deponent is] not [a] current high-ranking official[] is a factor when considering whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties.").

Sutter also has "unique first-hand knowledge" about whether he communicated with anyone at Greenberg Traurig regarding CMS's plan to incorporate into its Rate Announcement the assumption that Congress would override the scheduled 25% reduction in Medicare payments to physicians. See Lederman, 731 F.3d at 203.

In sum, even if Sutter were a former "high-ranking government official," the "exceptional circumstances" doctrine would not prevent the SEC from deposing him, because (1) the rationales for the "exceptional circumstances" doctrine do not apply here; (2) the information sought cannot be obtained through other, less burdensome means; and (3) Sutter has unique personal knowledge of the subject matter of the proposed deposition.

## CONCLUSION

Respondents' motion to dismiss or to transfer this action is denied. The SEC's application for an order requiring compliance with the investigative subpoenas served on Respondents is granted in part and denied in part as set forth above. Respondents are ordered to comply with the SEC's subpoenas – as limited by this Court – within ten days. Any privilege log will likewise be submitted to this Court and to the SEC within ten days. The Clerk of the Court is respectfully directed to terminate the motions (Dkt. Nos. 14, 25).

Dated: New York, New York
      November 13, 2015

                                    SO ORDERED.

                                      Paul G. Gardephe
                                      United States District Judge